QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Bruce E Van Dalsem (Bar No. 124128)
  brucevandalsem@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443 3000
Facsimile:    (213) 443 3100

  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| AMBER DOE,<br><br>             Plaintiff,<br><br>      v.<br><br>MICHAEL LEWIS GOGUEN et al.,<br><br>             Defendants. | Case No. 2:23-cv-02280-MEMF-SK<br><br>Hon. Maame Ewusi-Mensah Frimpong<br>Referral: Hon. Steve Kim<br><br>**DECLARATION OF KYLE BATTER IN SUPPORT OF DEFENDANT MICHAEL LEWIS GOGUEN'S *EX PARTE* APPLICATION FOR ORDER SEALING THE COMPLAINT [ECF NO. 1]** |

I, Kyle Batter, declare as follows:

1.     I am an attorney licensed to practice in the State of California and am admitted to practice before this Court.  I am an associate with the law firm Quinn Emanuel Urquhart & Sullivan, LLP, and counsel for Defendant Michael Lewis Goguen in the above-captioned matter.  I have personal knowledge of the matters set forth in this declaration, and if called as a witness I would testify competently to those matters.

2.     I am submitting this declaration in support of Mr. Goguen's *Ex Parte* Application for Order Sealing the Complaint (ECF No. 1).

3.     On March 6, 2023, the Honorable Elizabeth K. Lee of the Superior Court of California, San Mateo County, issued a Civil Harassment Restraining Order ("Restraining Order"), restraining Amber Laurel Baptiste from repeating certain false and defamatory statements concerning Mr. Goguen.  Attached hereto as **Exhibit A**, is a true and correct copy of that Restraining Order.

4.     On March 8, 2016 Ms. Baptiste filed a lawsuit in San Mateo Superior Court against Mr. Goguen for breach of contract, alleging among other things that Mr. Goguen was engaged in human trafficking, sexually assaulted her, and conspired to commit murder for hire (the "San Mateo action").  Mr. Goguen filed a cross-complaint in that action on March 14, 2016.

5.     On September 12, 2019, the Discovery Referee in the San Mateo action issued an order dismissing Ms. Baptiste's complaint in its entirety.  Attached hereto as **Exhibit B**, is a true and correct copy of that September 12, 2019 Order.

6.     After a trial before the Honorable Danny Y. Chou, on January 24, 2020, the San Mateo Superior Court issued a Final Statement of Decision regarding Mr. Goguen's cross-complaint.  Attached hereto as **Exhibit C**, is a true and correct copy of that January 24, 2020 Final Statement of Decision.

7.     On October 13, 2022, Baptiste filed Motion to Vacate Default and Default Judgment in the San Mateo Superior Court, which was over 1,000 pages long.  Mr. Goguen moved to seal that Motion and, on January 6, 2023, the Court granted Mr.

Goguen's motion to seal.  Attached hereto as **Exhibit D** is a true and correct copy of that January 6, 2023 Order.

8.     Based on my work representing Mr. Goguen in the San Mateo action, I am aware that Amber Baptiste uses the email address "amberlitigate@gmail.com" and that a mailing address for Amber Baptiste in the San Mateo action is 8306 Wilshire Blvd., Ste. 2020 Beverly Hills, CA 90211.  Attached hereto as **Exhibit E** is a true and correct copy of a Proof of Service filed on February 14, 2023 in the San Mateo Superior Court showing this email address and mailing address.  This email address and mailing address are set forth on Page 1 of the Complaint filed in this action as the contact information for "Amber Doe."

9.     On April 5, 2023 I contacted Amber Baptiste using the email address "amberlitigate@gmail.com," which is listed on the Complaint as Plaintiff's notice address. Attached hereto as **Exhibit F** is a true and correct copy of my email to Baptiste. In my email, I informed Baptiste that the contents of the Complaint violate the March 6, 2023 Restraining Order entered by the Superior Court of California, San Mateo County and, as a courtesy, provided an additional copy of that order to Baptiste. Pursuant to Local Rule 7-19, my email also provided notice of Mr. Goguen's intention to file this *ex parte* Application to Seal today and requested Baptiste's position on the motion.  Baptiste has not responded as of the time of filing.

10.     Since docketing the Complaint on March 28, 2023, Baptiste has begun circulating it to multiple individuals via email. The text of her email includes additional prohibited commentary under the Restraining Order, including false assertions that Mr. Goguen is a "trafficker" and "raped [her]."  Attached hereto as **Exhibit G** is a true and correct copy of an email sent by Baptiste on April 5, 2023 bearing the subject "Depositions and Defendants Interested parties."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  April 5, 2023

By  _/s/ Kyle Batter_
Kyle Batter

# Exhibit A

**CH-130**

## Civil Harassment Restraining Order After Hearing

Clerk stamps date here when form is filed.

**FILED**
SAN MATEO COUNTY

MAR – 6 2023

Clerk of the Superior Court
By _____
DEPUTY CLERK

*Person in ① must complete items ①, ②, and ③ only.*

① **Protected Person**
   a. Your Full Name: MICHAEL GOGUEN

   Your Lawyer *(if you have one for this case)*
   Name: DIANE DOOLITTLE          State Bar No.: 142046
   Firm Name: QUINN EMANUEL URGUHART & SULLIVAN, LLP
   b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or email.)*
   Address: 555 TWIN DOLPHIN DR. 5TH FLOOR
   City: REDWOOD SHORES          State: CA     Zip: 94065
   Telephone: (650) 801 5000          Fax: (650) 801 5100
   Email Address: DIANEDOOLITTLE@QUINNEMANUEL.COM

Fill in court name and street address:

Superior Court of California, County of
SAN MATEO
400 COUNTY CENTER
REDWOOD CITY, CA 94063

*Court fills in case number when form is filed.*

Case Number:
CIV537691

② **Restrained Person**
   *(Give all the information you know. Information with a star (*) is required to add this order to the California police database. If age is unknown, give an estimate.)*

   | | |
   |---|---|
   | *Full Name: AMBER LAUREL BAPTISTE | *Age: 42  Date of Birth: 10/18/1980 |
   | *Race: BL          Height: 5 ft 7 in  Weight: 120 lbs | Hair Color: Brown     Eye Color: Brown |
   | *Gender: ☐ M  ☒ F  ☐ Nonbinary  Home Address: | |
   | City: Los Angeles          State: CA     Zip: | |
   | Relationship to Protected Person: NONE | |

③ ☐ **Additional Protected Persons**
   In addition to the person named in ①, the following family or household members of that person are protected by the orders indicated below:

   | Full Name | Gender | Age | Lives with you? | How are they related to you? |
   |---|---|---|---|---|
   | JAMIE STEPHENSON GOGUEN | F | 40 | ☒ Yes ☐ No | WIFE |
   | | | | ☐ Yes ☐ No | |
   | | | | ☐ Yes ☐ No | |
   | | | | ☐ Yes ☐ No | |

   ☐ *Check here if there are additional persons. List them on an attached sheet of paper and write "Attachment 3— Additional Protected Persons" as a title. You may use form MC-025, Attachment.*

④ **Expiration Date**
   *This Order, except for any award of lawyer's fees, expires at*

   Time: 3/6/2026 ☐ a.m. ☐ p.m. ☐ midnight on *(date):* _____

   If no expiration date is written here, this Order expires three years from the date of issuance.

**This is a Court Order.**

Judicial Council of California, www.courts.ca.gov
Rev. January 1, 2023, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9
Approved by DOJ

**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
**(Civil Harassment Prevention)**

CH-130, Page 1 of 6
→

**Case Number:** CIV537691

(5) **Hearing**

a. There was a hearing on *(date):* 03/06/2023 at *(time):* 9 A.M. in Dept.: 17 Room: 2K
   *(Name of judicial officer):* JUDGE ELIZABETH K. LEE made the orders at the hearing.

b. These people were at the hearing:

   (1) ☐ The person in ①.  (3) ☒ The lawyer for the person in ① *(name):* DIANE DOOLITTLE

   (2) ☐ The person in ②.  (4) ☐ The lawyer for the person in ② *(name):* _____

   ☐ Additional persons present are listed at the end of this Order on Attachment 5.

c. ☐ The hearing is continued. The parties must return to court on *(date):* _____ at *(time):* _____.

### To the Person in ❷

**The court has granted the orders checked below. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.**

(6) ☒ **Personal Conduct Orders**

a. You must **not** do the following things to the person named in ①

   ☒ and to the other protected persons listed in ③:

   (1) ☒ Harass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of the person.

   (2) ☑ Contact the person, either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by email, by text message, by fax, or by other electronic means.

   (3) ☑ Take any action to obtain the person's address or location. If this item (3) is not checked, the court has found good cause not to make this order.

   (4) ☐ Other *(specify):*
       ☐ Other personal conduct orders are attached at the end of this Order on Attachment 6a(4).
       _____

b. Peaceful written contact through a lawyer or process server or other person for service of legal papers related to a court case is allowed and does not violate this Order.

(7) ☒ **Stay-Away Orders**

a. You **must** stay at least 50 yards away from *(check all that apply):*

   (1) ☒ The person in ①.

   (2) ☒ Each person in ③.

   (3) ☒ The home of the person in ①.

   (4) ☒ The job or workplace of the person in ①.

   (5) ☐ The school of the person in ①.

   (6) ☐ The school of the children of the person in ①.

   (7) ☐ The place of child care of the children of the person in ①.

   (8) ☒ The vehicle of the person in ①.

   (9) ☐ Other *(specify):*
       _____
       _____
       _____
       _____

b. This stay-away order does not prevent you from going to or from your home or place of employment.

### This is a Court Order.

Case Number:
CIV 537691

**8** **No Firearms (Guns), Firearm Parts, or Ammunition**

a. You cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get any prohibited items listed below in b.

b. **Prohibited items are:**

(1) Firearms (guns);

(2) Firearm parts, meaning receivers and frames, or any item that may be used as or easily turned into a receiver or frame (see Penal Code section 16531); and

(3) Ammunition.

c. If you have not already done so, you must:

- Within 24 hours of being served with this Order, sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any firearms (guns) and firearm parts in your custody or control or that you possess or own.

- File a receipt with the court within 48 hours of receiving this Order that proves that your firearms (guns) and firearm parts have been turned in, sold, or stored. (You may use *Receipt for Firearms and Firearm Parts* (form CH-800) for the receipt.)

d. ☐ The court has received information that you own or possess a firearm (gun), firearm parts, or ammunition.

e. ☐ The court has made the necessary findings and applies the firearm relinquishment exemption under Code of Civil Procedure section 527.9(f). Under California law, the person in **2** is not required to relinquish this firearm *(specify make, model, and serial number of firearm(s)):* _____

_____

The firearm must be in his or her physical possession only during scheduled work hours and during travel to and from his or her place of employment. Even if exempt under California law, the person in **2** may be subject to federal prosecution for possessing or controlling a firearm.

**9** ☐ **Lawyer's Fees and Costs**

The person in ___ must pay to the person in ___ the following amounts for

☐ lawyer's fees     ☐ costs:

| Item | Amount | Item | Amount |
|------|--------|------|--------|
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |

☐ Additional items and amounts are attached at the end of this Order on Attachment 9.

**10** ☐ **Possession and Protection of Animals**

a. ☐ The person in **1** is given the sole possession, care, and control of the animals listed below, which are owned, possessed, leased, kept, or held by him or her, or reside in his or her household. *(Identify animals by, e.g., type, breed, name, color, sex.)*

_____

_____

b. ☐ The person in **2** must stay at least _____ yards away from, and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of, the animals listed above.

**This is a Court Order.**

Case Number: CIV537691

(11) ☒ **Other Orders** *(specify):*

See attachment 11

☒ Additional orders are attached at the end of this Order on Attachment 11.

## To the Person in ❶:

(12) **Mandatory Entry of Order Into CARPOS Through CLETS**

This Order must be entered into the California Restraining and Protective Order System (CARPOS) through the California Law Enforcement Telecommunications System (CLETS). *(Check one):*

a. ☐ The clerk will enter this Order and its proof-of-service form into CARPOS.

b. ☐ The clerk will transmit this Order and its proof-of-service form to a law enforcement agency to be entered into CARPOS.

c. ☐ By the close of business on the date that this Order is made, the person in ❶ or his or her lawyer should deliver a copy of the Order and its proof-of-service form to the law enforcement agency listed below to enter into CARPOS:

Name of Law Enforcement Agency                Address *(City, State, Zip)*

☐ Additional law enforcement agencies are listed at the end of this Order on Attachment 12.

(13) **Service of Order on Restrained Person**

a. ☐ The person in ❷ personally attended the hearing. No other proof of service is needed.

b. ☒ The person in ❷ did not attend the hearing.

(1) ☒ Proof of service of form CH-110, *Temporary Restraining Order,* was presented to the court. The judge's orders in this form are the same as in form CH-110 except for the expiration date. The person in ❷ must be served with this Order. Service may be by mail.

(2 The judge's orders in this form are different from the temporary restraining orders in form CH-110. Someone—but not anyone in ❶ or ❸—must personally serve a copy of this Order on the person in ❷. or in any manner previously agreed upon by the person in ❷

(14) ☐ **No Fee to Serve (Notify) Restrained Person**

The sheriff or marshal will serve this Order without charge because:

a. ☐ The Order is based on unlawful violence, a credible threat of violence, or stalking.

b. ☐ The person in ❶ is entitled to a fee waiver.

(15) Number of pages attached to this Order, if any: 1

Date: 3/6/2023 _____        _____
                                               *Judicial Officer*

## This is a Court Order.

Case Number: CIV537691

## Warning and Notice to the Restrained Person in ❷ :

### You Cannot Have Firearms (Guns), Firearm Parts, or Ammunition

Unless item 8e is checked, you cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get any prohibited items listed in item 8b on page 3 while this Order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any firearms (guns) and firearm parts that you have or control as stated in item ⑧ above. The court will require you to prove that you did so.

## Instructions for Law Enforcement

### Enforcing the Restraining Order

This Order is enforceable by any law enforcement agency that has received the Order, is shown a copy of the Order, or has verified its existence on the California Restraining and Protective Order System (CARPOS). If the law enforcement agency has not received proof of service on the restrained person, and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the Order and then must enforce it. Violations of this Order are subject to criminal penalties.

### Start Date and End Date of Orders

This Order *starts* on the date next to the judge's signature on page 4 and *ends* on the expiration date in item ④ on page 1.

### Arrest Required If Order Is Violated

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed it, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6. Agencies are encouraged to enter violation messages into CARPOS.

### Notice/Proof of Service

The law enforcement agency must first determine if the restrained person had notice of the order. Consider the restrained person "served" (given notice) if (Pen. Code, § 836(c)(2)):

• The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
• The restrained person was at the restraining order hearing or was informed of the order by an officer.

An officer can obtain information about the contents of the order and proof of service in CARPOS. If proof of service on the restrained person cannot be verified and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the order and then enforce it.

### If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, this Order remains in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

## This is a Court Order.



Case Number:
CIV53769/

## Conflicting Orders—Priorities for Enforcement

**If more than one restraining order has been issued protecting the protected person from the restrained person, the orders must be enforced in the following priority** (see Pen. Code, § 136.2 and Fam. Code, §§ 6383(h)(2), 6405(b)):

1. *Emergency Protective Order (EPO):* If one of the orders is an *Emergency Protective Order* (form EPO-001), provisions (e.g., stay-away order) that are more restrictive than in the other restraining/protective orders must be enforced. Provisions of another order that do not conflict with the EPO must be enforced.

2. *No-Contact Order:* If a restraining/protective order includes a no-contact order, the no-contact order must be enforced. Item 6a(2) is an example of a no-contact order.

3. *Criminal Protective Order (CPO):* If none of the orders include an EPO or a no-contact order, the most recent CPO must be enforced. (Fam. Code, §§ 6383(h)(2) and 6405(b).) Additionally, a CPO issued in a criminal case involving charges of domestic violence, Penal Code sections 261, 261.5, or former 262, or charges requiring sex offender registration must be enforced over any civil court order. (Pen. Code, § 136.2(e)(2).) All provisions in the civil court order that do not conflict with the CPO must be enforced.

4. *Civil Restraining Orders:* If there is more than one civil restraining order (e.g., domestic violence, juvenile, elder abuse, civil harassment), then the order that was issued last must be enforced. Provisions that do not conflict with the most recent civil restraining order must be enforced.

*(Clerk will fill out this part.)*
**—Clerk's Certificate—**

I certify that this *Civil Harassment Restraining Order After Hearing* is a true and correct copy of the original on file in the court.

Date: ___MAR – 6 2023___   Clerk, by _____ NEAL TANIGUCHI _____, Deputy

**This is a Court Order.**

# Attachment 11

Baptiste is restrained from repeating the following false and defamatory statements, under her own name or under any pseudonym, that she has previously made in her social media posts:

(1)     Goguen purchased Baptiste when she was a young girl from an organized crime syndicate;

(2)     Goguen raped, sodomized, or abused Baptiste or any other women;

(3)     Goguen infected Baptiste or any other women with a sexually transmitted disease, including HPV;

(4)     Goguen kept Baptiste as a sex slave;

(5)     Goguen tore, ruptured, or perforated Baptiste's anal canal during sex, or that he left her bleeding and unable to evacuate her bowels;

(6)     Goguen stalked or harassed Baptiste or any other persons.

(7)     Goguen engaged in human trafficking, sex trafficking, sex slavery, or child sex tourism;

(8)     Goguen is a pedophile, psychopath, pervert, or sexual deviant;

(9)     Goguen forced numerous women to have abortions;

(10)    Goguen committed or solicited murder;

(11)    Goguen bribed the Court, attorneys, or law enforcement;

(12)    Goguen tampered with evidence to hide his crimes;

(13)    Goguen married multiple prostitutes;

(14)    Goguen committed tax evasion or tax fraud;

(15)    Goguen silenced victims through nondisclosure agreements or any other means;

(16)    Jamie Goguen is a prostitute;

(17)    Jamie Goguen cyberbullies Baptiste or any other rape or trafficking victim; and

(18)    Jamie Goguen instructs her friends to make false social media posts about Baptiste.

Notwithstanding the above, Baptiste is not restrained from presenting her grievance to government officials.

# Exhibit B

Hon. Read Ambler (Ret.)
State Bar No. 44156
JAMS
160 West Santa Clara Street - Suite 1600
San Jose, California 95113
(408) 288-2240
(408) 295-5267 (Fax)

Cal. Civ. Proc. Code § 638 Discovery Referee

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SANTA MATEO**

| | |
|---|---|
| AMBER LAUREL BAPTISTE, | CASE NO.: CIV 537691 |
| Plaintiff, | **DISCOVERY REFEREE ORDER NO. 30 GRANTING DEFENDANT AND CROSS-COMPLAINANT MICHAEL GOGUEN'S MOTION FOR TERMINATING SANCTIONS** |
| v. | |
| MICHAEL GOGUEN, | |
| Defendant. | |
| AND RELATED CROSS-ACTION | |

On August 19, 2019, Defendant and Counter-Claimant Michael L. Goguen ("Goguen" or "Defendant") filed a motion for terminating sanctions against Plaintiff and Cross-Defendant Amber Baptiste ("Baptiste" or "Plaintiff"). Baptiste did not file an opposition to the motion. A hearing on the motion was held on September 11, 2019. Counsel appeared on behalf of Goguen. Baptiste did not appear at the hearing. Having considered Goguen's papers, the arguments of counsel, and the record of the proceedings before the undersigned, the referee orders as follows:

I.  Background

*A. Baptiste's Complaint*

On March 8, 2016, Baptiste filed a verified complaint (the "Complaint") against Goguen for breach of a May 2014 Settlement Agreement between Baptiste and Goguen wherein Goguen agreed to pay Baptiste $40 million dollars. The Complaint begins by alleging that Goguen abused

Baptiste sexually, physically and emotionally for over 13 years (2001-2013). Complaint, ¶ 1. Baptiste alleges that Goguen raped her repeatedly and infected her with HPV in 2011 (and that she never tested positive for HPV prior to 2011). *Id.*, ¶¶ 21, 25. In June 2012, Goguen allegedly sodomized her and left her bleeding and nearly hemorrhaging to death on the floor of the hotel room. *Id.*, ¶ 24. Thereafter, Ms. Baptiste retained an attorney. *Id.*, ¶ 26.

In or around February 2014, Baptiste's attorney sent Goguen a draft complaint for personal injury and a demand letter for mediation. Complaint, ¶ 26. "When Mr. Goguen received the draft complaint, he instructed Ms. Baptiste to fire her attorney, convincing her that the attorney was a criminal who victimized his clients, would take her money, and would never leave her alone." *Id.*, ¶ 27. "Mr. Goguen told Ms. Baptiste that he would not negotiate with her while she retained her attorney and insisted that he and his lawyers would act as her attorneys." *Id.* "Afraid of Mr. Goguen's threats, Ms. Baptiste complied with Mr. Goguen's demands and fired her attorney." *Id.* Thereafter, Baptiste and Goguen entered into the Settlement Agreement. *Id.*, ¶ 30. In June 2014, Goguen made the first $10 million payment due to Baptiste under the Settlement Agreement. *Id.*, ¶ 33. On December 19, 2015, Goguen refused to make the second payment, asserting that the Settlement Agreement had been procured by extortion. *Id.*, ¶ 34.

At the time she filed the Complaint in March 2016, Baptiste was represented by the Glaser Weil law firm. Doolittle January 2019 Decl., ¶ 2. Glaser Weil's motion to withdraw as counsel was granted on July 25, 2016. On September 9, 2016, the Law Offices of Bisnar Chase substituted into this case as Baptiste's counsel. *Id.*, ¶ 3. In January 2017, Bisnar Chase stated that they intended to move to be relieved as counsel. *Id.* On January 24, 2017, the Sherman Law Group substituted into the case, replacing Bisnar Chase as Baptiste's counsel of record. *Id.*, ¶ 4.

### B. Goguen's Counterclaim

On January 6, 2017, Goguen filed a second amended counterclaim against Baptiste and Every Girl Counts ("EGC"). Thereafter, Goguen filed a third amended counterclaim against Baptiste and EGC (hereinafter, the "Counterclaim"). The Counterclaim alleges causes of action for: (1) extortion; (2) fraudulent inducement – HPV; (3) fraudulent inducement – sexual history;

1   (4) declaratory relief re validity of the Settlement Agreement; (5) breach of the Settlement

2   Agreement; (6) rescission of the Settlement Agreement; (7) restraining order pursuant to Cal. Civ.

3   Proc. Code section 527.6; (8) violation of the California Invasion of Privacy Act (Penal Code §

4   632); (9) fraudulent inducement - charitable contribution; and (10) breach of fiduciary duty.

5   Goguen alleges that in January 2014, Baptiste threatened to falsely and publicly accuse

6   him of "violent rape and intentionally spreading a sexually transmitted disease, among other

7   horrible conduct," unless Goguen acquiesced to her demand for a $40 million payment.

8   Counterclaim, ¶ 28. Starting in January 2014, Baptiste began making demands of Goguen in

9   writing, wherein she: (1) falsely accused Goguen of raping her and causing her severe physical

10  injury; (2) falsely claimed that she was then infected with the HPV virus and that Goguen had

11  transmitted the virus to her; (3) threatened that her false allegations will be "disclosed publicly"

12  and "provided to the press" unless Goguen demonstrated his "generosity;" (4) threatened to

13  disclose her allegations to Goguen's other past sexual partners; (5) threatened to involve

14  Goguen's wife and to investigate her medical history; and (6) threatened disclosure of the false

15  allegations to "the public." *Id.*, ¶ 29. Goguen alleges that Baptiste initially communicated her

16  extortionate threats through a lawyer, who demanded that Goguen pay forty million dollars in

17  exchange for a promise that Baptiste not make false and inflammatory allegations of rape and

18  sexual assault against Goguen. *Id.*, ¶ 36. Once it became clear that her demands against Goguen

19  were working, however, and that Goguen was willing to pay money in response to the threats,

20  Baptiste fired her lawyer. *Id.*

21  *C. Baptiste's Injury and Subsequent Events in the Litigation[1]*

22  In August 2017, Baptiste fractured her elbow when she fell out of bed. Surgery was

23  performed in Canada. On August 9, 2017, Baptiste's counsel at the time (Richard Sherman) called

24  Goguen's counsel to inform them that Baptiste would not be appearing for her deposition as

25

26  ───────────────

27  [1] The following section of this order is largely taken from Discovery Referee Order No. 26, issued on April 30, 2019, regarding Goguen's first motion for terminating sanctions. Citations to supporting evidence found in the prior order have been removed to streamline the current order.

28  Baptiste v. Goguen
    Case No. CIV 537691                                                                    3
    Discovery Referee Order No. 30

representative of [Cross-Defendant Every Girl Counts ("EGC)] (noticed for two days later and previously moved repeatedly at Baptiste's insistence) because she had "night terrors" the night before "that caused her to fall out of bed" and break her arm. Goguen's counsel found Baptiste's claimed injury questionable, given that she elected to participate in a third-party deposition the very day she suffered her injury, and asked counsel for Baptiste to provide medical records "corroborating her claimed injuries." The parties then agreed to move her deposition to September 5, 2017.

On August 16, 2017, Baptiste's counsel advised Goguen's counsel that the deposition could not go forward, as Baptiste was still in the hospital and "is not expected to leave until the 28th at the earliest," and "she may be in the hospital longer." Goguen's counsel again asked to "see medical records" to support Baptiste's inability to appear at the deposition. Nonetheless, Baptiste attended the depositions of Walter Canas, Lyla Peter, Bryan Alexander, and Bryan Nash telephonically in August and September 2017. Baptiste attended a hearing by telephone on February 12, 2018.

In March 2018, Goguen was still attempting to schedule Baptiste's deposition. On March 21, 2018, Baptiste's counsel informed Goguen's counsel that Baptiste was "having some significant medical problems with her arm." Baptiste attended a hearing in person before the referee on March 23, 2018. On March 23, 2018, Baptiste or her counsel propounded a supplemental request for production and a supplemental interrogatory. On March 26, 2018, Goguen propounded requests for production (set 13) seeking, *inter alia*, production of Baptiste's medical records regarding her injury. To date, Baptiste has not responded to these requests. On March 29, 2018, Baptiste or her counsel propounded a set of requests for production.

The parties then set April 6, 2018 for EGC's deposition. It was apparently understood that Baptiste would be EGC's designee. Baptiste, however, did not appear for the deposition. Minutes before the deposition was to commence, Baptiste gave notice that she would not be attending, claiming "night terrors." Baptiste's counsel represented that he would obtain "a detailed doctor's note" if Baptiste's issues persisted.

On April 23, 2018, Baptiste appeared for deposition and answered questions. Baptiste testified that she could not immediately make responsive materials in her storage facility available for inspection because of her elbow. When asked whether any of her medications impaired her memory, she stated "I don't know that I've had that experience." On May 1, 2018, Baptiste attended the deposition of her former attorney, Rivers Morrell ("Morrell"). .

On May 14, 2018, the Sherman Law Group filed a motion to be relieved as counsel, citing "irreconcilable differences" and "a complete breakdown in communications." "To accommodate the withdrawal and to give Baptiste adequate time to retain replacement counsel if she chose, Goguen agreed to: (1) numerous discovery extensions; (2) a continuance of Goguen's pending motion for sanctions; (3) a trial continuance; and (4) a 60-day stay of discovery deadlines and motion practice. Goguen also agreed to two continuances of Baptiste's Motion for Summary Adjudication to accommodate Mr. Sherman's withdrawal." At the hearing on Mr. Sherman's motion to be relieved as counsel, Baptiste represented that she would be proceeding in pro per. On June 13, 2018, the Court granted Mr. Sherman's motion to be relieved as counsel.

In June 2018, after the Sherman firm's stopped representing Baptiste, Baptiste sent Goguen's counsel a number of emails. In addition to making extensive allegations against Goguen and his counsel, the emails blame Goguen for her alleged injury and claim that she could not produce responsive materials because "I have a broken arm because I suffer from nightmares stemming from the Rape, the PTSD and the Night terrors." The following week, and with only two-hours' notice on the date when she was supposed to arrive at Goguen's counsel's office to make certain records available for inspection, Baptiste cancelled, stating that "I have broken bones in my body so I feel its best we not meet. . . . I don't know what will happen if I am alone in your office."

On August 10, 2018, Goguen filed a motion to compel Baptiste to comply with her statements of compliance served in response to Goguen's requests for production of documents (set one) requests 1-22, 27-29, 32-34, 36-47, 49-54, and 57-59. On the same day, Goguen filed a separate motion to compel Baptiste to make available for inspection all paintings she

commissioned using funds Goguen donated to be used exclusively for charitable purposes.

Baptiste's oppositions to the motions were supported by a declaration from Baptiste, wherein she declared that:

> 2. At the time of my deposition [in April 2018], I believed that I was in possession of various documents that were inquired of by counsel for the Defendant. At that time, I believed the documents to have been packed away and placed in my locked storage unit in Los Angeles, California, with my furnishings and other personal effects.

> 3. I have since returned to my storage facility and searched my storage unit in an effort to locate some paintings that Defendant sought to inspect, as well as the documents that were requested in Defendant's Document Production Requests numbered 1-22, 27-29, 32-34, 36-47, 49-54. In spite of my best efforts to locate the documents at my storage facility, and after a diligent search where I believed the documents to be located, I was unable to locate them and believe the documents to have either been lost or unintentionally discarded when I moved out of my home.

> 4. At the time of my deposition, I believed I had placed the documents in my storage facility. Since I was unable to locate them at that facility, I believe the documents to have been lost or unintentionally discarded and am unaware as to who may be in possession of the documents, if they exist at all at this time.

> . . .

> 2. At the time of my deposition, I believed that the paintings I had commissioned for Every Girl Counts, were professionally packed and placed in storage in my storage facility in Los Angeles. I have not seen the paintings since I was forced to move out of my home at the time of entering into a Release and Personal Injury Settlement Agreement with Michael Goguen, which he prepared from a Release he obtained from his attorney.

> 3. I have since returned to my storage facility and searched my storage unit to locate the painting in order to comply with the order of the JAMS referee. My most recent effort was on Sunday, October 8, 2018, when I went to the storage facility to conduct a further search in an effort to locate the paintings.

> 4. I previously provided a digital copy of the paintings to Defendant's counsel, which I was able to secure from the artists.

> 5. I believed I had placed the paintings in my storage facility until I discovered that none of the paintings were there when I searched for them. I do not have any information or idea as to who may be in possession of my paintings.

*See* Discovery Order 26 at 9, 11.

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

6

In August 2018, Goguen served upon Baptiste special interrogatories and requests for production concerning, *inter alia*, Baptiste's elbow injury. Van Dalsem Decl., Ex. J (special interrogatories (Set 11) no. No. 72); K (request for production (Set 15) request no. 150). Baptiste did not respond to these interrogatories and provided only objections to the request for production. *Id.*, Ex. L.

On or about August 28, 2018, Paoli & Purdy, PC filed a substitution of attorney for Baptiste. Doolittle January 2019 Decl., ¶ 6.

On September 12, 2018, Goguen's counsel sent a letter to Baptiste's counsel stating that Goguen had noticed the inspection of the originals of the documents Baptiste claims to have received from Dr. Belhassen, a doctor in France who Baptiste claims treated her after Goguen allegedly forcibly sodomized her in July 2012, that Baptiste had previously agreed to make the documents available for inspection but failed to produce the documents. A subsequent email asked Baptiste's counsel to confirm that the originals would be made available for inspection at a September 19, 2018 hearing at JAM Silicon Valley. In response, Baptiste's counsel stated that it was his understanding that Baptiste "will be bringing the original with her." Baptiste did not appear for the hearing and did not produce the originals. At the hearing, the referee ordered Baptiste to produce the original document for inspection on October 18, 2018. On October 2, 2018, Baptiste's then-new counsel advised Goguen's counsel that, "I think we may  have to hold off on Ms. Baptiste's deposition because there is a strong possibility that she will be undergoing surgery on her arm in the very near future." Goguen's counsel once again requested "proof of medical treatment." Baptiste, however, failed to bring the Belhassen record for inspection and did not appear for the October 18, 2018 hearing.

On October 16, 2018, Goguen filed an application for particularized expedited discovery. The application sought an order requiring Baptiste to: (1) serve verified, code-compliant responses to Goguen's Seventeenth Request for Production (regarding Baptiste's storage facilities); (2) serve verified, code-compliant responses to Goguen's Thirteenth Set of Special Interrogatories (regarding Baptiste's storage facilities and her government issued identification);

(3) immediately secure and preserve any and all materials and tangible things in any storage facility she maintains and provide a declaration under oath and subject to a penalty of perjury, describing the efforts she has taken to do so; (4) provide the foregoing by October 25, 2018; and (5) sit for a further deposition on October 29, 2018 for the limited purpose of explaining the circumstances surrounding her alleged spoliation of evidence.

On October 26, 2018, Goguen's motion to compel a further responses to two of Goguen's requests for production (requests 119 and 120) was granted, and Baptiste was ordered to produce, with 7 days of the order code-compliant written responses to the requests and all documents responsive to the requests 119 and 120. *See* Discovery Referee Order No. 14. Baptiste failed to produce any documents in response to this order.

On October 26, 2018, Goguen's motion to compel further responses to requests for production (set one) and Goguen's motion to compel inspection of the paintings were granted. *See* Discovery Referee Order 15. The order provides in part that:

> Within 7 days of receipt of this order, Baptiste shall: (1) conduct a further reasonable search for the paintings; (2) provide Goguen with an amended response to requests 16-18 in the deposition notice, without objections, that complies with Cal. Civ. Proc. Code sections 2031.210-2031.230; (3) produce the responsive paintings for inspection; and (4) if she fails to produce all responsive paintings, provide a declaration under oath and subject to a penalty of perjury describing in detail when and where she stored them and the efforts she took to locate the paintings in response to Goguen's discovery requests, and stating that after a diligent search, she was not able to locate them. . . .

> Based upon the record presented, with respect to document requests 1-22, 27-29, 32-34, 36-47, 49-54, and 57-59, Baptiste agreed to produce all responsive, non-privileged documents, if any, within Responding Party's possession, custody, or control. The record further reflects that Baptiste has failed to produce anything in response to these requests. . . . [¶] . . . Within 7 days of receipt of this order, Baptiste shall: (1) conduct a further reasonable search for the responsive documents; (2) provide Goguen with an amended response to these requests, that complies with Cal. Civ. Proc. Code sections 2031.210-2031.230; (3) produce all documents responsive to the requests at issue; and (4) if she fails to produce all responsive documents, provide a declaration under oath and subject to a penalty of perjury describing in detail the efforts she took to locate these materials, and stating that after a diligent search, she was not able to locate responsive documents.

Discovery Referee Order 15 at 9, 10. Since the issuance of the above-order, Baptiste has not provided any further response to the requests or produced any responsive documents.

On October 26, 2018, Goguen's motion to compel Baptiste to appear for two additional seven-hour deposition sessions was granted. *See* Discovery Referee Order 17. The motion had been made on the grounds Baptiste: (1) Baptiste improperly withheld responsive documents or encouraged third parties to withhold documents until after Baptiste's last deposition; (2) Baptiste continued to defame Goguen to law enforcement and in national press outlets; (3) Baptiste refused to provide non-evasive answers to proper deposition questions; and (4) Goguen received withheld materials after the conclusion her prior depositions.

On October 29, 2018, Baptiste or her counsel issued a subpoena to depose Goguen's counsel. On November 6, 2018, Goguen's motion to compel Baptiste to respond to his thirteenth and fourteenth sets of requests for production, tenth and eleventh sets of special interrogatories, fifth set of requests for admission, and sixth and seventh sets of form interrogatories was granted, and Baptiste was ordered to provide Goguen with "code-compliant responses to the foregoing discovery requests, without objections, and all documents responsive to the document requests" by November 13, 2018. Baptiste failed to provide any responses or documents by the deadline or at any time thereafter.

On November 6, 2016, the referee also issued Discovery Referee Order No. 19, granting Goguen's motion for particularized expedited discovery. The parties thereafter stipulate (and the referee entered an order) that Baptiste would appear for the deposition at 9:00 a.m. on November 30. Baptiste failed to serve any responses or documents in response to Discovery Referee Order 19, and failed to appear for the November 30 deposition. Baptiste's counsel appeared at the deposition and stated that Baptiste was "not feeling well" and has "difficulty in getting up early." On November 16 and 26, 2018, and December 10, 2018, Baptiste or her counsel issued seven subpoenas to third parties seeking deposition testimony and documents.

*Goguen's First Motion for Terminating Sanctions*

On December 3, 2018, Goguen filed his first motion for terminating sanctions, i.e., an order dismissing Baptiste's complaint, striking her answer to Goguen's third amended cross-complaint and entry of judgment against Baptiste on Goguen's cross-complaint in the amount of $10,025,000, plus prejudgment interest. The motion was made pursuant to California Code of Civil Procedure sections 581, 583.150, 2023.010 et seq., 2025.450, 2025.480, 2030.300, and 2031.310, and the Court's inherent power to impose sanctions for: (1) Baptiste's spoliation of evidence; (2) violations of Discovery Referee Orders 14, 15, 19, 20, and the referee's September 19, 2018 order; and (3) providing false and fabricated evidence. Goguen asserted that "Baptiste has engaged in a shocking campaign of fabrication, perjury, and the intentional destruction and concealment of key evidence, all the while willfully ignoring and violating the Discovery Referee's specific orders," and "Baptiste's actions have prejudiced Goguen and made it impossible to conduct a trial with any reasonable assurance that the truth would be available."

After the filing of the motion for terminating sanctions on December 3, 2018, Goguen's counsel again sought proof of Baptiste's injury in response to Baptiste's counsel's statement that he would be seeking to "continue the trial and stay discovery until after Amber undergoes surgery on her arm." Days later, Goguen's counsel reiterated this request after Baptiste claimed that she would be missing a deposition due to her elbow. On December 18, 2018, the Paoli and Purdy firm filed a motion to withdraw as Baptiste's counsel.

*Baptiste's Opposition to the First Motion for Terminating Sanctions*

On December 20, 2018, Baptiste filed an opposition to Goguen's first motion for terminating sanctions. The opposition was made on the grounds that Baptiste "is not competent to engage in discovery or willfully violate a court's discovery order," that the assertion that she has spoliated critical documents is false and that Baptiste's failure to appear for deposition or produce discovery was not a willful violation of Order 19. The motion was supported by declarations from Mr. Paoli and Dr. Vance Eberly. Mr. Paoli declared in part that:

2. . . . I have been able to observe her demeanor and noted since undertaking to

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

10

represent her on these claims that she has been unable to remain focused and assist with discovery efforts in two of the three claims (the third is currently stayed).

3. . . . In spite of my efforts, I have been unable to secure the assistance of Ms. Baptiste in engaging in discovery, prosecution, and/or defense of this and the other litigations she is a party to, for which Paoli & Purdy, PC, has been retained as her counsel. It is my opinion and observation, that Ms. Baptiste had become increasingly unavailable to assist with her claims since retaining Paoli & Purdy, PC, and I believe it is due to what I had just learned about her inability to tolerate pain and use/dependency of prescribed narcotic medications from her physicians.

4. On December 4, 2018, I accompanied Ms. Baptiste to an orthopedic surgeon's office for examination and evaluation of her left elbow. . . . I received the report from Dr. Eberly several days following the examination and determined that Dr. Eberly included his findings on the medical record that Ms. Baptiste had become dependent on prescription narcotic medications.

6. I was unaware of the reasons I was unable to secure the assistance of Plaintiff, Amber Baptiste from the onset of my undertaking representations of her claims and defenses. It was not until I received the report from Dr. Eberly, who was seeing her for an examination and evaluation of her left elbow for surgical intervention, that I realized the extent of her dependency on narcotic medications and its effect on her ability to engage in the litigation process.

Paoli December 19, 2018 Decl., ¶¶ 2-4, 6.

Dr. Vance Eberly is a physician licensed to practice medicine in California, with a specialty in orthopedic surgery. Eberly Decl., ¶ 1. Dr. Eberly examined Baptiste on December 4, 2018. *Id*., Ex. 2. Dr. Eberly declares that:

3. . . . I took x-rays of her left elbow and confirmed that she suffered a left elbow supracondylar fracture nonunion and a left elbow medial epicondyle fracture malunion resulting in chronic left elbow pain. I further observed that her mental status had been compromised as she attempted to report the history of her injury and symptoms to me during my evaluation of her fractured elbow. Upon further examination, I determined that she has been treating with a variety of medications . . .

4. It is my opinion, within a reasonable degree of medical certainty, that as a result of the chronic pain she has been experiencing since fracturing her elbow, Amber Laurel Baptiste has a serious narcotic medication dependency, which renders her incompetent to remain sufficiently cognitive and able to answer questions accurately. As a result of her dependency on narcotic medication, subjecting Ms. Baptiste to oral or written litigation discovery would be the equivalent of expecting an individual who would be legally

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

11

intoxicated on alcohol to respond in a coherent manner to question presented to her. Given her present condition on increasing narcotic medication for chronic pain, I do not find her to be capable to assisting with her lawyers in the civil litigation, at this time, as she cannot appreciate the significance of her role in the lawsuit due to her regiment of narcotic medication and the dependency she has developed to combat her chronic pain.

5. It is my further opinion, within a reasonable degree of medical certainty, that Ms. Baptiste is incompetent, and unable to participate in litigation discovery to the extent she must remain on the mixture of pain medications and, Ambien to assist her sleep. I have referred her to [a doctor] for a surgical consultation of the left elbow fracture nonunion for the hardware removal, nonunion takedown and ORIF. I further recommended that she seek treatment from a pain management physician and attempt to taper the amount of medication use, and instructed her not to drive until she is able to undergo revision surgery and become weaned from taking narcotic medication.

Eberly Decl., ¶¶ 3-5.

### *Goguen's Reply to the Terminating Sanctions Motion*

Goguen's reply to Baptiste's opposition was supported by, *inter alia*, a declaration from Dr. Suzanne Dupee, an expert in forensic psychiatry, who declares that Dr. Eberly's opinions in this case "exceed his expertise as an orthopedic surgeon" and that "a forensic psychiatric evaluation is the only method to determine a litigant's competency." Dupee Decl., ¶¶ 3, 6.

### *Order Continuing the Hearing on the Motion for Terminating Sanctions*

The first hearing regarding Goguen's motion for terminating sanctions was held on January 4, 2019. After the hearing, the referee issued an order continuing the hearing on the motion. *See* Discovery Referee Order 23. The order found that "a ruling on the merits of Goguen's motion is inappropriate at the present time," and ordered the parties to "meet and confer regarding the competency issues asserted by both sides, resolution of such issues, the extent of the asserted lack of competency to each of the discovery failures or claims at issue in the motion, Baptiste's compliance with her outstanding discovery obligations (i.e., the subject matter of the present motion) and the timing therefore, and the manner in which discovery shall proceed in this matter, including a plan for a hearing on the merits of the present motion." *Id.* at 3.

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

12

On January 16, 2019, after completion of the required meet and confer discussions, Goguen's counsel issued an amended notice of his first motion for terminating sanctions, setting February 1, 2019 as the date for the further hearing.

### Baptiste's Motion to Stay Discovery

On January 16, 2019, Baptiste filed a motion to stay discovery until April 30, 2019 to enable Baptiste to resolve a number of medical issues. The motion was supported by a declaration from her counsel and Dr. Eberly's prior declaration. The motion to stay was set for hearing on February 12, 2019. On January 18, 2019, the Superior Court issued a tentative ruling granting Mr. Paoli's motion to be relieved as counsel and denying Baptiste's motion to amend. On January 29, 2019, Goguen filed an opposition to the motion to stay discovery.

Pursuant to a request for continuance by Baptiste, the hearing on Goguen's motion for terminating sanctions was reset for February 12, 2019. On February 11, 2019, Baptiste filed a declaration in support of her opposition to the motion for terminating sanctions that addressed her medical issues. Baptiste's lengthy declaration states, *inter alia*, that: (1) she is very ill, and describes her medical issues; (2) she needs at least two additional surgeries, and is waiting to be scheduled for the surgeries; (3) she takes 14 medications per day and cannot think clearly about her case; (4) the case has been delayed due to the actions of Goguen's counsel; (5) she has (or had) problems with her current and former counsel; (6) the history of her problems with Goguen and his attorneys; (7) she is too ill to respond to Goguen's burdensome discovery; (8) if required, she can seek further declarations from her medical care providers, but asks that the declaration be submitted only to the referee; and (9) she fears Goguen's counsel will interfere with her medical care, and wonders if the court will appoint a lawyer for her. Baptiste February 11, 2019 Decl., ¶¶ 1-26.

### Order Granting Stay of Discovery

The hearing on the motion to stay discovery and the continued motion for terminating sanctions was conducted on February 12, 2019. At the conclusion of the hearing, the referee granted a 60-day stay of discovery (to April 12, 2019) and made number of additional orders. On

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

13

February 28, 2019, the referee issued a written order granting the stay, which provides, in pertinent part, that:

1. All discovery, other than as set forth in this order, shall be stayed until April 12, 2019.

2. [Baptiste] shall comply with all outstanding discovery orders [by] no later than April 9, 2019.

3. [Baptiste] shall produce all medical records and corroborating documentation associated with the claims made in the Declarations of Amber Laurel Baptiste dated February 11, 2019, William M. Paoli dated January 15, 2019, and Vance Eberly, M.D., dated December 17, 2018, as soon as practicable, and no later than April 1, 2019.

4. The hearing on Goguen's motion for terminating sanctions and Goguen's motion to compel Baptiste to respond to requests for production (set 15), requests for production (set 16), special interrogatories (set 12) and form interrogatory (set 6) and for monetary sanctions is continued to April 12, 2019, at 10:00 a.m., at JAMS San Jose.

5. Should Baptiste be hospitalized prior to April 12, 2019, Baptiste either directly (should she become a pro se litigant), or through her counsel, shall immediately give notice to Goguen's counsel and JAMS by appropriate service of notice and by providing medical records documenting the dates of and reasons for such hospitalization. [Baptiste] shall not seek to have any ex parte communications with Discovery Referee regarding her hospitalization or any other topic.

6. Should Baptiste become a pro se litigant, all communications between Baptiste and Goguen's counsel shall either be a) in writing or b) in the presence of a court reporter who shall transcribe all such communications. Each of the parties shall provide the other with reasonable notice prior to any communication whereby a court reporter is required.

Discovery Referee Order No. 24 at 3-4.

### *March-April 2019*

On March 13, 2019, counsel for Goguen sent a letter to Baptiste's counsel requesting that Baptiste submit to medical examinations by a forensic psychiatrist and an orthopedic surgeon

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

14

1   regarding the allegations made in connection with her opposition to Goguen's motion for

2   terminating sanctions. Baptiste, through counsel, refused to submit to any medical examinations.

3        On April 11, 2019, Goguen filed a status report in support of the motion for terminating

4   sanctions. The report was supported by declarations from Mr. Van Dalsem and Canadian counsel

5   for Goguen, Mr. Beddoes. Mr. Van Dalsem declared that as of April 11, 2019, Baptiste: (1) had

6   not produced a single medical record or other corroborating documentation associated with the

7   claims made in her January 11, 2019 declaration, the Paoli January 15, 2019 declaration and/or

8   the December 2018 declaration of Dr. Eberly, M.D.; (2)  had not complied with any outstanding

9   discovery orders, in whole or part; and (3) had not provided notice that she has been hospitalized,

10  nor had she served any medical records indicating the same. Van Dalsem April 11, 2019 Decl.,

11  ¶¶ 13-15.

12       On April 12, 2019, a further hearing was held regarding the motion for terminating

13  sanctions. Counsel for Goguen and Baptiste appeared in person at the hearing, and Baptiste

14  appeared telephonically. Baptiste spoke on her own behalf, making extensive, occasionally

15  bizarre allegations against Goguen and his counsel, and noting her current medical problems

16  ("PTSD," broken arm, metal poisoning or toxicity, and her daily medical issues (fever, vomiting)

17  and an inability to drive). Thereafter, Baptiste's counsel, Mr. Paoli, spoke with respect to his

18  concerns regarding Baptiste's state of mind and ability to competently participate in the litigation.

19  Mr. Paoli also noted his inability to obtain Baptiste's medical records due to Baptiste's inability to

20  understand why she must provide the documents.

21                                  *Discovery Referee No. 26*

22       On April 30, 2019, the referee issued Discovery Referee Order No. 26, denying Goguen's

23  first motion for terminating sanctions, and extending the stay on discovery. The order found, *inter*

24  *alia*, that: (1) Baptiste had failed to comply with five orders issued by the referee between

25  October 18, 2018 and November 6, 2018 and failed to comply with stay on discovery order; (2)

26  Baptiste provided Goguen with false responses to interrogatories 35 and 36 and two additional

27  discovery requests. However, the order further provides that:

28  Baptiste v. Goguen
    Case No. CIV 537691
    Discovery Referee Order No. 30

                                                                                    15

Based upon the record presented, Goguen has failed to establish that terminating sanctions are an appropriate remedy for Baptiste's failure to comply with six court orders between October and November 2018 and her false discovery responses. In 2016, Baptiste elected to sue Goguen for breach of contract. In response, Goguen has asserted significant claims against her. Unless and until Baptiste elects to withdraw her Complaint and Goguen drops his counterclaims against her, Baptiste must comply with her discovery obligations, and must comply with the court's discovery orders. Whether Baptiste trusts Goguen or Goguen's counsel has no bearing on her obligations in this litigation. Similarly, Baptiste's apparent belief that certain discovery responses or documents are not relevant to the litigation is misplaced. The inconsistencies in Baptiste's discovery responses warrant the additional discovery at issue in this motion (and other recent motions by Goguen).

Baptiste's repeated failure to comply with the referee's orders, and her submission of false discovery responses, is unacceptable litigation conduct. In the ordinary civil case, Baptiste's failure to comply with six orders, along with evidence of false discovery responses, would warrant very significant sanctions (i.e., narrow issue and or evidentiary sanctions as opposed to the requested terminating sanctions). However, even assuming this was an ordinary case, Goguen's motion does not seek such sanctions, and does not provide a basis (e.g., the impact of Baptiste's various specific failures on his claims) for the referee to award more limited evidentiary and/or issue sanctions.

The issues presented by the present motion, however, are not ordinary. The record presented with respect to Baptiste's competency and ability to respond to discovery and/or assist her counsel in the litigation compels the conclusion that the requested sanctions are not warranted at the present time. The evidence shows that the issue of Baptiste's competence has adversely affected this litigation since August 2017. Based upon the incomplete record presented, Baptiste's failures to comply with the orders in question post-date her elbow injury and appear to be connected to Baptiste's medical problems. While it is true that Baptiste, or more specifically her counsel, have propounded and pursued discovery on her behalf, at the end of the day this fact does not make Baptiste competent for purposes of the litigation. The record reflects that Baptiste's medical problems are playing a significant role in her failure to comply with her discovery obligations.

While Baptiste's medical problems are unfortunate, the time has come for clarity with respect to these problems, and one would hope, Baptiste undertaking the efforts necessary to address her problems. The record is clear that Baptiste has inserted her medical problems into this litigation. Given her failure to comply with the outstanding discovery orders due to claimed competency issues, discovery from Baptiste is warranted regarding her medical problems, and the impact of any such problems on her ability to respond to discovery and the court's orders. Such discovery would include discovery directed at Baptiste's medical records and an independent medical examination of Baptiste (pursuant to a discovery request or stipulation of the parties, or if necessary, order of the court). Irrespective of the source of Baptiste's medical problems, irrespective of her view

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

16

of Goguen and her counsel, and irrespective of her beliefs regarding the litigation, Baptiste must take the actions necessary to enable her to pursue her claims and defend against Goguen's claims without further delay or excuse. Baptiste's continued failure to comply with her discovery obligations and court orders likely will result in the failure of her claims and a significant judgment against her.

Accordingly, for the reasons noted, Goguen's motion for terminating sanctions is DENIED. This denial is without prejudice to Goguen's ability to bring a motion seeking lesser sanctions for the failures to comply at issue in this motion. However, any such sanctions motion or further motion to compel written discovery responses (with the exception noted below) may not be filed prior to a resolution of the issue of Baptiste's competence by the parties, the court or the referee. Moreover, outside of a request for an independent medical examination pursuant to the Discovery Act (and if necessary, motion practice related thereto) and Baptiste's compliance with existing orders, the stay on discovery in this action is hereby extended indefinitely. Given Baptiste's discovery misconduct to date, Baptiste may not conduct further discovery until she provides the required discovery (i.e., the further responses required by the prior orders and discovery regarding her medical problems) to Goguen. Between now and June 17, 2019, the referee expects Baptiste to meaningfully address her medical issues so as to allow her to take the actions necessary to participate fully in this litigation, comply with the outstanding discovery orders and produce documents regarding her medical problems. Failure to comply with foregoing will result in the lifting of the stay on the discovery motions that may be asserted by Goguen. In sum, this is Baptiste's final opportunity to resolve (or make significant efforts towards resolution) of her failures to comply with the referee's prior orders. The parties shall submit, on June 17, 2019, briefs and declarations regarding the actions undertaken, and after consideration of these briefs, the referee will issue a further order regarding the stay on discovery and discovery motions.

Order No. 26 at 48-50.

### Goguen's Motion for Order Compelling Baptiste to Submit to Medical Examinations

On May 23, 2019, Goguen a motion for order compelling Baptiste to submit to mental and physical medical examinations. The notice of motion set forth the specific tests and examinations that would be performed by each doctor, the time for and location of the examinations, and the need for x-rays and a urine sample for a non-invasive 10-panel drug screen. The motion was made pursuant to California Code of Civil Procedure sections 2032.310, 2032.320, 2032.020, and 2032.530 on the grounds that Baptiste has placed her mental and physical condition in controversy in this case, and that good cause exists to order Baptiste to submit to mental and

physical examinations as set forth in the motion and is supported by declarations for her counsel, Mr. Van Dalsem, and the two doctors who would be performing the examinations.

The declaration of Mr. Van Dalsem, Goguen's counsel, provided, *inter alia*, that: (1) Goguen's counsel's attempts to get Baptiste to submit to medical examinations by a forensic psychiatrist and an orthopedic surgeon regarding the allegations made in connection with her opposition to Mr. Goguen's Motion for Terminating Sanctions were unsuccessful; (2) as of May 23, 2019, "Ms. Baptiste has not produced a single medical record from a treating physician or other corroborating documentation associated with the claims made in connection with her opposition to Mr. Goguen's Motion for Terminating Sanctions;" (3) Ms. Baptiste "has not complied with any outstanding discovery orders, in whole or part, as ordered by Discovery Order No. 24;" (4) "Ms. Baptiste has not provided notice that she has been hospitalized or undergone surgery, nor has she served any medical records indicating the same, as ordered by Discovery Order No. 24;" and (5) counsel for Mr. Goguen will pre-pay for a non-invasive urinalysis 10-panel drug screen.  Van Dalsem May 23, 2019 Decl., ¶¶ 2-5, 8-11.

The second declaration, from Dr. Dupee, an expert in forensic psychiatry, set forth the purpose of her examination, and the examination to be conduct. Dupee May 23, 2019 Decl., ¶¶ 4-12. The final declaration from Dr. Stetson, an orthopedic surgeon who works regularly with patients with elbow injuries, set forth the purpose of his examination and the examination he would conduct. Stetson Decl., ¶¶ 6-9.

### Baptiste's June 13, 2019 Declaration

On June 6, 2018, Baptiste's counsel's motion to be relieved as counsel was granted and filed by the court. On June 13, 2019, Baptiste submitted a declaration in opposition to the present motion, wherein she declares, *inter alia*, that: (1) she is "extremely sick and bed ridden on most days," and has "multiple medical problems which I am working to find the source of the various break downs in my health;" (2) "I have been undergoing medical care and treatment for my left elbow. I am currently scheduled to undergo surgery on July 2, 2019, to remove broken drill bits and numerous pins that were placed in my elbow;" (3) "I am also advised that following the

surgery, I will require the assistance of a care giver. As such, I am told that I should make arrangements to reside in an assisted living facility for a period of thirty days following the surgery," and "I will be incapable of engaging in the litigation during that period of time, but expect to be released from the facility and capable of engaging in the litigation following my discharge from the assisted living facility;" and (4) the requested examinations are not permitted by Cal. Civ. Proc. Code sections 2032.220 and 2032.320. *See* Baptiste June 13, 2019 Decl., ¶¶ 1-2, 4-7.

### *Discovery Referee Order No. 27*

On June 17, 2019, the referee issued Discovery Order 27, granting Goguen's motion for court-ordered independent medical examination of Baptiste. After reviewing the relevant law regarding independent medical examinations, the order states:

> Based upon the record presented, good cause exists for a physical examination and a mental examination of Baptiste. Over the best two years in this litigation, Baptiste has firmly placed her mental and  physical condition in controversy in the action. While this case does not fit the typical situation in which an examination is required, there can be no doubt that Baptiste's has put her injuries and mental condition at issue in this lawsuit. Baptiste has repeatedly placed her physical and mental problems (allegedly caused by Goguen) at issue in response to Goguen's attempts to obtain discovery and court orders. Baptiste's asserted competency and medical issues have essentially ground this litigation to a halt. The evidence presented with respect to the type of mental and physical examinations needed, and the doctors in question, likewise establish good cause for the requested examinations. In sum, the requested examinations are necessary to the resolution of the action, or at a minimum, the completion of discovery. Given the procedure Baptiste will be undergoing on July 2, 2019, the examinations shall take no earlier than August 5, 2019, and no later than August 30, 2019.

> Accordingly, Goguen's motion for court-ordered independent medical examination of Plaintiff and Cross-Defendant Amber Baptiste is GRANTED, and the referee orders as follows:

> 1. Plaintiff shall submit to a mental examination conducted by Suzanne Dupée, M.D., regarding the conditions, injuries, symptoms, and diagnoses described in the December 19, 2018 Declaration of William Paoli, the December 17, 2018 Declaration of Vance Eberly, and the February 11, 2019 Declaration of Amber Baptiste Declarations. The examination shall take place at 1148 Manhattan Avenue, Suite 9, Manhattan Beach, California 90266, between August 5 and

August 30, 2019. The examination shall occur on a date during this period chosen by Goguen's counsel, and shall commence at 9:00 a.m. If Baptiste does not appear by 10:00 a.m., the examination will be cancelled and Baptiste will be found to have failed to appear. The examination will consist of an interview, not to exceed four hours, as well as completion of the following tests, the time estimate for which is an additional three to four hours total: the MMPI-2 (Minnesota Multiphasic Personality Inventory-2), the Personality Assessment Inventory ("PAI"), the Trauma Symptom Inventory-2 ("TSI2"), the Detailed Assessment of Post-Traumatic Stress ("DAPS"), the Macarthur Confidence Assessment Tool ("MCAT") and the Test of Malingered Memory ("TOMM"). Baptiste shall also submit to a 10-panel drug screen requiring a non-invasive urine sample. The drug screen shall be conducted the day prior to Plaintiff's mental examination, at the following location: DMG & Associates, Inc. 2511 South Barrington Ave., 2nd Floor, Los Angeles, CA 90064.

2. Plaintiff shall submit to an orthopedic examination conducted by Dr. William Stetson, M.D. The examination shall take place at 191 South Buena Vista Street, Suite 470, Burbank, CA 91505, between August 5 and August 30, 2019. The examination shall occur on a date during this period chosen by Goguen's counsel, and shall commence at 2:00 p.m. If Baptiste does not appear by 3:00 p.m., the examination will be cancelled and Baptiste will be found to have failed to appear. The scope of the examination will be those conditions, injuries, symptoms, and diagnoses described in the December 19, 2018 Declaration of William Paoli, the December 17, 2018 Declaration of Vance Eberly, and the February 11, 2019 Declaration of Amber Baptiste. The examination will consist of an in-person interview and a physical examination using standard orthopedic methods not to exceed two hours. Furthermore, unless Baptiste submits to counsel for Goguen by August 2, 2019, X-rays of her arm taken after April 15, 2019, Dr. Stetson shall be permitted to X-ray Baptiste.

3. Plaintiff is ordered to comply with the examinations and all procedures attendant thereto, including pre-examination protocols that are customary and explained to Plaintiff by the examining doctors and/or their staff, and to provide truthful and accurate responses to the examining doctors and staff. Each of these examinations may be audio recorded at the request of either party. The results of the examinations shall be available to the Court no later than September 6, 2019. Plaintiff is also ordered to meet and confer in good faith with Goguen's counsel before June 28, 2019 to expeditiously schedule the examinations on the dates set forth above, or, by mutual agreement of the parties, on alternative dates.

Discovery Referee Order 27 at 18-20.

***Goguen Status Report and Communications Between Counsel for Goguen and Baptiste***

On June 18, 2019, Goguen filed the status report required by Order No. 26, which is supported by a declaration from Goguen's counsel. The supporting declaration noted that Ms. Baptiste has not provided to Goguen any discovery in connection with any of the outstanding discovery orders and had not produced to Mr. Goguen any medical records regarding her purported medical issues. Doolittle June 2019 Decl., ¶¶ 2-3. Goguen's brief requests, in light of the October 15, 2019 trial date, that the discovery stay be lifted in two stages: (1) the stay on discovery be lifted on August 5, 2019, pursuant to a statement in Baptiste's June 13 declaration; and (2) from now until August 5, 2019, Goguen requests that the stay be partially lifted to permit him to proceed with written and third party discovery.

Baptiste did not submit a status update as required by Order No. 26.

On June 25, 2019, counsel for Goguen emailed Baptiste. Van Dalsem August 2019 Decl., ¶ 5, Ex. D. The email states:

Pursuant to Discovery Order No. 27, Mr. Goguen has scheduled the following examinations:

- An Orthopedic Examination by Dr. Stetson to take place on August 5 at 3 pm at 191 South Buena Vista Street, Suite 470, Burbank, CA 91505;
- A Mental Examination by Dr. Dupée to take place on August 8 at 9 am at 1148 Manhattan Avenue, Suite 9, Manhattan Beach, CA 90266; and
- A 10- panel drug screen on August 7 at 9:15 am at DMG & Associates, Inc. 2511 South Barrington Ave., 2nd Floor, Los Angeles, CA 90064.

We have attached a copy of Discovery Order No. 27 and direct your attention to it and your obligations thereunder.

*Id.*, Ex. D.

On June 26, 2019, Baptiste sent a responsive email to counsel for Goguen Van Dalsem Decl., Ex. D. Baptiste's email provides that:

I will be filling a Writ because this is all outside of the course of discovery in a breach of contract and if the man who repeatedly raped me and caused irreparable damage to my mind and body and continues to hire men to stalk me i am going to file suit for the additional injuries he caused me by breaching the contract that he and his lawyers wrote and forced me into. He asked me to forever extinguish my rights and then continued to caused me harm and distress for an additional 5 years. A Writ of mandamus will be filed

because there is no law that permits for the defendant to extract bodily fluids and my very DNA or examine my body parts that are not even part of the breach of contract. Even in a personal injury case a defendant cannot just take mental examinations of a plaintiff unless they have specify sought damages for brain damage.

You cannot just go along making up laws as we go. I will be hospitalized and undergoing more than one major surgery this summer so no I cannot commit to these dates that the man that raped me has appointed for him to further harass me with invasive testing that is not even permitted under California state law and I will take it all the way to the supreme court.

Even if I were to under go those examinations i could not tell you today if I would be available on those dates and times as I don't know when I will be well and able to be released from the hospital. So it is very unfair for you to schedule these illegal examinations of my person when I have stated I will be hospitalized and undergoing surgery again. I have been ill for a very long time and medical treatment had been delayed because of the harassment of your firm and all other people hired by the man who raped me to harass me follow me, break onto peoples properties, harassment elderly people, harassment and instilling fear into Young mothers with small children and cancer patients. Your firm and your client have abused this process for over 5 years. I need medical care. I intend to seek the care I need and I will proceed with the case when able. I have no choice. You firms unwarranted witness tampering and tampering with my lawyers that never stops will all be brought to the courts attention as well.

*Id.*, Ex. D. In response on June 27, counsel for Goguen emailed Baptiste again, stating, *inter alia*, that, "You have not told us you are unavailable on the dates we selected, so they will be confirmed, and you will be expected to appear as ordered." *Id.*, Ex. D. Baptiste did not respond to the June 27 email confirming the dates, "never proposed any alternative dates, and never provided any further information regarding the scheduling of her purported surgery." Van Dalsem Decl., ¶ 5. Moreover, while Baptiste stated she would be filing a writ challenging the order requiring her to appear for the examinations, Baptiste has not done so. *Id.*

### Discovery Referee Order No. 28

On July 10, 2019, the referee issued Discovery Referee Order 28. The order provides in pertinent part that:

> Goguen's request that the stay on discovery be partially lifted to permit him to proceed with written and third party discovery is GRANTED IN PART AND DENIED IN PART. The stay is lifted with respect to third party discovery. The stay, however, shall

remain with respect to all discovery directed to (and or propounded by) Baptiste and Every Girl Counts. The parties shall provide the referee with further updates, at the appropriate time, regarding the scheduling of the examinations, the occurrence of the examinations, and Baptiste's compliance with the referee's prior orders.

### *Baptiste Fails to Appear to the Court-Ordered Medical Examinations*

On August 5, Dr. William Stetson's office informed counsel for Goguen that Baptiste failed to appear for her orthopedic examination scheduled for that day. Van Dalsem Decl., ¶ 6. On August 7, the drug testing lab, DMG & Associates, informed counsel for Goguen that Baptiste had failed to appear for her scheduled 10-panel drug screen scheduled for that day. *Id.*, ¶ 7. On August 8, Dr. Suzanne Dupée informed counsel for Goguen that Baptiste had failed to appear for her mental examination scheduled for that day. *Id.*, ¶ 9. Due to Baptiste's failure to appear, Goguen has been billed for fees by the lab and doctors totaling $5,180. *Id.*, ¶¶ 7, 8, 10, Exs. E, F.

Since April 30, 2019, when Discovery Order No. 26 was issued, "Baptiste has not provided Mr. Goguen with any responses to any of the outstanding discovery." Van Dalsem Decl., ¶ 14.

Despite claiming she cannot participate in the litigation process for all of 2019, Baptiste continues to make posts on Twitter wherein she makes a number of assertions about Goguen, including that he is "serial rapist," "pedophile," "known sex offender" and "human trafficker." *See* Van Dalsem Decl., ¶ 15, Ex. J. The Twitter posts include posts on each of the days that she was supposed to appear for her medical examinations or at the lab. *See Id.*, Ex. J.

### *The Present Motion*

On August 19, 2019, Goguen filed the present motion for terminating sanctions against Baptiste, specifically, an order dismissing Baptiste's complaint. The motion is made pursuant to California Code of Civil Procedure sections 581, 583.150, 2023.010 et seq., 2025.450, 2025.480, 2030.300, and 2031.310, and the Court's inherent power to impose sanctions for "failure to comply with Discovery Order 27, which required Baptiste to undergo Independent Medical Examinations, and certain provisions of Discovery Order 26, which required her to comply with numerous other orders and to produce documents related to her purported medical condition."

The motion asserts that "combined with Baptiste's repeated failures to comply with her discovery obligations, including her continuing violations of other Court orders, Baptiste's actions have irreparably prejudiced Goguen, made it impossible to complete discovery, made it impossible for Goguen to defend himself, and made it impossible to conduct a trial in this action." The motion is supported by declaration from Goguen's counsel, Mr. Van Dalsem, who declares, *inter alia*, that "Baptiste has refused to participate in discovery in this matter since approximately July 2018, when discussions regarding a further deposition of Ms. Baptiste broke down." Van Dalsem Decl., ¶ 19.

The motion was served upon Baptiste on August 19, 2019. Baptiste did not file an opposition to the motion. On September 4, 2019, Goguen filed a reply to his motion, supported by a further declaration from Mr. Van Dalsem. Baptiste did not appear at the September 11, 2019 hearing on the motion.

Discussion

Goguen contends that the referee has an ample record on which to issue terminating sanctions. Goguen asserts that: (1) "Baptiste has misused the discovery process by willfully violating Court orders, falsifying an excuse to her repeated discovery violations with her purported elbow injury and resulting drug dependency, and then refusing to appear for Court-ordered examinations aimed at determining the validity of those very excuses;" (2) the referee provided Baptiste with a "final opportunity" to cure her outstanding violations in Order 26, but Baptiste failed to do so; and (3) her recent failures are preceded by a long, documented history of discovery abuses which the imposition of monetary, evidentiary, and issue sanctions has done nothing to curb. Goguen further contends that: (a) terminating sanctions are proper given Baptiste's refusal to participate in court-ordered independent medical examinations; (b) no lesser sanction will protect Goguen's interests in the litigation; and (c) Baptiste's claimed incompetency, which she has not proven as required by California Criminal Jury Instruction 4.10, provides no excuse to avoid terminating sanctions.

One of the purposes of the discovery rules is to "enhance the truth-seeking function of the litigation process." *Juarez v. Boy Scouts of Am., Inc.* (2000) 81 Cal.App.4th 377, 389 (citation omitted). "Those who interfere with the truth-seeking function of the trial court strike at the very heart of the justice system." *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 110. "The courts will not tolerate such interference." *Id.*

The court, after notice to any affected party, and after opportunity for hearing, may impose sanctions "against anyone engaging in conduct that is a misuse of the discovery process." Cal. Civ. Proc. Code § 2023.030.[2] Section 2023.010 addresses conduct subject to sanctions, and provides that misuses of the discovery process include:

(d) Failing to respond or to submit to an authorized method of discovery.
(e) Making, without substantial justification, an unmeritorious objection to discovery.
(f) Making an evasive response to discovery.
(g) Disobeying a court order to provide discovery.
(h) Making or opposing, unsuccessfully and without substantial justification, a motion to compel or to limit discovery.

Section 2023.030 describes the types of sanctions that a court may impose, including monetary, issue, evidence, terminating, and contempt sanctions. § 2023.030(a)-(e).) Section 2023.030 authorizes a court to impose the specified types of sanctions "to the extent authorized by the chapter governing any particular discovery method or any other provision of this title." § 2023.030. If a party fails to obey an order compelling further response [or an order compelling compliance], the court may make those orders that are just, including the imposition of an issue sanction, an evidence sanction, or a terminating sanction . . ." §§ 2030.300(e)[motion to compel further responses to interrogatories] 2031.310(i) [documents] and 2025.480(k). "In lieu of or in addition to that sanction, the court may impose a monetary sanction." *Id.* "The statutory requirement that there must be a failure to obey an order compelling discovery before the court may impose a nonmonetary sanction for misuse of the discovery process provides some assurance

---

[2] Unless otherwise noted, all further statutory references are to the Code of Civil Procedure.

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

25

that such a potentially severe sanction will be reserved for those circumstances where the party's discovery obligation is clear and the failure to comply with that obligation is clearly apparent." *New Albertsons, Inc. v. Superior Court* (2008) 168 Cal.App.4th 1403, 1423.

"Only two facts are absolutely prerequisite to imposition of the sanction: (1) there must be a failure to comply ... and (2) the failure must be willful." *Liberty Mut. Fire Ins. Co. v. LcL Administrators, Inc.* (2008) 163 Cal.App.4th 1093, 1102 (citation omitted).

"The purpose of discovery sanctions is not to provide a weapon for punishment, forfeiture and the avoidance of a trial on the merits, but to prevent abuse of the discovery process and correct the problem presented." *McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 210 (citations and quotations omitted). "One of the principal purposes of the Discovery Act . . . is to enable a party to obtain evidence in the control of his adversary in order to further the efficient, economical disposition of cases according to right and justice on the merits." *Id.* (citation omitted). "In exercising its broad discretion to sanction discovery abuses, the trial court may impose any sanction authorized by statute that will enable the party seeking discovery to obtain the objects of the discovery sought." *In re Marriage of Chakko* (2004) 115 Cal.App.4th 104, 109 (citation omitted). "A discovery sanction may not place the party seeking discovery in a better position than it would have been in if the desired discovery had been provided and had been favorable." *Id.* "Discovery sanctions should be appropriate to the dereliction and should not exceed that which is required to protect the interests of the party entitled to but denied discovery." *Vallbona v. Springer* (1996) 43 Cal. App. 4th 1525, 1545 (citations omitted).

"A decision to order terminating sanctions should not be made lightly." *Mileikowsky v. Tenet Healthsystem* (2005) 128 Cal.App. 4th 262, 279. "But where a violation is willful, preceded by a history of abuse, and the evidence shows that less severe sanctions would not produce compliance with the discovery rules, the trial court is justified in imposing the ultimate sanction." *Id.* at 279-280. "Courts have the inherent authority to dismiss a case as a sanction." *Crawford v. JPMorgan Chase Bank, N.A.* (2016) 242 Cal.App.4th 1265, 1271. "The authority should be

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

26

exercised only in extreme situations, such as where the conduct was clear and deliberate and no lesser sanction would remedy the situation." *Id.*

The instant action was filed by Baptiste in March 2016. While Baptiste fractured her elbow in August 2017, and this injury may be affecting her to this day, the history of this case shows that Baptiste participated in the discovery process through approximately July 2018. In August 2018 and thereafter, Goguen propounded discovery directed to relevant issues. Thereafter, however, the record reflects that Baptiste has essentially stopped responding to discovery and stopped complying with the referee's discovery orders. During October 2018, her counsel represented that Baptiste's deposition may have to be continued due to a possible surgery on her arm. On October 18, 2018, Baptiste violated the referee's oral order to produce specific medical records (regarding her treatment for the alleged 2012 rape) at a hearing.

On October 26, 2018, a number of discovery orders were issued by the referee. Baptiste was ordered to produce documents in response to two document requests (concerning bank records and her travel history). *See* Discovery Referee Order 14. Baptiste was ordered conduct a further reasonable search for specific paintings, provide Goguen with an amended response to requests 16-18 in a deposition notice, produce the responsive paintings for inspection or provide a declaration describing in detail when and where she stored them and the efforts she took to locate the paintings in response to Goguen's discovery requests. *See* Discovery Referee Order 15. Baptiste was ordered to conduct a further search for documents responsive to document requests 1-22, 27-29, 32-34, 36-47, 49-54, and 57-59 (which Baptiste had previously responded to by agreeing to produce all responsive, non-privileged documents), provide amended responses to these requests, and produce responsive documents or provide a declaration regarding her search for these documents. *See Id.* These document requests were directed to Baptiste's communications and interactions with or relating to Goguen, the Settlement Agreement, Baptiste's alleged extortion, Baptiste's HPV infection, other diseases, Baptiste's related gynecological care, Baptiste's alleged marriage fraud and illegal presence in the United States, Baptiste's allegation that she is a victim of human trafficking, injuries allegedly caused by

Goguen, Baptiste's charity EGC, other allegations in Baptiste's Complaint, and documents related to Baptiste's interrogatory responses. *See Id.* Baptiste was also ordered to appear for two additional days of deposition testimony. *See* Discovery Referee Order 17. To date, however, Baptiste has failed to comply will each of the foregoing orders.

On November 6, 2018, Goguen's motion to compel Baptiste to respond to his thirteenth and fourteenth sets of requests for production, tenth and eleventh sets of special interrogatories, fifth set of requests for admission, and sixth and seventh sets of form interrogatories was granted, and Baptiste was ordered to provide Goguen with "code-compliant responses to the foregoing discovery requests, without objections, and all documents responsive to the document requests" by November 13, 2018. *See* Discovery Referee Order 20. These discovery requests, generally, were directed at Baptiste's medical records relevant to Baptiste's claims, and her communications with counsel prior to and after execution of the Settlement Agreement, Baptiste's ability to enter the United States, and regarding numerous accusations made by Baptiste to Goguen's counsel about Goguen in June/July 2018. *Id.* On November 8, 2018, Goguen's motion to compel expedited responses to discovery regarding her storage facilities and government-issued identification, and to compel a further deposition of Baptiste regarding the loss of evidence was granted. Baptiste, however, has failed to comply wither either November 2018 order.

In response to the foregoing, Goguen filed his first motion for terminating sanctions, based in part on the foregoing violations. The referee continued the hearing on the motion due to the competency issues raised by Baptiste's counsel, and required the parties to try to resolve such issues. *See* Discovery Referee Order 23. On January 16, 2019, Baptiste filed a motion to stay discovery until April 30, 2019 to enable Baptiste to resolve a number of medical issues. On February 12, 2019, the referee granted the requested stay on discovery and continued Goguen's first motion for terminating sanctions until April 12, 2019. *See* Discovery Referee Order 24. The order, however, required Baptiste to: (1) shall comply with all outstanding discovery orders by no later than April 9, 2019; and (2) produce all medical records and corroborating documentation associated with the competency claims made by Baptiste, her counsel and her document in

December 2018 and January 2019. Baptiste, however, did comply with all outstanding discovery orders by April 12, 2019, and the did not produce (and has not produced) the specified medical records. No evidence has been presented to suggested that Baptiste used the 60-day stay to resolve her medical issues.

On April 12, 2019, at the further hearing on Goguen's first motion for terminating sanctions, Baptiste and her counsel again raised her medical problems and/or competency in response to Goguen's motion. On April 30, 2019, the referee issued an order denying Goguen's first motion for terminating sanctions. *See* Discovery Referee Order 26. While the order found that Baptiste had failed to comply with the foregoing orders, and provided false responses to four discovery requests, the motion was denied on a number of grounds, including the record presented with respect to Baptiste's ability to respond to discovery and/or assist her counsel. *Id.* The order nonetheless informed Baptiste that due to her failure to comply with the outstanding discovery orders based upon claimed competency issues, discovery from Baptiste was warranted regarding her medical problems, and the impact of any such problems on her ability to respond to discovery and the court's orders. *Id.* The order further noted that "Baptiste must take the actions necessary to enable her to pursue her claims and defend against Goguen's claims without further delay or excuse," and that "Baptiste's continued failure to comply with her discovery obligations and court orders likely will result in the failure of her claims and a significant judgment against her. The order further: (1) stayed Baptiste's right to conduct discovery until she complied with the referee's prior orders; (2) required both sides to submit a brief regarding Baptiste's efforts to fully participate in the litigation by June 17, 2019; and (3) warned Baptiste that the order reflected her "final opportunity to resolve (or make significant efforts towards resolution) of her failures to comply with the referee's prior orders." *Id.* Baptiste, however, did not comply with the prior orders in response to Discovery Referee Order 26.

In June 2019, Baptiste submitted a declaration noting her continued medical problems, that she was scheduled for surgery on her elbow on July 2, 2019, and that she would be incapable

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

29

of engaging in litigation as a result of the surgery for 30 days. However, Baptiste did not provide any corroborating evidence with respect to the surgery or need for rest.

On June 17, 2019, Goguen's motion for court-ordered mental and physical examinations of Baptiste was granted. *See* Discovery Referee Order 27. Due to her assertion that she would have surgery on July 2, would need to rest for thirty days thereafter, the referee required that the examinations occur between August 5 and August 30, 2019. *Id.* Thereafter, Goguen's counsel informed Baptiste of the days of the examinations and drug screening, which were all within the permitted time window. Baptiste, however, indicated to Goguen's counsel that she would not appear, did not agree with the legality of the order compelling her to submit to medical examinations, and that she needed medical care. Baptiste, however, has not filed a writ and has not submitted a requested that Discovery Referee Order 27 be stayed. Thereafter, Baptiste failed to appear for either the mental or physical examination, and did not appear for the drug screening. In response, Goguen filed the presented. Baptiste did not file an opposition to the motion, and did not appear at the hearing on the motion.

Based upon the foregoing, Baptiste has failed to comply with numerous discovery orders since October 2018, including the April 30, 2019 and June 17, 2019 orders. The record presented further establishes that Baptiste's failures were willful. Baptiste appears to believe that the information responsive to the discovery at issue is either not relevant, or with respect to the medical examinations, not permitted by law. While Baptiste is free to believe what she wants to believe, the orders are binding on Baptiste, and her failure to comply with the orders is unacceptable. The referee has given Baptiste numerous opportunities, despite her failures to comply with the orders, to rectify her failures to provide discovery or to establish her inability to proceed with the litigation. Unfortunately, Baptiste has done neither, and the record presented does not support a conclusion that Baptiste will do so in the future. Baptiste's failure to comply with the referee's orders has resulted in Goguen being unable to obtain, since approximately June 2018, relevant discovery regarding the parties' claims in the litigation. Baptiste's failure to comply with the relevant orders therefore has significantly prejudiced Goguen's ability to prepare

Baptiste v. Goguen
Case No. CIV 537691
Discovery Referee Order No. 30

30

for trial. In light of Baptiste's continued failure to comply with the referee's orders, the referee finds that the requested dismissal sanction is justified. The referee is not persuaded that any further orders or lesser sanctions would result in Baptiste's compliance with her discovery obligations.

Accordingly, Goguen's motion to terminating sanctions against Baptiste, and for an order dismissing Baptiste's complaint, is GRANTED.

Counsel for Goguen shall file this order with the Court, serve opposing counsel and the court with filed-endorsed copies and post a filed-endorsed copy of the order on Case Anywhere.

IT IS SO ORDERED.

Dated:   September 12, 2019

Hon. Read Ambler (Ret.)
Cal. Civ. Proc. Code § 638 Referee

## **PROOF OF SERVICE BY E-Mail**

Re: Baptiste, Amber Laurel, et al. vs. Goguen, Michael
Reference No. 1110021344

I, Jason Clark, not a party to the within action, hereby declare that on  September 12, 2019, I served

the attached Discovery Referee Order No. 30 Granting Defendant and Cross-Complainant Michael Gougen's

Motion for Terminating Sanctions on the parties in the within action by electronic mail at San Jose,

CALIFORNIA, addressed as follows:

Diane M. Doolittle Esq.
Sara L. Pollock Esq.
Margret M. Caruso Esq.
Quinn Emanuel Urquhart & Sullivan LLP
555 Twin Dolphin Dr.
Fifth Floor
Redwood Shores, CA   94065
Phone: 650-801-5000
dianedoolittle@quinnemanuel.com
sarapollock@quinnemanuel.com
margretcaruso@quinnemanuel.com
    Parties Represented:
    Michael Goguen

Patrick Doolittle Esq.
Quinn Emanuel Urquhart & Sullivan LLP
50 California St.
22nd Floor
San Francisco, CA   94111
Phone: 415-875-6600
patrickdoolittle@quinnemanuel.com
    Parties Represented:

Kyle K. Batter Esq.
Quinn Emanuel Urquhart & Sullivan LLP
555 Twin Dolphin Dr.
Fifth Floor
Redwood Shores, CA   94065
Phone: 650-801-5000
kylebatter@quinnemanuel.com
    Parties Represented:

Bruce E. Van Dalsem Esq.
Quinn Emanuel Urquhart & Sullivan LLP
865 S. Figueroa St.
10th Floor
Los Angeles, CA   90017
Phone: 213-443-3000
brucevandalsem@quinnemanuel.com
    Parties Represented:

Ms. Amber Laurel Baptiste
8306 Wilshire Blvd.
Box 2020
Beverly Hills, CA   90211
amberslawsuit2016@gmail.com
    Parties Represented:
    Amber Laurel Baptiste
    Every Girl Counts, LLC

I declare under penalty of perjury the foregoing to be true and correct. Executed at San Jose, CALIFORNIA on  September 12, 2019.

Jason Clark
JAMS
JClark@jamsadr.com

# Exhibit C

1    SUPERIOR COURT OF THE STATE OF CALIFORNIA

2    COUNTY OF SAN MATEO

3

4    AMBER LAUREL BAPTISTE,                    ) Case No.: CIV 537691
                    Plaintiff,                 )
5                                              ) **FINAL STATEMENT OF DECISION**
                                               )
6         v.                                   )
                                               )
7    MICHAEL GOGUEN and DOES 1 through 100     )
     inclusive,                                )
8                                              )          **ENDORSED FILED**
                    Defendant.                 )          **SAN MATEO COUNTY**
9    _____ )
                                               )              JAN 2 4 2020
10   MICHAEL GOGUEN,                           )
                                               )        Clerk of the Superior Court
11                  Cross-Complainant,         )        By_____J. TORRES_____
                                               )               DEPUTY CLERK
12        v.                                   )
                                               )
13                                             )
     AMBER LAUREL BAPTISTE, EVERY GIRL         )
14   COUNTS, a California Corporation, and ROES 1 )
     through 10 inclusive,                     )
15                                             )
                    Defendants.                )
16   _____ )

17

18                        **INTRODUCTION**

19        Plaintiff and Cross-Defendant Amber Laurel Baptiste and Defendant and Cross-Complainant

20   Michael Goguen were involved in a sexual affair for many years over the span of more than a decade.

21   When Baptiste wanted to be more than Goguen's mistress and started making derogatory comments

22   about his then wife, Goguen ended their affair. Unhappy with the breakup, Baptiste threatened to file a

23   lawsuit against Goguen, claiming that Goguen had infected her with Human Papillomavirus (HPV), a

24   sexually transmitted disease. To avoid a public lawsuit and believing, based on Baptiste's false

25   representations, that Baptiste was currently infected with HPV and that he had been her only lover,

26   Goguen entered into a settlement agreement to pay Baptiste $40 million in four equal installments. In

27   return, Baptiste agreed, among other things, to "cease all communications" with Goguen. During the

28   first six to seven months after Goguen paid the first $10 million installment, however, Baptiste sent

                    FINAL STATEMENT OF DECISION - 1

Goguen almost 1600 text messages. In those text messages, Baptiste continued to attack Goguen and his then wife. Goguen ultimately told Baptiste that he would not pay her the remaining $30 million owed under the settlement agreement. Enraged, Baptiste sent Goguen a barrage of text messages over the next 15 months, accusing Goguen of numerous crimes and misdeeds and threatening to sue him.

Eventually Baptiste followed through on her threat and filed this action for breach of the settlement agreement against Goguen. Baptiste's verified complaint included allegations that Goguen, among other things, repeatedly raped and sodomized her, tore her rectal canal, and infected her with HPV. Goguen denied these allegations and filed a cross-complaint against Baptiste and her charity, Every Girl Counts, alleging 10 causes of action. The cross-complaint alleged, among other things, that Baptiste procured the settlement agreement through extortion and fraud.

During more than three years of litigation, Baptiste willfully disobeyed numerous discovery orders. As a result, the Court dismissed her breach of contract claim with prejudice. As a result, this case proceeded to trial solely on Goguen's cross-complaint on October 28, 2019. On that day, Diane M. Doolittle and Bruce E. Van Dalsem appeared on behalf of Goguen. But Baptiste and Every Girl Counts did not. Because Baptiste and Every Girl Counts waived their right to a jury trial by failing to appear and because Goguen expressly waived his right to a jury trial, the Court tried Goguen's cross-claims without a jury over the next three days.

Having considered all testimony and evidence presented at trial, all papers submitted in connection with the trial, oral arguments of counsel, and all other pleadings and papers on file herein, the Court issues the following Statement of Decision pursuant to section 632 of the Code of Civil Procedure and Rule 3.1590 of the California Rules of Court.

As detailed below, the Court finds in favor of Goguen on his causes of action for extortion, fraud – HPV, fraud – sexual history, declaratory relief, rescission, a civil harassment restraining order, invasion of privacy, fraud – charitable donation, and breach of fiduciary duty. As a result, Goguen is entitled to compensatory damages in the amount of $10,250,000, statutory damages in the amount of $5,000, interest, declaratory relief, rescission, injunctive relief, and a civil harassment restraining order.

## STATEMENT OF FACTS

The Court makes the following factual findings:

### A. The First Meeting Between Goguen and Baptiste

1. Goguen and Baptiste met in March 2002 in Dallas, Texas. (Reporter's Transcript (RT) 80.) At that time, Goguen and Baptiste talked and exchanged contact information. (*Ibid.*; PTX0002.)

2. When Baptiste first met Goguen, she was 21 years old (RT 80; Goguen Designations of Videotaped Deposition Testimony (Goguen Design.), Ex. A [343:23-25] (Baptiste); PTX0342 [13]; PTX0994 [11]), and was working as an exotic dancer at Baby Dolls, a topless gentlemen's bar in Dallas (Goguen Design., Ex. B [9:16-18; 9:24-10:03] (Bobic)).

### B. Baptiste's Relationship with Goguen and Her Other Relationships and Travels

3. After their first meeting, Goguen and Baptiste began a romantic and sexual relationship that spanned more than a decade. (See, e.g., PTX00002; PTX0020; PTX0212; PTX0407; PDX0004.)

4. Although Goguen and Baptiste corresponded regularly through emails and text messages throughout their relationship, they saw each other sporadically and no more than seven times in any given year. (See RT 104; PDX0004; PDX0010.)

5. During her relationship with Goguen, Baptiste was involved in romantic and sexual relationships with other men and women and regularly traveled around the world. (Goguen Design., Exs. B [66:01-68:05; 110:02-113:09] (Bobic) & F [52:07-52:22; 54:08-54:12; 54:24-55:05] (Morad); RT 281-282; PTX0994 [11].)

#### 1. The early years of their relationship (2002 to 2005)

6. Soon after their first meeting, Baptiste sent Goguen pictures of herself and began corresponding with him by email. (See PTX0002.) In her emails, Baptiste was very affectionate toward Goguen and effusive about him and their relationship.[1] Goguen was similarly affectionate and effusive.[2]

---

[1] (See, e.g., PTX0016 [5/23/02: "You are such a sweet man. I wish you were here with me right now. Miss you lots"]; PTX0020 [6/14/02: "Michael if I were to never see your beautiful smiling face again know that you gave me something so special in a time that I really needed it"]; PTX0051 [6/12/03: "Thank you for being such an amazing friend to me in every way. You have this incredible ability to bring the super happy feeling to all of my senses"]; PTX0063 [9/17/03: You are always so super sweet to me. You are like a shining star. When I am with you I get to forget everything else in my world and just enjoy the sheer ecstasy that my body experiences with your every touch. The glow that it leaves me

---

7. In one of her early emails, Baptiste told Goguen that she voluntarily "started dancing" at age 18 "to create[] a whole new world for" herself. (PTX0020.) She also wrote about going to school (PTX0074; PTX0099), and applying for jobs (PTX0113).

8. Goguen and Baptiste became sexually intimate in 2003. (RT 91-92.)

9. On June 7, 2003, Baptiste asked Goguen to buy her "a condo and vehicle" that he could use "as a write off." According to Baptiste, this would allow her "to bartend and go to school, [and] move out of this home which always has so much drama . . . ." (PTX0174.) Goguen did not, however, do so. (RT 105-106.)

10. In July 2005, Baptiste proposed that Goguen provide her "freedom from stripping" so she could become his "mistress" and make him "the happiest man alive." (PTX0174.) At that time, Goguen did not accept her offer. (See RT 104.)

### 2. Baptiste's other relationships in Dallas and her return to Canada

11. Baptiste voluntarily worked at Baby Dolls as an exotic dancer from 2002 to 2003. (Goguen Design., Ex. B [42:14-48:18] (Bobic).) She lived with Diane Bobic, a friend and dancer at Baby Dolls, for part of that time. (*Ibid.* [29:01-05].) Baptiste and Bobic had sex with each other. (*Ibid.* [66:21-68:05]; *id.*, Ex. F [78:08-80:11] (Morad).) Baptiste also had sexual encounters with various professional athletes. (*Id.*, Ex. F [110:02-113:09] (Morad).)

12. Baptiste married Jerico Gilbreath on November 25, 2002 (PTX0037; Goguen Design., Ex. D [19:22-24] (Gilbreath)), so she could circumvent U.S. immigration laws and obtain a green card (PTX0551 [6]). In doing so, she committed "marriage fraud." (*Ibid.*) She did not divorce

---

lasts till the next I see you"]; PTX0099 [5/3/04: "You always make me feel super sexy. It is so hard to hold back sometimes. It is very important to me that you know how special you are to me"]; PTX0113 [6/30/04: "I miss you and can't wait to talk to you or see you in person"]; PTX0166 [5/16/05: "I want to make sure we start meeting on a monthly basis again if possible. That way we don't forget each other. I always want everything to be comfortable and sexy and erotic between us"].)

[2] (See, e.g., PTX0060 ["Amber, I can't conjure up enough incredibly sweet and complimentary things to say that would really get across what an amazing woman you are. You are soooo attractive and lovable on every level!! And, what is more amazing to me, is that you keep getting sweeter, sexier, and more beautiful every time I see you!"]; PTX0100 ["I would LOVE to see you again SOON!! I miss everything [about] you, and everything about the way I feel when I see you (mentally happy, physically ecstatic, … ;) You are a 1 in a billions woman, and I totally agree with the gameplan of always staying in each other's lives :)"].)

1    Gilbreath until 2014 – shortly before she received a $10 million payment from Goguen.

2    (PTX1119.)

3  13. After she was involved in a car accident in 2003, Baptiste left Dallas and returned to Canada.

4    (Goguen Design., Exs. B [14:11-16:02] (Bobic) & F [83:07-84:19] (Morad).)

5    **3. Baptiste's relationship with Tareq Morad**

6  14. Morad met Baptiste in 2001 in Canada. (*Id.*, Ex. F [17:25-18:20] (Morad).) At the time, Baptiste

7    was voluntarily working as an exotic dancer (*ibid.* [31:25-36:07]), and had worked as an exotic

8    dancer throughout Canada as well as abroad in Japan and the Caribbean (*ibid.* [46:22-47:15]).

9  15. Morad and Baptiste began a romantic and sexual relationship at the end of 2003. (*Ibid.* [96:10-

10    97:10].) That relationship continued, on and off, until 2007. (*Ibid.*) During their relationship,

11    Morad and Baptiste vacationed together in Hawaii and San Diego. (*Ibid.* [134:21-138:04].) They

12    also regularly had sex, including unprotected sex. (*Ibid.*; see also *ibid.* [105:02-05; 106:02-

13    106:23; 108:02-108:11; 182:19-183:06].) Baptiste regularly told Morad that she loved him, and

14    Morad and Baptiste talked about marriage. (*Ibid.* [102:08-103:06; 169:22-172:02].) Baptiste also

15    referred to Morad as her boyfriend. (*Ibid.* [222:22-226:09]; *id.*, Ex. B. [47:08-47:18; 50:03-

16    50:11] (Bobic).)

17  16. Baptiste voluntarily resumed working as an exotic dancer in January 2005 and continued to work

18    as an exotic dancer on and off during the remainder of her relationship with Morad. (*Id.*, Ex. F

19    [153:02-159:14] (Morad).)

20  17. In late 2005, Morad bought a condominium in Calgary for Baptiste to live in. (*Ibid.* [153:02-

21    159:14].)

22  18. During their relationship, Baptiste never mentioned that she: (1) had been the victim of human

23    trafficking; (2) was lost in a wager; (3) was blackmailed as a minor; or (4) was forced to be an

24    exotic dancer against her will. (*Ibid.* [48:07-48:20; 49:24-50:10; 58:06-58:22].) Morad saw no

25    evidence that Baptiste was a victim of human trafficking. (*Ibid.* [298:03-299:07].)

26  19. During their relationship, Baptiste mentioned Goguen to Morad and never said anything negative

27    about Goguen. (*Ibid.* [113:10-115:21].)

28

20. In the late spring or early summer of 2007, Morad and Baptiste broke up. (*Ibid.* [217:02-222:09; 243:14-243:23].) At that time, Morad offered to transfer the condominium to Baptiste and gave her $50,000. (*Ibid.*) In exchange, Morad asked Baptiste to sign a release. (*Ibid.*) Although Baptiste initially agreed to do so, she later refused. (*Ibid.*)

21. A few months later, Baptiste sued Morad, alleging that she and Morad were involved in a common law marriage and that she was entitled to a share of the earnings and assets he obtained during their relationship. Baptiste retained a lawyer who filed a statement of claim against Morad. (*Ibid.* [217:02-222:09, 222:22-226:09]; PTX0198.) Baptiste also placed a lien on Morad's family home. (Goguen Design., Ex. F [237:02-237:12] (Morad).)

22. In a letter dated November 27, 2007, Baptiste's lawyer asked Morad for $750,000 to resolve Baptiste's statement of claim. (PTX00746.)

23. At some point, Baptiste contacted Morad directly to discuss settlement. Eventually, she and Morad agreed to resolve her statement of claim for a payment of $200,000 by Morad. In return, Baptiste returned the condominium to Morad. Baptiste also kept the $50,000 that Morad had already given her. (Goguen Desgn., Ex. F [235:02-236:13] (Morad).) On or about February 5, 2008, Morad and Baptiste executed a settlement agreement. (PTX0747.) On March 12, 2008, a Canadian court entered a consent judgment resolving Baptiste's statement of claim. (PTX0199.)

### 4. Baptiste rekindles her relationship with Goguen

24. Between 2006 and 2008, Baptiste and Goguen had minimal contact with each other. During that time period, they occasionally exchanged emails but did not see each other. (RT 104; PDX0010.)

25. Soon after the Canadian court entered the consent judgment resolving her claim against Morad, Baptiste reached out to Goguen. (RT 113-114.)

26. After Goguen replied (PTX0200), he and Baptiste began corresponding again and talked about seeing each other (PTX0206). In February 2009, Goguen told Baptiste that he had remarried and explained that, due to his new family, he was unable to see her. (PTX0210.)

27. In response, Baptiste sent Goguen an email in April 2009 offering to be his "forever dream girl" and his "muse and mistress." She wrote that she would like to have "secret rendezvouses with" him and "continue where we left off" and that she would "never tell anyone." (PTX0212.)

28. Goguen accepted Baptiste's offer and began an affair with her. (RT 116.) Goguen typically met Baptiste at a hotel or near a hotel. His employer, Sequoia Capital (Sequoia), never paid for any of those hotel rooms. (RT 94.)

29. From 2009 to 2012, Goguen saw Baptiste multiple times and had sex with her. (PDX0010; PTX0317 ["I have only seen you on five occasions this year [2010]"]; RT 94, 97.) During this time, Baptiste regularly told Goguen that she loved him and wrote effusively about Goguen and their relationship.[3] Goguen also regularly told Baptiste that he loved her and wrote effusively about Baptiste and their relationship.[4]

30. As to their sexual relationship, Baptiste wrote to Goguen in May 2009 that Goguen "gained" her "full trust because when ever [sic] I came to see you you always respected my decisions with that I was comfortable sexually and never pushed me to do more than I wanted to and now I am

---

[3] (See, e.g., Goguen Design., Ex. A [570:11-570:16] (Baptiste); PTX0224 [5/9/09: "We talk and make love and it is fabulous"]; PTX0258 [1/8/10: "you are one of my absolute favorite people in the world there are so many things that I love about you as a person"]; PTX0261 [2/21/10: "Thank you for the other night. It was so amazing so wonderful"]; PTX0279 [4/7/10: "I love you always"]; PTX0305 [8/13/10: ["Let me start by saying I want you to know always and forever that I truly love you mind body and soul from the bottom of my heart"]; PTX0317 [10/16/10: "Know that no matter what I am always here for you. You can always count on me and I will never ever betray you"]; PTX0338 [2/13/11: "You are a great man. Not everyone is the same you are very special"]; PTX0342 [3/9/11: "Michael all of my feelings surrounding you are happy feelings there are no bad feelings"]; PTX0355 [5/13/11: "I love you so much. . . You are absolutely the most amazing man I have ever met"]; PTX0363 [7/28/11: "I really do love you with all of my heart"]; PTX0364 [8/1/11: "I love you . . . I love sharing with you and I love having you in my life"]; PTX0379 [10/28/11: "Even if we aren't near each other often you are one of my very best friends and my forever love. I could never forget one moment with you. I love you so much more than you realize"]; PTX0389 [2/3/12: "I love you because I love who you are and how I feel when I am with you"]; PTX0402 [4/28/12: "I love you so much and I miss you so much"]; PTX0407 [5/30/12: "I love you so very much. I never want to be without you"]; PTX1128 [7/24/12: "I love you"]; PTX0420 [10/16/12: "I feel like we love each so very much there is no sense in us being apart"]; PTX0423 [11/1/12: "There are so many wonderful things that I love about you"]; PTX0430 [12/6/12: "I love you as a person as much as I ever have. You look as beautiful to me as you ever have"].)

[4] (See, e.g., PTX0282 ["I LOVED your letter . . . and I LOVED your pictures! I could never have enough of you. :)"]; PTX0288 ["I have never imagined that anyone could have as sweet and beautiful a spirit as you have. The fact that you are so amazingly perfect on the outside would be too good to be true, if I didn't know it to be true with my own senses better than anybody"]; PTX0363 [1: "I miss you, and i love you always"; 2: "Baby I love you so much!!!!"; 9: "I miss u and love u so much my sweet angel!"; 17: "I love you VERY VERY much"].)

ready to do more and I hope you are there for that as well." (PTX0224.) Baptiste reiterated this in February 2012 (PTX0389: ["I trusted you even then because you did not demand anything of me. And you were patient with me time after time that I came to see you"].) Baptiste also repeatedly told Goguen how much she enjoyed having sex with him.[5] Goguen also told Baptiste how much he enjoyed having sex with her.[6]

31. During this time, Baptiste told Goguen that he was her only lover (see, e.g., PTX0279 [4/7/10: "I do not see any other men on a sexual level because I told you that I want you to be my lover"]), and that he was the first person with whom she ever had vaginal intercourse (see, e.g., PTX0439 [2/27/13: "I waited for you and I don't think you even noticed. We had sex for the first time and you immediately stood up and made the comparison that my virgin vagina feels different than hookers vagina"]).

**5. Their June 30, 2012 tryst in London and Baptiste's subsequent travels**

32. In June 2012, Baptiste asked Goguen to meet her in London and offered to arrange everything. (PTX0409 [1-2].) When Goguen agreed, Baptiste wrote him that she was "so excited to see" him. (*Ibid.* [2-3].)

33. On June 30, 2012, Goguen met Baptiste at a hotel in London, and they had consensual sex. (RT 154-155; Goguen Design., Ex. E [55:12-16] (Hunt).)

34. The next day, Baptiste texted Goguen, writing that he was "amazing." (PTX0409 [5].) On July 9, 2012 – eight days later – Baptiste sent an email to Goguen stating that "the last night we spent together was the very best night we have ever had." (PTX0409 [5].) She repeated this in an email to Goguen on July 30, 2012. (PTX0412 [2: "The last night together was really incredible for

---

[5] (See, e.g., Goguen Design., Ex. A [571:18-571:24] (Baptiste); PTX0224 [5/9/09: "We talk and make love and it is fabulous"]; PTX0364 [8/1/11: "I love making love to you"]; PTX0379 [10/28/11: "You taste so delicious and fit perfectly inside me like a puzzle. Every single touch imprints onto my memory"; "I could never even make love [to] you enough times to show you how special you are to me"]; PTX0412 [7/24/12: "The last night together was really incredible for me. I could feel so many things moving between us that I have not felt before"]; PTX0416 [8/7/12: "I want to make love to you all of the time"].)

[6] (See, e.g., PTX0363 [4: "I'm gonna want to spend all night as closely connected 2gether as two people possibly could be ;)"; 10: "I can't wait to spend the whole night in a passionate naked embrace while we catch up and make up for lost time"].)

me"].) Baptiste also wrote Goguen that she "would never erase that night for anything" and that
"[i]t was beautiful each and every moment." (PTX0551 [6-7].)

35. In the days immediately following her tryst with Goguen in London, Baptiste went dancing and
partying with her friend, Darcy Hunt. (See Goguen Design., Ex. E [65:16-67:07, 83:03-84:03,
140:25-141:18] (Hunt).) She also went shopping with Hunt and exercising during the week of
July 12, 2012. (See PTX00841 [5]; Goguen Design., Ex. E [80:04-12, 82:06-82:15, 101:15-
102:14, 135:23-138:18] (Hunt).) During the time he spent with Baptiste after her tryst with
Goguen in London, Hunt did not observe Baptiste suffering from any pain or having any
difficulty walking. (Goguen Design., Ex. E [90:15-91:23, 93:10-92:21] (Hunt).)

36. In the days and months after her tryst with Goguen in London, Baptiste traveled extensively
throughout Europe and South Africa. (PTX0994 [11]; Goguen Design., Ex. E [99:08-100:16,
103:14-104:05, 104:18-106:22, 107:02-108:05, 112:05-114:18, 124:17-126:13, 127:21-129:08]
(Hunt); RT 299.)

37. Despite this, Baptiste claimed in a July 30, 2012 email to Goguen that she "ruptured a vein"
during their sex in London. She also claimed that she visited a doctor who told her that she "must
have surgery." (PTX0412 [1].) Before her tryst with Goguen in London, however, Baptiste had
complained to her doctor about rectal bleeding for years and had been diagnosed with
hemorrhoids. (PTX0842 [6-7].)

38. There is no evidence that Baptiste suffered from any physical injury, including any tearing,
rupture, or perforation of her rectal canal, as a result of her tryst with Goguen in London. (RT
160, 321-322.) There is no evidence that she ever received any medical treatment for an injury to
her rectal canal (aside from hemorrhoids), including any emergency medical treatment. (RT 295,
317, 321-324.) Baptiste did not mention any such injury to Dr. Karen Sandler, her personal
physician, after her tryst with Goguen in London, and Dr. Sandler did not observe any such
injury. (Goguen Design., Ex. H [126:4-12, 174:1-9] (Sandler).)

39. If Baptiste had suffered any serious rectal injuries after her tryst with Goguen in London, she
would have required surgery and would have been hospitalized. (RT 316-320.) She would have
been unable to travel anywhere for at least four to six weeks. (RT 320.) Moreover, she would

have had anal incontinence. (RT 325.) Her medical records, however, state that she suffered from no bowel problems in February 2013. (PTX0761, RT 324.)

### 6. Goguen's $250,000 donation to Every Girl Counts

40. In March 2011, Baptiste told Goguen that she had established a non-profit, Every Girl Counts, so she could mentor young girls. (PTX0342 [17]; RT 221.)

41. Baptiste told Goguen that she had formed a board for Every Girl Counts that included female professionals who worked in medicine and law. (See PTX0397 [9-10]; PTX0402 [3]; PTX0465 [2].) She also told him that Every Girl Counts had established a center and was supporting "36" girls by providing them with food, housing, and education. (See PTX0451 [11]; PTX0465 [6].)

42. Baptiste repeatedly solicited Goguen for donations to Every Girl Counts. (See, e.g., PTX0551 [15].) She assured Goguen that the money would only be used for the non-profit and the young girls it was helping. (See PTX0402 [10-11]; PTX0551 [15]; RT 223-224.) She also assured Goguen that Every Girl Counts was a "legitimate charity" (PTX0551 [15]), and that he could "write . . . off" the donation (PTX0451 [11]).

43. Every Girl Counts, however, had *no* board of directors, *no* officers or employees, and *no* volunteers. It did *not* support 36 girls, and there were *no* emails or documents relating to the charity or its purported operations. (Goguen Design., Ex. A [vol. 5: 131:18-23, 207:21-208:13] (Baptiste); PTX0551 [15]; PTX0872 [3-5]; PTX0873 [3-5].)

44. Goguen eventually agreed to donate money to Every Girl Counts. (PTX0420 [6: "I am SO SO proud of you for the person you are!!! I love the work that you're doing, and I haven't forgotten about funding your charity!! If you are still ok with me doing it, I'd like to start by wiring a few hundred $k into that account this week. In the future I plan to add to it as your activities and successes continue"].)

45. On May 16, 2013, Goguen wired $250,000 to Every Girl Counts. (PTX0894 [6].)

46. Baptiste used part of Goguen's charitable donation to commission fantasy paintings of herself at a cost of over $40,000. (Goguen Design., Ex. A [vol 5: 178:07-20; 181:21-182:01; 182:07-09; 182:19-183:03] (Baptiste).)

### 7. Baptiste's recordings of her telephone conversations with Goguen

47. Baptiste regularly recorded her telephone conversations with Goguen. (*Ibid.* [1348:01-1348:09]; PTX0839 [4].)

48. Baptiste had these conversations transcribed. (Goguen Design., Ex. A [1349:21-1350:01] (Baptiste).)

49. Baptiste claimed that she did not know where the recordings and transcripts were anymore. (*Ibid.* [1350:23-1351:01; 1351:08-1351:16].)

50. At the time Baptiste recorded these telephone conversations, Goguen did not know about or consent to the recordings. (RT 227-228.)

### 8. Baptiste's Human Papillomavirus (HPV) infection and her claim that Goguen infected her with HPV

51. On February 23, 2010, Baptiste tested positive for HPV. (Goguen Design., Ex. H [69:10-70:18; 72:06-24] (Sandler); PTX0263.) Baptiste also tested positive for HPV in August 2010 (Goguen Design., Ex. H [109:08-12; 143:22-144:01] (Sandler); PTX0308) and January 2012 (Goguen Design., Ex. H [131:03-131:11; 143:22-144:01] (Sandler); PTX0756).

52. On February 28, 2013, Baptiste tested negative for HPV. (Goguen Design., Ex. H [129:02-130:12] (Sandler); PTX0551 [10]; PTX0762.) According to her doctor, Baptiste had fought off the infection. (Goguen Design., Ex. H [131:03-11; 131:22-132:06] (Sandler).)

53. Since February 2013, Baptiste has *never* tested positive for HPV. (PTX0551 [10].)

54. From 2010 to 2014, Baptiste's pap smears were negative and showed no signs of cancer. (Goguen Design., Ex. H [143:02-17; 151:16-152:19] (Sandler).)

55. Despite testing negative for HPV in February 2013, Baptiste told Goguen in June 2013 that she tested positive for HPV. (RT 131; PTX0457 [12].) At that time, Baptiste told Goguen that her doctor told her that her "immune system would kill it in a few months." (PTX0457 [12].) She also told Goguen that she has "only ever had one sexual partner" and has not had "any other sexual interactions . . . besides" him (*ibid.* [10, 12]), even though she had multiple sexual partners in the past (see, *supra*, at ¶¶ 11, 15). In doing so, Baptiste made it clear that Goguen had infected her with HPV. (See also PTX0465 [8].)

56. Goguen told Baptiste that he tested positive for HPV in college but thought that he was no longer infected. (PTX0409 [236]; PTX 0476 [2].) He suggested that his college infection may have been the source of her infection. (*Ibid.*) In her July 2013 response, Baptiste suggested that Goguen may have contracted HPV from his wife at the time. (See PTX0476 [2].)

### 9. The demise of their romantic and romantic relationship

57. In 2012, Baptiste expressed to Goguen her growing frustration over just being his mistress and stated that she wanted more from him. She repeatedly told Goguen that he should leave his wife, be with her, and have children with her. (See, e.g., RT 117-118; PTX0407; PTX0409; PTX0420; PTX0430; PTX0439.) Despite her frustration with their relationship, Baptiste told Goguen in February 2013 that she still believed that "it was worth it" to have gotten involved with him. (PTX0438 [6].)

58. At the end of 2011, Baptiste began denigrating Jordana Goguen, Goguen's wife at the time. (See, e.g., PTX0379 [10/28/11: "This girl was not an actress. Further more I think she was more of a prostitute than a stripper"].) Throughout 2012 and 2013, Baptiste's derogatory comments about Jordana became harsher and more frequent.[7] Goguen defended Jordana and asked Baptiste to stop but she did not. (See, e.g., RT 117-118; PTX 0484.)

59. Upset with her repeated denigration of Jordana, Goguen finally ended his relationship with Baptiste by email in October 2013. (RT 136-137; PTX0484.)

60. From 2009 to 2013, Goguen gave Baptiste approximately $850,000. (RT 109.) This did not include his donation to Every Girl Counts. (*Ibid.*)

---

[7] (See, e.g., PTX0402 [4/8/12: "She is still running around like a teenager"]; PTX0407 [5/30/12: "This woman is delusional and lies all day long"; "A woman of this nature is poison to a man"]; PTX0420 [10/16/12: "There is not one thing that I find attractive about her. I think she is mentally and emotionally unstable"]; PTX0430 [12/6/12: "She is not a good business women. Nobody would ever take her seriously. She is a lower rent version of Tila Tequila. The women has injected her face so many times she is starting to look like Michael Jackson. She has no place in the beauty business."]; PTX0443 [3/4/13: "She is not doing a very good job as a wife"].)

### C. Baptiste's Demands and Threats and the Settlement Agreement

#### 1. Baptiste's demands immediately after the breakup

61. The day after Goguen ended their relationship, Baptiste wrote him that her "heart is broken." (PTX0485 [1].) She also demanded that he "pay for the mortgage" on an apartment for her and pay her an "allowance" so that she "can live without stress for awhile." (PTX0485 [5].)

62. When Goguen did not respond (RT 145-146), Baptiste demanded that Goguen buy her a multimillion dollar apartment and commercial space in New York and pay her an allowance (see, e.g., PTX0489 [2-5]; PTX0459 [131-160]). She told Goguen that if he did "not want to love" her, he could "pay all of the bills." (PTX0459 [164].)

63. In December 2013, Baptiste told Goguen that she was "so mad at" him that she "could spit hornets." (PTX0484 [177].) She claimed that her purported HPV infection would prevent her from having children and may result in cervical cancer. (PTX0484 [177-178].) She also asked him to come up with a "plan" to "fix this." (PTX0484 [179].)

64. At that time, Goguen did not agree to Baptiste's demands. (RT 170.)

#### 2. Baptiste's retention of Rivers Morrell and her alteration of her medical records[8]

65. On January 7, 2014, Baptiste retained Rivers Morrell, an attorney, to represent her "in connection with all damages and injuries out of an incident concerning STD transmission." (PTX0498; see also Goguen Design., Exs. A [975:20-976:04] (Baptiste) & G [61:24-62:13] (Morrell).) Baptiste told Morrell that Goguen was her only sexual partner and that he had infected her with HPV. (*Id.*, Ex. G [71:22-72:07] (Morrell).) She asked him to prepare a "demand letter" and told him that Goguen would pay her "a lot of money" after receiving that letter. (*Ibid.* [61:24-62:13, 62:23-63:03].)

66. On January 8, 2014, Baptiste visited her doctor and obtained copies of her HPV test results. (Goguen Design., Exs. C [62:23-64:19, 64:20-66:07] (DiPaola) & H [23:19-24:04] (Sanders).) Those test results indicated that she had tested positive for HPV in February 2010 (PTX0263) and August 2010 (PTX0308), but had tested negative for HPV in February 2013 (PTX0762).

---

[8] The Court allowed Goguen to obtain Baptiste's communications with Morrell pursuant to the crime/fraud exception to the attorney-client privilege. (See PTX0539.)

67. On January 9, 2014, Baptiste faxed to Morrell copies of her HPV test results. (PTX0442; PTX0540 [17-21]; Goguen Design., Ex. G [142:10-143:04, 145:08-146:22, 146:25-147:05, 148:12-148:23] (Morrell).) The test results she faxed to Morrell did not, however, match the test results that she had obtained from her doctor.

68. First, the February 2013 test result faxed by Baptiste to Morrell changed the result from "*negative*" to "*positive*" for HPV. (Compare PTX0762 [authentic] with PTX0540 [Morrell version: 18-19]; Goguen Design., Ex. G [125:01-08, 126:06-12, 126:17-21, 130:06-131:06; 131:11-19, 137:17-139:22, 141:02-07, 142:10-143:04] (Morrell).) The altered February 2013 test result faxed by Baptiste to Morrell, however, contained the *same* date, order number, and sample collection time and date as the authentic test result obtained by Baptiste from her doctor. (*Ibid.*)

69. Second, the collection date of the February 23, 2010 test result faxed by Baptiste to Morrell – which indicated that she tested positive for HPV – had been changed from "02/23/2010" to "02/23/2011." (Compare PTX0263 [authentic] with PTX0540 [Morrell version: 17]; Goguen Design., Ex. G [125:01-08, 126:06-12, 126:17-21, 130:06-131:06; 131:11-19, 137:17-139:22, 141:02-07, 142:10-143:04] (Morrell).) Baptiste's age had also been altered to match the altered collection date. (*Ibid.*)

70. Finally, the collection date of the August 31, 2010 test result faxed by Baptiste to Morrell – which indicated that she tested positive for HPV – had been changed from "08/31/2010" to "08/31/2011." (Compare PTX0308 [authentic] with PTX0540 [Morrell version: 21]; Goguen Design., Ex. G [125:01-08, 126:06-12, 126:17-21, 130:06-131:06; 131:11-19, 137:17-139:22, 141:02-07, 142:10-143:04] (Morrell).) Baptiste's age had also been altered to match the altered collection date. (*Ibid.*)[9]

71. Morrell did not obtain Baptiste's medical records directly from her doctor. Other than reviewing the medical records provided by Baptiste, Morrell made no efforts to investigate Baptiste's HPV claim. (Goguen Design., Ex. G [308:17-18, 308:25-309:5] (Morrell).)

---

[9] The dates of the February 23, 2010 and August 31, 2011 test results were presumably altered to avoid the three-year statute of limitations for fraud. (See Goguen Design., Ex. G [64:02-65:20, 116:09-118:02] (Morrell).)

### 3. The Draft Complaint

72. At Baptiste's direction and approval and based on the altered medical records that he received
from Baptiste, Morrell prepared a draft complaint (Draft Complaint). (Goguen Design., Ex. G
[116:09-118:02, 238:21-239:10] (Morrell).)

73. Baptiste told Morrell that he did not need to worry "to[o] much about the contents of the
complaint." (PTX0540 [27].) She explained to Morrell that she knew Goguen's "personality very
well" (*ibid.* [31]), and that Goguen "will pay me" (*ibid.* [27]), because "[h]e will settle rather
than have this become public" (*ibid.* [31]).

74. The Draft Complaint alleged nine causes of action. Eight related to Baptiste's purported HPV
infection. (PTX0501 [3-32].) The Draft Complaint also included Sequoia, Goguen's employer,
as a defendant (*ibid.*), even though Morrell had *no* evidence connecting Sequoia to the
allegations in the Draft Complaint (Goguen Design., Ex. G [164:06-20, 169:15-170:25, 183:10-
22, 184:01-09] (Morrell)). In the prayer for relief, the Draft Complaint sought a total of $40
million in damages. (PTX0501 [32].)

75. The Draft Complaint further alleged that:

    (1) Baptiste "met and began dating [Goguen] in or about 2000," when Baptiste "was 19 years
old" (*ibid.* [5]);

    (2) Baptiste "did not date or engage in sexual intercourse with any other person during the
course of her relationship with Mr. Goguen" (*ibid.* [8]);

    (3) When Baptiste informed Goguen that "she had contracted an STD, including HPV" "[i]n
or around July 2012," Goguen said that "he knew he had an STD," "had numerous
outbreaks," and was getting "treated" and that she should "just live with it" (*ibid.* [9]);

    (4) Baptiste "has suffered pain and irritation from frequent biopsies necessary to test for
cancer and other potential critical diseases" (*ibid.* [10]);

    (5) As a result of having "an STD including HPV," Baptiste "is at an increased risk of
developing and contracting cervical cancer and other forms of genital cancer, as well as other
forms of cancer. All of these cancers put [Baptiste] at risk for dying" (*ibid.*);

(6) Baptiste may be "prohibited from having children due to the contraction of the STD transmitted by" Goguen and is "at risk for a hysterectomy which would prevent her from ever having children" (*ibid.* [11]);

(7) Baptiste "continues to require medical treatment due to complications and the affects [sic] of contracting an STD, including HPV" (*ibid.*); and

(8) "In or around July 2012," Goguen forced Baptiste "to engage in various sexual acts (other than vaginal intercourse), including anal intercourse" – which caused "severe damage to her anus and/or rectum, including a severe tear (including a perforation of the rectal canal) . . . causing excessive bleeding" (*ibid.* [11]).

76. Goguen denied these claims (RT 233-237), and Baptiste presented no evidence to support them. Moreover, these claims are contravened by evidence that Baptiste met Goguen in 2002 when she was 21; that her relationship with Goguen was consensual; that she, for over a decade, wrote effusively and affectionately about Goguen and their relationship, including their sexual relationship; that she had multiple sexual partners before she tested positive for HPV; that she tested negative for HPV after February 2013; that she did not suffer a tear, rupture, or perforation of her rectal canal or any other serious physical injury during her relationship with Goguen, including after having sex with him in June 2012; that she voluntarily sent thousands of text messages to Goguen after he ended his relationship with her; that she altered medical records of her HPV infection; and that she willfully disobeyed discovery orders. (See, *supra*, at ¶¶ 1-71; Discovery Referee Order Nos. 13 and 30.)

### 4. The demand letters

77. On January 27, 2014, Morrell, with Baptiste's knowledge and approval, sent Goguen a demand letter with the Draft Complaint. (PTX0501; Goguen Design., Exs. A [975:20-976:02] (Baptiste) & G [283:07-16] (Morrell)].) Morrell did *not*, however, send the letter and Draft Complaint to Sequoia, the other named defendant. (PTX0501.)

78. On February 8, 2014, Morrell sent another demand letter to Goguen's counsel. (PTX0499; Goguen Design., Ex. G [308:25-311:09] (Morrell).) In that letter, Morrell wrote that Baptiste "has the 'high-risk' type" of HPV and will have that virus "in her for the rest of her life."

(PTX0499 [3-4].) As a result, Baptiste is at risk of developing numerous cancers, may not be able to have children, and will be subject to a "[l]ifetime of biopsies, and other tests." (*Ibid.* [4].)

79. Morrell also wrote that "[y]ou have requested that this all remain confidential, and that none of this be disclosed publicly, nor provided to the press." Morrell, however, explained that "[t]his will depend on your client, his action, his conduct, and his 'generosity', as you put it." (*Ibid.* [1].) Morrell then raised the potential consequences to Goguen if he did not resolve the matter without litigation: "I doubt that the public, your client's existing clients, your client's future clients, your client's associates, and any of his charitable organizations will have the same view of your client if this matter does not resolve thru pre litigation mediation." (*Ibid.* [4].)

80. When Goguen's counsel did not respond to this letter, Morrell sent Goguen's counsel an email on February 17, 2019 stating that he would be filing the complaint that week. (Goguen Design., Ex. G [315:14-316:20] (Morrell).) But Morrell did not do so. (*Ibid.* [317:11-13].)

### 5. Baptiste's firing of Morrell and her direct negotiations with Goguen

81. On February 19, 2014, Baptiste sent an email to Morrell firing him. (*Ibid.* [318:03-320:03]; PTX0409 [296]; PTX0543 [51].) In that email, Baptiste wrote that she "*no longer wish[ed] to pursue the case* for several reasons which I previously stated." (Goguen Design., Ex. G [318:03-320:03] (Morrell), emphasis added.) Baptiste had previously asked Morrell to "put everything on hold" due to a purported medical condition. (*Ibid.*; see also PTX0543 [44, 46-47].)

82. Even before she fired Morrell, Baptiste had been communicating directly with Goguen about resolving their dispute. (See, e.g., PTX0409 [219-295].) Baptiste continued to do so after she fired Morrell. (See, e.g., PTX0409 [296-543]; PTX0510; PTX0511].)

83. During these communications with Goguen, Baptiste continued to emphasize that he was her only lover and that she faced serious health consequences from her purported HPV infection. (See, e.g., PTX0409 [393, 395, 397, 402, 469, 475, 490, 502, 505, 510].) She also threatened to tell Goguen's wife if she ran into her (see, e.g., PTX0409 [453]), and to file a lawsuit and publicize her allegations if Goguen did not resolve their dispute (see, e.g., *ibid.* [353, 354, 444, 451, 455, 469-470, 488, 494, 511, 524]). Baptiste even warned Goguen that it would be a "media circus" "[i]f this blows up in any way." (PTX0511 [166].)

84. Baptiste also made it clear that Goguen was going to pay her the "full" $40 million and all her legal bills if Morrell sued her. (PTX0409 [472, 475].)

85. During his direct negotiations with Baptiste, Goguen gave Baptiste $200,000 as demanded by her, for her purported medical treatments. (RT 189; PTX0894 [7].)

### 6. The Settlement Agreement

86. Fearing the media circus that would ensue if Baptiste sued him and the resulting impact on his family and career and believing that he had infected Baptiste with HPV, Goguen agreed to pay Baptiste $40 million to resolve their dispute. (RT 201.) On May 23, 2014, Goguen and Baptiste signed a written settlement agreement (Settlement Agreement). (PTX0514.)

87. Under the terms of the Settlement Agreement, Goguen agreed to pay Baptiste $40 million in four $10 million installments on June 1, 2014, December 31, 2014, June 30, 2015, and December 2015. (PTX0514 [¶ 1].) In return, Baptiste agreed to release all claims against Goguen and agreed not to bring a legal action again him. (*Ibid.* [¶¶ 3-4].)

88. Baptiste and Goguen also agreed "to keep confidential" anything related to their relationship, personal life, the Settlement Agreement, and any potential lawsuits contemplated by Baptiste. (*Ibid.* [¶¶ 6-8].) They agreed not to "directly or indirectly disclose, discuss, publish or disseminate any such information to any person or entity, including without limitation, friends, family members, any media outlet, print or electronic media, Internet social networks, or any other means of publication by any means whatsoever, forever and for all time." (*Ibid.* [¶ 6].)

89. Finally, Baptiste and Goguen agreed to "cease *all communications* between them hereafter, with the exception of communications pertaining directly to the implementation of this Agreement." (*Ibid.* [¶ 9], emphasis added.)

### D. Baptiste's Numerous Texts to Goguen From May 23, 2014 Through December 19, 2014

90. On May 30, 2014, Goguen wired $300,000 to Baptiste. On June 2, 2014, Goguen made a second payment of $9.7 million to Baptiste's foreign bank account. (PTX0984 [9].) In doing so, he fulfilled his obligation under the Settlement Agreement to make the first $10 million payment. (See PTX0514 [¶ 1].)

91. Although Baptiste agreed to "cease all communications" with Goguen "with the exception of communications pertaining directly to the implementation of" the Agreement, Baptiste began sending text messages to Goguen soon after executing the Agreement. (See, e.g., PTX0510 [173-195].) The number of text messages sent by Baptiste to Goguen only increased after Goguen made the first $10 million payment. (See PTX0510; PTX0511; PTX0804.)

92. From May 23 through December 19, 2014, Baptiste sent Goguen almost *1600* text messages. (PDX0042.) In these text messages, Baptiste continued to attack Goguen, Jordana, and his family. (See, e.g., PTX0409; PTX0511; PTX0804.) Baptiste also sent pictures of herself and promoted her skills and attributes in an apparent attempt to rekindle their relationship. (*Ibid.*) For the most part, Goguen did not respond. (See *ibid.*)

93. In her text messages, Baptiste also repeatedly demanded that Goguen attend therapy and claimed that Goguen had breached the Settlement Agreement by refusing to attend therapy (see, e.g., PTX0510 [137-484]; PTX0511 [143-515]; PTX0804 [16-172]), even though the Agreement did not require him to do so (see PTX0514).

94. In July 2014, Baptiste asked Goguen to "accelerate" his payments so she could get the full $40 million by the end of 2014 and so she did not "have to spend another year thinking about a potential lawsuit getting a judgment or dealing with your problems." (PTX0804 [69].) When Baptiste followed up on this request, Goguen repeatedly told her that he would only make the payments required under the Settlement Agreement and would not accelerate them. (See, e.g., PTX0804 [74, 85-94].) In response, Baptiste threatened to file a lawsuit and obtain a judgment. (See, e.g., PTX0804 [87].) Baptiste also continued to send Goguen a barrage of text messages. (See, e.g., PTX0409; PTX0510; PTX0511; PTX0804.)

95. On December 19, 2014, Goguen's counsel sent Baptiste a letter rescinding the Settlement Agreement. In the letter, Goguen's counsel advised Baptiste that Goguen would no longer be making any payments to her and asked her to return the $10 million payment that he had paid to her pursuant to the Agreement. (PTX0517.)

**E. Baptiste's Continued Communications With Goguen From December 19, 2014 through March 8, 2016 – The Date this Action Was Filed**

96. After receiving the letter from Goguen's counsel, Baptiste continued to send text messages to Goguen. (See, e.g., PTX0409; PTX0510; PTX0511.) In these text messages, she continued to attack Goguen and accuse him of numerous crimes and misdeeds. (See *ibid.*) Baptiste also repeatedly threatened to sue Goguen. (See *ibid.*)

97. From December 19, 2014 through March 8, 2016 – the date Baptiste filed this action – Baptiste sent Goguen *over 1600* text messages. (PDX0042.)

98. After Baptiste filed this action on March 8, 2016, Goguen changed his phone number so he would no longer receive text messages from Baptiste. (RT 258.)

**F. Baptiste's Social Media Posts After March 8, 2016**

99. After March 2016, Baptiste began posting regularly about the lawsuit, her accusations against Goguen, and Goguen's alleged crimes and misdeeds on social media, including on LinkedIn, Facebook, and Twitter. (See, e.g., PTX0527; PTX0553.) She has done so as recently as September 2019. (See PTX0527, PTX0553.)

100.    In these posts, Baptiste claims that Goguen abused and harmed her, including that he:

(1) "purchased" her when she was a "young girl" from an "organized crime" syndicate (see, e.g., PTX0527 [40]; PTX0553 [13, 37, 97]);

(2) raped, sodomized, and physically, sexually, and emotionally abused her (see, e.g., PTX0527 [8, 38-60, 73-76]; PTX0553 [21-22, 47-48, 50, 56, 62, 81, 83, 88, 132-133]);

(3) infected her with high risk strains of HPV and/or other sexually transmitted diseases, putting her at greater risk of developing cancer and preventing her from having children (see, e.g., PTX0527 [73-76]; PTX0553 [56]);

(4) kept Baptiste as a sex slave (see, e.g., PTX0553 [10]);

(5) ruptured her anal canal when he raped her and left her bleeding and unable to "evacuate" her bowels (see, e.g., PTX0527 [73-76]; PTX0553 [5, 56]); and

(6) stalked and harassed her (see, e.g., PTX0527 [8, 26, 73, 75, 77]; PTX0553 [139]).

101.      Goguen denied these claims (RT 233-237), and Baptiste presented no evidence to support
them. Moreover, these claims are contravened by evidence that Baptiste met Goguen in 2002
when she was 21; that her relationship with Goguen was consensual; that she, for over a decade,
wrote effusively and affectionately about Goguen and their relationship, including their sexual
relationship; that she had multiple sexual partners before she tested positive for HPV; that she
tested negative for HPV after February 2013; that she did not suffer a tear, rupture, or perforation
of her rectal canal or any other serious physical injury during her relationship with Goguen,
including after having sex with him in June 2012; that she voluntarily sent thousands of text
messages to Goguen after he ended his relationship with her; that she altered medical records of
her HPV infection; and that she willfully disobeyed discovery orders. (See, *supra*, at ¶¶ 1-71;
Discovery Referee Order Nos. 13 and 30.)

102.      Baptiste also continues to make social media posts claiming that Goguen:

(1) engaged in human trafficking, sex trafficking, sex slavery (see, e.g., PTX0527 [38-60,
73]; PTX0553 [8, 13-18, 30, 97, 113-116]);

(2) is a pedophile, psychopath, pervert, and sexual deviant (see, e.g., PTX0527 [38-60];
PTX0553 [3, 5, 23, 28-29, 48, 110, 123]);

(3) has drugged and raped numerous women – including multiple underage girls and a
"15 year old baby sitter" – and is a "serial rapist" (see, e.g., PTX0527 [26, 38-60, 73-74];
PTX0553 [1, 9, 14, 22, 29, 31, 35, 36, 39, 54, 71-72, 75-78, 80, 83, 111]);

(4) stalks his rape and trafficking victims (see, e.g., PTX0553 [114]);

(5) has "forced" numerous women to have abortions (see, e.g., PTX0527 [38-60, 73-76];
PTX0553 [9, 24, 27, 31, 116]);

(6) bribed the Court, Baptiste's attorneys, and law enforcement, and tampered with
records to hide his crimes of rape and murder (see, e.g., PTX0527 [77]; PTX0553 [55,
58, 71, 107, 123, 155-156]);

(7) intentionally spread sexually transmitted diseases to "hundreds of girls and women"
(see, e.g., PTX0527 [9, 19, 21, 23, 26, 29-30, 32, 34, 49, 73-75]; PTX0553 [56, 83, 88,
134, 140]);

(8) married multiple prostitutes, including his current wife (see, e.g., PTX 0527 [38-60, 66, 77]; PTX0553 [14-16, 32-33, 111-116, 132, 161]);

(9) committed tax evasion and tax fraud and is "under IRS investigation" as well as "police investigation" (see, e.g., PTX0527 [36, 49, 52-53, 62]; PTX0553 [18, 83]); and

(10) "silenced" his "victims," including one girl "who was forced into prostitution at age 14 with a multimillion dollar non-disclosure agreement" (see PTX0527 [38-41, 47-49, 59-61, 77]; PTX0553 [9, 15, 17, 31, 116, 142]).

103.     Again Goguen denied these claims. (RT 233-237.) Moreover, Baptiste provided *no* evidence to support them. Finally, her many demonstrably false accusations against Goguen and her willful refusal to obey discovery orders casts further doubt on the credibility of these claims. (See, e.g., *supra*, at ¶¶ 1-71; Discovery Referee Order Nos. 13 and 30.)

104.     In her social media posts, Baptiste also claims that Goguen's current wife, Jamie Goguen, is a prostitute, cyberbullies Baptiste and other rape victims, and instructs her friends to make false social media posts about Baptiste. (See, e.g., PTX0427 [8, 19, 21, 24, 26, 28, 30, 32, 34, 47, 50, 52, 54, 55, 59, 65, 66]; PTX0553 [13, 32, 34, 113, 116, 132-133, 154].) Baptiste, however, provided *no* evidence to support these claims. And her many demonstrably false accusations against Goguen and her willful refusal to obey discovery orders casts further doubt on the credibility of these claims. (See, e.g., *supra*, at ¶¶ 1-71; Discovery Order Nos. 13 and 30.)

105.     Many of these social media posts by Baptiste include Goguen's full name and picture as well as photos of his wife, Jamie Goguen, and his children. (See, e.g., PTX0527 [12, 21, 56, 59, 63]; PTX0553 [10, 13-17, 19, 21-24, 25-28, 35, 39-40, 50, 54-55, 57, 61, 71, 77, 113, 116, 129-130, 146, 151-153, 158].)

106.     Baptiste has sent threatening emails to Goguen's counsel and has harassed his accountant and nonprofits that he is associated with. (RT 239-240; PTX0739.)

**G. The Impact of Baptiste's Private and Public Accusations on Goguen**

107.     Even before Baptiste filed this action, her accusations against Goguen caused him great distress. (See, e.g., RT 197-198.)

108.     But after Baptiste filed the lawsuit, it became worse. The day this action was filed Goguen resigned from Sequoia. (RT 220.) His divorce with Jordana "turned very ugly." His daughter in college had to take a leave of absence, and his younger daughter stopped talking to him. (RT 198.)

109.     The barrage of text messages from Baptiste after they executed the Settlement Agreement left Goguen "emotionally exhausted." (RT 218.)

110.     Baptiste's posts on social media continue to negatively affect Goguen's interactions with banks and investors. (RT 77-78.)

## STATEMENT OF THE CASE

111.     On March 8, 2016, Baptiste filed this action against Goguen. Her "Verified Complaint for Breach of Contract" (Verified Complaint) alleged one cause of action for breach of contract. In support, Baptiste, among other things, alleged under penalty of perjury that:

(1) she "has been the victim of human trafficking since she was 15";

(2) she "was brought to America to be sold as a dancer to a strip club";

(3) Goguen "repeatedly promised her that "he would help her break free of the human traffickers and . . . protect her from them" "if she would go out with him";

(4) Goguen attempted to force her to have sex with him the night they first went out but let her go "after she broke down in tears";

(5) Goguen "continually raped" her, "including forcibly sodomizing" her, "[f]rom 2001 to 2013";

(6) Goguen "routinely forced" her "to use alcohol and intoxicating agents to render her more pliable to his lewd demands";

(7) she "did not engage in sexual intercourse with any other person during her association with Goguen";

(8) Goguen would "forcibly ejaculate in her mouth, causing her to choke and vomit";

(9) Goguen "forcibly sodomized" her for hours "in June 2012" and ripped "through her anal canal . . . causing a 7-inch tear" – which left "nearly hemorrhaging to death"; and

(10) she discovered in 2011 that Goguen had intentionally infected her with "several high-risk strains of" HPV – which "put her at risk of various cancers, including cervical cancer, which could require a hysterectomy and prevent her from being able to bear children."

112.     In his answer, Goguen denied the allegations in the Verified Complaint and asserted numerous affirmative defenses. (See Defendant/Cross-Complainant Michael Goguen's First Amended Answer and Affirmative Defenses to the Verified Complaint of Plaintiff/Cross-Defendant Amber Laurel Baptiste.)

113.     Goguen filed a cross-complaint against Baptiste (Cross-Complaint), alleging causes of action for: (1) extortion; (2) fraud based on her misrepresentations regarding her HPV status; (3) fraud based on her misrepresentations regarding her sexual history; (4) declaratory relief to invalidate the Settlement Agreement; (5) breach of contract; (6) rescission of the Settlement Agreement; (7) a restraining order under Code of Civil Procedure section 527.6; (8) invasion of privacy; (9) fraud based on Baptiste's solicitation of donations to Every Girl Counts, a nonprofit established by Baptiste; and (10) breach of fiduciary duty. Goguen also alleged causes of action for fraud and breach of fiduciary duty against Every Girl Counts. (See Third Amended Cross-Complaint of Defendant/Cross-Complainant Michael Goguen Against Plaintiff/Cross-Defendant Amber Baptiste and Cross-Defendant Every Girl Counts.)

114.     In her answer to the Cross-Complaint, Baptiste denied the allegations and asserted multiple affirmative defenses. Baptiste did not, however, include the litigation privilege as an affirmative defense. (See Answer of Plaintiff and Cross-Defendant Amber Laurel Baptiste to Cross-Complainant Michael L. Goguen's Third Amended Cross-Complaint.)

115.     In its answer to the Cross-Complaint, Every Girl Counts also denied the allegations and asserted multiple affirmative defenses. (See Answer of Cross-Defendant Every Girl Counts to Cross-Complainant Michael L. Goguen's Third Amended Cross Complaint.)

116.     On April 14, 2017, the Court denied Baptiste's anti-SLAPP motion. The Court held, among other things, that the litigation privilege did not appear to bar Goguen's claims based on the "evidence presented here" because "it does not appear that the asserted 'pre-litigation

communications' by Baptiste's former counsel were related to a proceeding contemplated in good faith and under serious consideration." The Court also concluded that the litigation privilege did not apply to threats made by Baptiste "to disclose allegedly false information about him and his family which was not set forth in the" Draft Complaint.[10]

117.    On September 18, 2017, the Court appointed Judge (Ret.) Read Ambler as the Discovery Referee. Judge Ambler was "authorized and empowered to supervise, direct, and decide any and all discovery disputes and other discovery issues," including sanctions motions. (See Order Appointing Discovery Referee (CCP § 638) ¶ 3.)

118.    On October 18, 2018, Judge Ambler, based on Baptiste's willful discovery violations, ordered issue and evidentiary sanctions against her. As part of these sanctions, Judge Ambler ordered that "[t]he jury shall be instructed that:

"1. All of Baptiste's passports accurately reflect her birthdate of October 18, 1980;

"2. Baptiste freely traveled the world extensively at a time she now claims she was a victim of sex trafficking;

"3. Baptiste travelled extensively throughout Europe and South Africa in the days and months after alleging being raped in London in 2012 (the "London Incident") leaving her "nearly hemorrhaging to death" and "unable to walk;

"4. At all times since filing this lawsuit, Baptiste was free to travel to the United States.

"5. Baptiste willfully violated a Court discovery order requiring her to produce her current passport, and this willful violation of a court order should be considered as evidence of her lack of credibility regarding the London Incident and her allegations of sex trafficking." (See Discovery Referee Order No. 13.)

119.    On September 12, 2019, Judge Ambler granted Goguen's motion for terminating sanctions based on Baptiste's willful violation of numerous discovery orders. As a result, Judge

---

[10] (See Order (1) Denying Ms. Baptiste's Motion to Amend, (2) Denying Ms. Baptiste's Anti-SLAPP Motion; (3) Granting Mr. Goguen's Motion for a Letter of Request Concerning the City of Edmonton; (4) Granting Mr. Goguen's Motion for a Letter of Request Concerning Independent Artists; (5) Denying Mr. Goguen's Motion for a Mental Examination of Ms. Baptiste, and (6) Granting the Parties' Three Motions to Seal at 3-4.)

Ambler ordered that Baptiste's Verified Complaint be dismissed with prejudice. (See Discovery Referee Order No. 30.)

120.     Pursuant to the parties' stipulation, the Court set this case for trial on Goguen's Cross-Complaint on October 15, 2019. (See Order Granting Ex Parte Application for a Trial Continuance Pursuant to Stipulation dated Dec. 24, 2018.)

121.     On October 15, 2019, this matter was called for trial by Judge Leland Davis. Goguen and his counsel were present. Baptiste was not.[11] Instead, Baptiste telephoned the courtroom, stating that she was unable to attend the trial because she was "ill." After a recess, Judge Davis recalled the matter and asked his clerk to call Baptiste and inform her that the trial was moving forward. Baptiste informed the clerk that she was not attending the trial. Judge Davis continued the matter to October 17, 2019 and issued an Order to Show Cause re: Contempt for failure to appear and an Order to Show Cause re: why the case should not be sent out for trial on October 17, 2019. (See Minute Order dated Oct. 15, 2019.) Judge Davis also ordered Baptiste to "FILE proof of illness." (*Ibid.*)

122.     On October 17, 2019, the matter was called for trial by Judge Davis. Goguen and his counsel were present. Baptiste was not. Baptiste also did not contact the Court. After a recess, Judge Davis assigned the matter to Judge Joseph Scott for trial on October 21, 2019. (See Minute Order dated Oct. 17, 2019.)

123.     On October 17, 2019, Baptiste filed what appeared to be a motion for reconsideration of Discovery Referee Order No. 30. (See Decl. of Baptiste in Support of Order Granting Reconsideration of Discovery Referee Order No. 30.) But Baptiste did not serve her moving papers on Goguen or file a proof of service. For these reasons, the Court denied the motion on October 23, 2019. (See Oct. 23, 2019 Letter from the Law and Motion Desk, Civil Dept.)

124.     On October 17, 2019, Baptiste submitted declarations from Drs. John Itamura and Nancy Kaser-Boyd. Dr. Itamura wrote that Baptiste had surgery on July 2, 2019 to address her allergic reaction to "metals that had been placed in her left distal humerus" in 2017. Dr. Itamura,

---

[11] By this time, Baptiste had gone through multiple attorneys and was proceeding in pro per.

however, retracted that declaration and submitted a new declaration. His new declaration merely stated that he advised Baptiste to be "on bedrest" after her surgery on July 2, 2019 and that Baptiste "does show signs of anxiety and PTSD." (Decl. of Bruce Van Dalsem ISO Cross-Complainant Michael Goguen's Motion to Strike Declaration of Dr. John Itamura, Uploaded to Case Anywhere by Cross-Defendant Amber Baptiste on October 25, 2019.) On December 16, 2019, the Court struck the October 17, 2019 declaration of Dr. Itamura. (See Discovery Referee Order No. 31.) Dr. Kaser-Boyd's declaration stated that Baptiste has difficulty focusing and concentrating and opined that she "had serious physical and psychological limitations during the course of the litigation." Neither Drs. Itamura nor Kaser-Boyd expressed any opinion as to whether Baptiste could appear in court or participate in the trial.

125.     On October 21, 2019, Goguen and Baptiste appeared in person before Judge Scott for trial. Judge Scott, however, was no longer available to serve as the trial judge. As a result, Judge Davis, in the presence of Baptiste, ordered the parties to return on October 28, 2019 at 9:00 a.m. to commence trial before Judge Danny Y. Chou. Baptiste did *not* object. (See Minute Order dated Oct. 21, 2019.)

126.     On October 28, 2019, Goguen and his counsel appeared for trial before Judge Chou but Baptiste did not. Nor did Baptiste contact the Court to explain her absence. (RT 8.) The Court also called Baptiste and left her a message but Baptiste never responded. (RT 71.)

127.     The Court granted Goguen's motion in limine and struck the answer of Every Girl Counts on the ground that its right to conduct intrastate business had been suspended by the Secretary of State. (See Decl. of Diane M. Doolittle in Support of Complainant Michael Goguen's Motions in Limine, Ex. 10.)

128.     After giving Baptiste an additional hour to appear, the Court commenced the trial at 10:00 a.m. At that time, the Court found that Baptiste and Every Girl Counts had waived their right to a jury trial pursuant to Code of Civil Procedure section 631, subdivision (f), because they failed to appear. (RT 17.) Goguen also waived his right to a jury trial on the record. (RT 8.)

129.     The Court conducted the bench trial from October 28 through October 30, 2019. During the trial, Baptiste *never* appeared and *never* contacted the Court or Goguen. (RT 184; 308.)

130.    At trial, Goguen, Michael Perry, an expert in "computer forensics and geolocation" (RT 270), and Dr. Zuri Murrell, "an expert in hemorrhoids, anal fissures, incontinence, fistulas, abscesses, and HPV" (RT 313), testified on behalf of Goguen. Goguen also introduced into evidence excerpts of the depositions of Baptiste, Every Girl Counts, Diane Bobic, Chelsie Di Paola, Jerico Gilbreath, Darcy Hunt, Tareq Morad, Rivers Morrell, Dr. Karen Sandler, and Bryan Ward. (See Goguen Design., Exs. A-I.)

131.    At the close of trial, the Court, with the agreement of Goguen and pursuant to *Bay World Trading, Ltd. v. Nebraska Beef, Inc.* (2002) 101 Cal.App.4th 135, adopted an alternative procedure for preparing the statement of decision. Under this alternative procedure, the Court would not issue a tentative decision. Instead, both parties would have the opportunity to submit proposed statements of decision to the Court by November 12, 2019. The Court would then issue its proposed statement of decision by December 20, 2019. Both parties would then be able to submit objections or comments to the Court's proposed statement of decision by January 10, 2020. The Court would then issue its statement of decision by February 9, 2020.

132.    The Court granted Goguen's request to extend the deadline for the parties' submission of proposed statements of decision to November 18, 2019. On that date, Goguen submitted a proposed statement of decision but Baptiste did not.

133.    On January 10, 2020, Goguen submitted comments to the Court's proposed statement of decision and a proposed judgment. Baptiste did not, however, submit anything to the Court.

## CONCLUSIONS OF LAW

Because Goguen has elected not to proceed on his fifth cause of action for breach of contract, the Court only addresses Goguen's nine remaining causes of action.

### A. Cause of Action No. 1: Extortion

"Extortion is the obtaining of property or other consideration from another, with his or her consent, . . . induced by a wrongful use of force or fear . . . ." (Pen. Code, § 518.) "Fear, such as will constitute extortion, may be induced by a threat of any of the following: [¶] . . . [¶] 2. To accuse the individual threatened, or a relative of his or her, or a member of his or her family, of a crime. [¶] 3. To

1  expose, or to impute to him, her, or them a deformity, disgrace, or crime. [¶] 4. To expose a secret

2  affecting him, her, or them. . . ." (*Id.*, § 519.) "Every person who, with intent to extort property or other

3  consideration from another, sends or delivers to any person any letter or other writing, whether

4  subscribed or not, expressing or implying, or adapted to imply, any threat such as is specified in Section

5  519 is punishable in the same manner as if such property or other consideration were actually obtained

6  by means of such threat." (*Id.*, § 523.) And "[e]very person who, by any extortionate means, obtains

7  from another his signature to any paper or instrument, whereby, if such signature were freely given, any

8  property would be transferred, or any debt, demand, charge, or right of action created, is punishable in

9  the same manner as if the actual delivery of such debt, demand, charge, or right of action were

10  obtained." (*Id.*, § 522.)

11      "Extortion has been characterized as a paradoxical crime in that it criminalizes the making of

12  threats that, in and of themselves, may not be illegal." (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 326.)

13  Moreover, "threats to do the acts that constitute extortion under Penal Code section 519 are extortionate

14  whether or not the victim committed the crime or indiscretion upon which the threat is based and

15  whether or not the person making the threat could have reported the victim to the authorities or arrested

16  the victim." (*Id.*, at p. 327.)

17      The evidence at trial establishes by a preponderance of the evidence that Baptiste committed

18  extortion. In the demand letters and her text messages to Goguen after their breakup in October 2013,

19  Baptiste threatened to expose Goguen to a "media circus" for having an affair with her, for knowingly

20  infecting her with HPV, and for causing severe injuries to her rectal canal during sex. (See, *supra*, ¶¶ 61-

21  85.) In doing so, she expressly threatened to: (1) "accuse" Goguen of "a crime"; (2) "expose" or "impute

22  to" Goguen a "disgrace" or "crime"; and (3) "expose a secret affecting" Goguen. (Pen. Code, § 519.)

23  Baptiste made these threats with the intent to induce payment from Goguen (see, *supra*, at ¶¶ 61-85),

24  and those threats did, in fact, induce Goguen to enter into the Settlement Agreement and pay Baptiste

25  $10 million (see, *supra*, at ¶¶ 86-89). This conduct therefore constitutes extortion. (See *Stenehjem v.

26  Sareen* (2014) 226 Cal.App.4th 1405, 1423-1424 (*Stenehjem*).)

27

28

Nonetheless, the litigation privilege may still bar this cause of action if Baptiste's threats were made "in furtherance of the objects of the litigation."[12] (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1251 (*Action Apartment*), internal quotations and citation omitted; see also *Blanchard v. DIRECTV, Inc.* (2004) 123 Cal.App.4th 903, 918 [holding that litigation privilege barred extortion claim].) The evidence at trial, however, establishes that these threats were not.

"The litigation privilege, codified at Civil Code section 47, subdivision (b), provides that 'a publication or broadcast' made as part of a 'judicial proceeding' is privileged." (*Action Apartment, supra*, 41 Cal.4th at p. 1241.) "The principal purpose of the litigation privilege is to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." (*Ibid.*, internal quotations and citations omitted.)

Although the litigation privilege "may extend to steps taken prior to litigation" (*Dickinson v. Cosby* (2017) 17 Cal.App.5th 655, 682 (*Dickinson*)), it only protects prelitigation steps that are related "to litigation that is contemplated in good faith and under serious consideration" (*Action Apartment, supra*, 41 Cal.4th at p. 1251). "Whether litigation was contemplated in good faith and under serious consideration is a question of fact. The good faith inquiry is not a question of whether the statement was made with a good faith belief in its truth, but rather, whether the statement was made with a good faith intention to bring a lawsuit." (*Dickinson*, at p. 683.) Thus, "a threat to commence litigation will be insufficient to trigger application of the privilege if it is actually made as a means of inducing settlement of a claim, and not in good faith contemplation of a lawsuit." (*Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 35, fn. 10 (*Edwards*).) Finally, "[w]hile not dispositive, whether a lawsuit was ultimately brought is relevant to the determination of whether one was contemplated in good faith at the time of the demand letter." (*Dickinson*, at p. 683.)

The evidence at trial establishes that Baptiste made the threats in the demand letters and her text messages solely to induce a settlement – "and not in good faith contemplation of a lawsuit." (*Edwards, supra*, 53 Cal.App.4th at p. 35, fn. 10.) As to the demand letters, the evidence establishes that Baptiste

---

[12] Because Baptiste raised the litigation privilege in her anti-SLAPP motion (see, *supra*, at ¶ 116), the Court may consider it here (see *Cruey v. Gannett Co.* (1998) 64 Cal.App.4th 356, 367 [holding that party may introduce defense of privilege even if not pled as affirmative defense "so long as the opposing party has adequate notice and opportunity to respond"]).

1   had no intention to file a lawsuit at the time they were sent. First, Baptiste altered the medical records

2   that formed the basis for the allegations in the Draft Complaint sent by Morrell to Goguen. Given the

3   risk of exposure of her alteration of these records if she filed a lawsuit, it is reasonable to infer that

4   Baptiste never intended to do so at the time the demand letters were sent. Second, Baptiste made clear to

5   Morrell that the demand letters and Draft Complaint were intended to "scare" Goguen and that, based on

6   her knowledge of Goguen's "personality," Goguen would "pay" to avoid a public lawsuit. (See, *supra*,

7   at ¶ 73.) Indeed, Baptiste even told Morrell that he did not have to worry "to[o] much about the contents

8   of the" Draft Complaint. (*Id.*, at ¶ 71.) Third, Morrell apparently followed Baptiste's instructions.

9   Beyond reviewing the altered medical records provided to him by Baptiste, he made no effort to

10  investigate her claims. For example, he never obtained her medical records directly from her doctor.

11  Fourth, Morrell included Sequoia as a defendant even though he had no evidence to connect Sequoia to

12  the allegations in the Draft Complaint (*id.*, at ¶ 74) and conceded that he would have needed more

13  evidence before "he proceeded with the lawsuit against Sequoia" (see Goguen Design., Ex. G [138:10-

14  22] (Morrell)). Fifth, Morell only sent the demand letters to Goguen – and not to Sequoia. (PTX0501.)

15  Finally, neither Baptiste nor Morrell followed through on Morrell's threat to file a lawsuit after

16  Goguen's attorneys ignored his demand letters. (See, *supra*, at ¶ 80.) Instead, Baptiste fired Morrell. (*Id.*,

17  at ¶ 81.) These facts establish that Baptiste did not have a good faith intention to file a lawsuit when she

18  authorized Morrell to serve the demand letters and Draft Complaint on Goguen.

19      Even if the demand letters and Draft Complaint are protected by the litigation privilege (which

20  they are not), the threats in the text messages sent by Baptiste to Goguen after she fired Morrell are not.

21  At that point, Baptiste no longer had an attorney representing her. Although Baptiste claimed that she

22  was consulting with attorneys (PTX0409 [318, 451, 529, 530]), there was no credible evidence at trial to

23  support this claim. And there was no evidence that Baptiste had an attorney ready to file a lawsuit

24  against Goguen after she fired Morrell. Finally, the fact that Baptiste waited almost 15 months to file

25  this breach of contract action against Goguen after he refused to make any more payments pursuant to

26  the Settlement Agreement strongly suggests that Baptiste was not seriously contemplating a lawsuit at

27  the time she negotiated the Settlement Agreement. (See, *supra*, at ¶¶ 95, 111.) Accordingly, the

28  litigation privilege does not bar this cause of action.

Because Goguen's $10 million payment was wrongfully induced by Baptiste's extortionate threats, Goguen is entitled to $10 million plus interest on his first cause of action for extortion.

### B. Causes of Action Nos. 2 and 3: Fraud-HPV and Sexual History

"The elements of fraud are (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990 (*Robinson Helicopter*).) Here, the evidence at trial establishes each of these elements by a preponderance of the evidence.

First, the evidence establishes that Baptiste made misrepresentations to induce Goguen to enter the Settlement Agreement and pay her $10 million. For example, Baptiste falsely represented that she was infected with HPV when she knew that she had tested negative for HPV since February 2013. (See, *supra*, at ¶¶ 52, 55, 75, 78, 83.) She also falsely represented that she only had sex with Goguen. (*id.*, at ¶¶ 11, 15, 31, 55, 75, 83.) She made these false representations during her negotiations with Goguen in order to induce him to pay her a large sum of money. (*Id.*, at ¶¶ 72-85.) Indeed, she made this clear in her communications with Morrell, her attorney for part of those negotiations. (*Id.*, at ¶ 73.)

Second, the evidence establishes that Goguen justifiably relied on these misrepresentations when he executed the Settlement Agreement and paid her the first $10 million installment. Baptiste had retained an attorney who had drafted a complaint alleging those misrepresentations and who had threatened to file that Draft Complaint. (See, *supra*, at ¶¶ 65, 72-80) On that basis, Goguen reasonably believed that the attorney had done some investigation and had at least some evidence to support Baptiste's claims that she had an HPV infection and that Goguen was her only lover. Baptiste also repeatedly told Goguen that she had been infected with HPV and that he was her only lover before their breakup in October 2013. (*Id.*, at ¶¶ 31, 55.) Goguen's reliance on these misrepresentations was therefore justifiable.

Finally, Goguen suffered damage. These misrepresentations by Baptiste induced him to execute the Settlement Agreement and pay her $10 million.

The litigation privilege does not bar these claims. (See, *supra*, at pp. 30-31.) Accordingly, Goguen is entitled to $10 million plus interest on his second and third causes of action for fraud.

### C. Cause of Action No. 4: Declaratory Relief

"To qualify for declaratory relief," a party "would have to demonstrate its action presented two essential elements: '(1) a proper subject of declaratory relief, and (2) an actual controversy involving justiciable questions relating to [the party's] rights or obligations.' " (*Wilson & Wilson v. City Council of Redwood City* (2011) 191 Cal.App.4th 1559, 1582.) Whether a contract is void is a proper subject of declaratory relief. (See *AMN Healthcare, Inc. v. Aya Healthcare Servs., Inc.* (2018) 28 Cal.App.5th 923, 928, 933 [affirming summary judgment granting declaration that provision of contract is void].) And there is an actual controversy regarding the validity of the Settlement Agreement. Because Goguen has established that the Settlement Agreement was obtained thru extortion and fraud (see, *supra*, at pp. 28-32), he is entitled to a declaration that the Agreement is null, void, and unenforceable.

### D. Cause of Action No. 6: Rescission

Under Civil Code section 1689, subdivision (b)(1) and (6), "[a] party to a contract may rescind the contract" if "the consent of the party rescinding . . . was obtained through duress, menace, fraud, or undue influence" or "the public interest will be prejudiced by permitting the contract to stand." "The remedy of rescission extinguishes the contract and restores the parties to their former positions by requiring them to return whatever consideration they have received." (*Koenig v. Warner Unified School Dist.* (2019) 41 Cal.App.5th 43, 59-60 (*Koenig*).)

In this case, Goguen's consent to the Settlement Agreement was obtained through extortion and fraud. (See, *supra*, at pp. 28-32.) Accordingly, Goguen is entitled to rescission of the Settlement Agreement (Civ. Code, § 1689, subds. (b)(1) & (6)) and recovery of the $10 million that he paid to Baptiste as consideration for the rescinded Agreement (see *Koenig*, *supra*, 41 Cal.App.5th at pp. 59-60 [holding that rescission requires parties "to return whatever consideration they have received"].)

### E. Cause of Action No. 7: Civil Harassment Order (Code Civ. Proc., § 527.6)

Under Code of Civil Procedure section 527.6, subdivision (a)(1), "[a] person who has suffered harassment as defined in subdivision (b) may seek . . . an order after hearing prohibiting harassment as provided in this section." That order may also "include other named family or household members" upon "a showing of good cause." (Code Civ. Proc., § 527.6, subd. (c).) To obtain such an order, the petitioner must establish "by clear and convincing evidence that unlawful harassment exists . . . ." (*Id.*, §

1    527.6, subd. (i).) The petitioner must also establish by clear and convincing evidence "that future harm

2    is highly probable." (*Russell v. Douvan* (2003) 112 Cal.App.4th 399, 404.) In determining whether the

3    petitioner has established unlawful harassment and future harm, the Court may consider all relevant

4    evidence, including hearsay. (*Kaiser Found. Hosp. v. Wilson* (2011) 201 Cal.App.4th 550, 555-558.)

5          "The elements of unlawful harassment . . . are as follows: (1) a knowing and willful course of

6    conduct entailing a pattern of a series of acts over a period of time, however short, evidencing a

7    continuity of purpose; (2) directed at a specific person; (3) [that] seriously alarms, annoys, or harasses

8    the person; (4) [that] serves no legitimate purpose; (5) [that] would cause a reasonable person to suffer

9    substantial emotional distress and actually cause[s] substantial emotional distress to [the person to be

10   protected by the order]; and (6) which is not a [c]onstitutionally protected activity." (*Parisi v.*

11   *Mazzaferro* (2016) 5 Cal.App.5th 1219, 1227 (*Parisi*), internal quotations and citations omitted.)

12         The evidence at trial establishes by clear and convincing evidence that, over the past six years,

13   Baptiste sent thousands of text messages to Goguen and posted numerous social media posts falsely

14   accusing him and his current wife, Jamie Goguen, of numerous crimes and misdeeds. (See, *supra*, at ¶¶

15   90-106.) These texts and posts have caused substantial emotional distress to Goguen and his family.

16   (See, *supra*, at ¶¶ 107-110.) There is no indication that Baptiste intends to stop posting these false

17   accusations against Goguen and his wife. Indeed, the evidence at trial establishes by clear and

18   convincing evidence that Baptiste was and continues to be "engaged in a persistent and malicious

19   campaign to unjustifiably damage" Goguen's "reputation and interfere with his" businesses and other

20   endeavors. (*Parisi*, *supra*, 5 Cal.App.5th at p. 1228.) Thus, the evidence is more than sufficient to

21   establish unlawful harassment and a high probability of future unlawful harassment by Baptiste. (See *id.*,

22   at pp. 1227-1228.) Goguen is therefore entitled to a restraining order against Baptiste pursuant to Code

23   of Civil Procedure section 527.6, subdivision (a)(1). There is also good cause to include Jamie Goguen

24   as an additional protected person pursuant to Code of Civil Procedure section 527.6, subd. (c).

25         The only remaining issue is whether any of Baptiste's unlawful harassment is "[c]onstitutionally

26   protected." (*Parisi*, *supra*, 5 Cal.App.5th at p. 1227.) Although Baptiste does have a right to free speech

27   under the federal and California Constitutions, that right is " 'not absolute.' " (*Balboa Island Village*

28   *Inn, Inc. v. Lemen* (2007) 40 Cal.4th 1141, 1147 (*Balboa Island*).) Defamatory or " '[l]ibelous speech

1  has been held to constitute one' " category of speech that is not protected by the First Amendment.

2  (*Ibid.*) Baptiste's social media posts accusing Goguen of numerous crimes and misdeeds (see, *supra*, at

3  ¶¶ 99-106) "were false, defamatory, and served no legitimate purpose" (see *Parisi*, at pp. 1228-1229).

4  Thus, these posts are not constitutionally protected.

5  Nonetheless, " 'an order issued in the area of First Amendment rights must be couched in the

6  narrowest terms that will accomplish the pin-pointed objective permitted by constitutional mandate and

7  the essential needs of the public order. . . . In other words, the order must be tailored as precisely as

8  possible to the exact needs of the case.' " (*Balboa Island*, *supra*, 40 Cal.4th at p. 1159.) A court may not

9  impose a prior restraint on Baptiste's free speech rights solely on the ground that her speech would be

10  defamatory "if spoken or published." (*Id.*, at pp. 1149-1150.) But a court, "following a trial at which it is

11  determined that the defendant defamed the plaintiff," "may issue an injunction prohibiting the defendant

12  from repeating the statements determined to be defamatory." (*Id.*, at pp. 1155-1156.) In that situation, a

13  court may "delineate and identify specific defamatory statements made by" a person "in his prior

14  correspondence and enjoin their repetition" pursuant to Code of Civil Procedure section 527.6. (*Parisi*,

15  *supra*, 5 Cal.App.5th at p. 1232.)

16  Accordingly, Goguen is entitled to a restraining order that prohibits Baptiste, under her name or

17  any pseudonym, from repeating the false and defamatory statements that she has previously made in her

18  social media posts.[13] These prohibited statements consist of her statements that Goguen:

19  (1) purchased Baptiste when she was a young girl from an organized crime syndicate;

20  (2) raped, sodomized, or abused Baptiste or any other women;

21  (3) infected Baptiste or any other women with a sexually transmitted disease, including

22  HPV; thereby, putting them at greater risk of developing cancer and preventing her from

23  having children;

24  (4) kept Baptiste as a sex slave;

25

26

27  [13] Since the filing of the Verified Complaint over three years ago, Baptiste's unlawful harassment has

28  consisted solely of her social media posts about Goguen and his wife. Accordingly, the restraining order only prohibits the repetition of false and defamatory statements made by Baptiste in those posts.

1       (5) tore, ruptured, or perforated Baptiste's anal canal during sex and left her bleeding and

2          unable to "evacuate" her bowels;

3       (6) stalked and harassed Baptiste or any other persons.

4       (7) engaged in human trafficking, sex trafficking, sex slavery, or child sex tourism;

5       (8) is a pedophile, psychopath, pervert, or sexual deviant;

6       (9) forced numerous women to have abortions;

7       (10) committed or solicited murder

8       (11) bribed the Court, attorneys, or law enforcement,

9       (12) tampered with evidence to hide his crimes;

10       (13) married multiple prostitutes;

11       (14) committed tax evasion or tax fraud; and

12       (15) silenced his alleged victims through nondisclosure agreements or any other means.

13     These prohibited statements also consist of Baptiste's statements that Jamie Goguen:

14       (1) is a prostitute;

15       (2) bullies Baptiste or any other rape or trafficking victim; and

16       (3) instructs her friends to make false social media posts about Baptiste.

17     Finally, the restraining order may not prevent Baptiste "from presenting her grievance to

18 government officials." (*Balboa Island, supra*, 40 Cal.4th at p. 1160.)

19     **F. Cause of Action No. 8: Invasion of Privacy**

20     Penal Code section 632, subdivision (a) prohibits a " person" from using, "intentionally and

21 without the consent of all parties to a confidential communication," a "recording device to . . . record the

22 confidential communication, whether the communication is carried on among the parties in the presence

23 of one another or by means of a telegraph, telephone, or other device, except a radio." A " 'confidential

24 communication' means any communication carried on in circumstances as may reasonably indicate that

25 any party to the communication desires it to be confined to the parties thereto . . . ." (Pen. Code, § 632,

26 subd. (c).) Under Penal Code section 637.2, subdivisions (a) and (b), an injured party may bring an

27 action against a person who has violated section 632 and recover $5000 in damages per violation and

28 obtain injunctive relief.

1    Here, the evidence at trial establishes that Baptiste recorded private telephone conversations with

2    Goguen without his knowledge and consent. (See, *supra*, at ¶¶ 47-50.) This violates Penal Code section

3    632. Accordingly, Goguen is entitled to $5,000 in damages and injunctive relief.

4    **G. Cause of Action No. 9: Fraud-Charitable Contribution**

5    Because the operation of Every Girl Counts was suspended by the Secretary of State as of the

6    date of the trial, the answer of Every Girl Counts was stricken pursuant to *Alhambra-Shumway Mines,*

7    *Inc. v. Alhambra Gold Mine Corp.* (1957) 155 Cal.App.2d 46, 50-51, and a default was entered. (See,

8    *supra*, ¶ 127.) Thus, Goguen only had to prove up his damages as to Every Girl Counts. In any event,

9    the evidence at trial established the elements of fraud against both Every Girl Counts and Bapiste by a

10   preponderance of the evidence.

11   As noted above, "[t]he elements of fraud are (1) a misrepresentation (false representation,

12   concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to

13   induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter*, *supra*, 34

14   Cal.4th at p. 990.)

15   Here, Baptiste told Goguen that Every Girl Counts was a legitimate charity that provided 36

16   young girls with food, housing, and education. She claimed that Every Girl Counts had a functioning

17   board comprised of various professionals. In her solicitations for donation, Baptiste told Goguen that his

18   donation would only be used for charitable purposes – i.e., to assist young girls. Based on these

19   representations by Baptiste, Goguen donated $250,000 to Every Girl Counts. These representations by

20   Baptiste, however, were false. In fact, Every Girl Counts *never* provided any services to young girls and

21   *never* had a functioning board. Moreover, Baptiste used part of Goguen's donation to pay for fantasy

22   paintings of herself – and not for a charitable purpose. (See, *supra*, at ¶¶ 40-46.)

23   Because Baptiste and Every Girl Counts obtained Goguen's $250,000 donation through fraud, he

24   is entitled to $250,000 plus interest from both Baptiste and Every Girl Counts on this cause of action

25   **H. Cause of Action No. 10: Breach of Fiduciary Duty**

26   As noted above, the Court struck the answer of and entered a default against Every Girl Counts

27   so Goguen only had to prove up his damages against Every Girl Counts. (See, *supra*, at ¶ 127.) In any

28

1   event, the evidence at trial established that both Every Girl Counts and Baptiste breach their fiduciary

2   duties by a preponderance of the evidence.

3   "The elements of a cause of action for breach of fiduciary duty are: (1) existence of a fiduciary

4   duty; (2) breach of the fiduciary duty; and (3) damage proximately caused by the breach." (*Williamson*

5   *v. Brooks* (2017) 7 Cal.App.5th 1294, 1300.)

6   Both Every Girl Counts and Baptiste owed a fiduciary duty to Goguen when they solicited his

7   donation. (See Bus. & Prof. Code, § 17510.8 ["there exists a fiduciary relationship between a charity or

8   any person soliciting on behalf of a charity, and the person from whom a charitable contribution is being

9   solicited"].) Thus, both Every Girl Counts and Baptiste had "a duty . . . to use" any "charitable

10   contributions" that they solicited and obtained from Goguen "for the declared charitable purposes for

11   which they are sought." (*Ibid.*) Every Girl Counts and Baptiste breached this duty by failing to use

12   Goguen's $250,000 donation for the declared charitable purpose of assisting young girls. Instead,

13   Baptiste used part of the donation to commission fantasy paintings for her own personal benefit. Goguen

14   suffered damage -- i.e., the loss of his $250,000 charitable donation -- due to this breach. (See, *supra*, at

15   ¶¶ 40-46.)

16   Accordingly, Goguen is entitled to $250,000 plus interest from both Baptiste and Every Girl

17   Counts on this cause of action.

18

19                                                **ORDERS**

20   Based on the foregoing, the Court shall enter judgment in favor of Goguen on his causes of

21   action against Baptiste for: (1) extortion; (2) fraud – HPV; (3) fraud – sexual history; (4) declaratory

22   relief; (5) rescission; (6) civil harassment order; (7) invasion of privacy; (8) fraud – charitable

23   contribution; and (9) breach of fiduciary duty. The Court shall also enter judgment in favor of Goguen

24   on his causes of action against Every Girl Counts for fraud – charitable contribution and breach of

25   fiduciary duty and on Baptiste's cause of action for breach of contract. Finally, the Court dismisses

26   Goguen's breach of contract cause of action with prejudice.

27   The Court awards Goguen compensatory damages against Baptiste in the amount of $10 milllion

28   plus interest.

1    The Court awards Goguen additional compensatory damages against Baptiste and Every Girl

2  Counts in the amount of $250,000 plus interest.

3    The Court awards Goguen statutory damages under Penal Code section 637.2, subdivision (a)(1)

4  against Baptiste in the amount of $5,000.

5    The Court issues a declaration declaring that the Settlement Agreement is null, void, and

6  unenforceable.

7    The Court orders that the Settlement Agreement is rescinded and that Baptiste return the $10

8  million paid by Goguen to her in consideration for the rescinded Agreement.

9    The Court enjoins Baptiste from using, sharing, or publicizing any recording or transcription of

10  her private telephone conversations with Goguen.

11    The Court grants a civil harassment restraining order that protects both Goguen and his current

12  wife, Jamie Goguen. The restraining order shall be issued on Form CH-130: Civil Harassment

13  Restraining Order After Hearing and shall include the following orders:

14    (1) "Personal Conduct Orders," including the no contact and no harass orders and the prohibition

15  on obtaining the addresses of Goguen or his wife:

16    (2) Stay-Away Orders from the persons, homes, vehicles, and jobs or workplaces of Goguen and

17  his wife; and

18    (3) "No Guns or Other Firearms and Ammunition."

19    The restraining order shall also prohibit Baptiste, under her name or any pseudonym, from

20  repeating the following false and defamatory statements that she has previously made in her social

21  media posts:

22    (1) Goguen purchased Baptiste when she was a young girl from an organized crime

23    syndicate;

24    (2) Goguen raped, sodomized, or abused Baptiste or any other women;

25    (3) Goguen infected Baptiste or any other women with a sexually transmitted disease,

26    including HPV;

27    (4) Goguen kept Baptiste as a sex slave;

28

(5) Goguen tore, ruptured, or perforated Baptiste's anal canal during sex and left her bleeding and unable to evacuate her bowels;

(6) Goguen stalked or harassed Baptiste or any other persons.

(7) Goguen engaged in human trafficking, sex trafficking, sex slavery, or child sex tourism;

(8) Goguen is a pedophile, psychopath, pervert, or sexual deviant;

(9) Goguen forced numerous women to have abortions;

(10) Goguen committed or solicited murder

(11) Goguen bribed the Court, attorneys, or law enforcement

(12) Goguen tampered with evidence to hide his crimes;

(13) Goguen married multiple prostitutes;

(14) Goguen committed tax evasion or tax fraud; and

(15) Goguen silenced his victims through nondisclosure agreements or any other means..

(16) Jamie Goguen is a prostitute;

(17) Jamie Goguen cyberbullies Baptiste or any other rape or trafficking victim; and

(18) Jamie Goguen instructs her friends to make false social media posts about Baptiste.

Goguen may seek attorneys' fees and costs on any legally permissible ground through a properly noticed post-trial motion.

IT IS SO ORDERED.

Dated: _January 24, 2020_

Danny Y. Chou
Judge of the Superior Court

FINAL STATEMENT OF DECISION - 40



**SUPERIOR COURT OF SAN MATEO COUNTY**
400 County Center, Redwood City, CA 94063
(650) 261-5100
www.sanmateocourt.org



**ENDORSED FILED**
**SAN MATEO COUNTY**

JAN 2 4 2020

Clerk of the Superior Court
By_____J. TORRES_____
DEPUTY CLERK

## AFFIDAVIT OF EMAIL SERVICE

Date:                    **01/24/2020**

In the Matter of:        **MICHAEL GOGUEN and DOES 1 through 100 inclusive, v. AMBER LAUREL BAPTISTE, EVERY GIRL COUNGS, a California Corporation, and Roes 1 through 10 inclusive**

Case No.:                **CIV 537691**

I declare under penalty of perjury that on the following date I sent by electronic mail, a true copy of the attached document(s) **FINAL STATEMENT OF DECISION**, addressed to the listed email address(es):

Executed on: 01/24/2020          Neal I. Taniguchi, Court Executive Officer/Clerk

By: _____

Jane Torres, Deputy Court Clerk

Copies mailed to:

DONNA DOOLITTLE                    Donnadoolittle@quinnemanuel.com
BRUCE VAN DALSEM                   Brucevandalsem@quinnemanuel.com
VICKY PARKER                       vickiparker@quinnemanuel.com

AMBER LAUREL BAPTISTE              amberslawsuit2016@gmail.com
EVERY GIRL COUNTS                  amber8585@gmail.com

1
2

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN MATEO

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

| | |
|---|---|
| AMBER LAUREL BAPTISTE,<br><br>          Plaintiff,<br><br>    v.<br><br>MICHAEL GOGUEN and DOES 1 through 100 inclusive,<br><br>        Defendant.<br><br>_____<br><br>MICHAEL GOGUEN,<br><br>         Cross-Complainant,<br><br>    v.<br><br>AMBER LAUREL BAPTISTE, EVERY GIRL COUNTS, a California Corporation, and ROES 1 through 10 inclusive,<br><br>        Defendants. | Case No.: CIV 537691<br><br>**FINAL JUDGMENT**<br><br><br>**ENDORSED FILED**<br>**SAN MATEO COUNTY**<br><br>JAN 2 4 2020<br><br>Clerk of the Superior Court<br>by_____J. TORRES_____<br>DEPUTY CLERK |

18          The above-captioned case was tried, without a jury, before the Honorable Danny Y. Chou, from

19    October 28 through October 30, 2019. Defendant and Cross-Complainant Michael Goguen (Goguen)

20    appeared with his counsel Diane M. Doolittle and Bruce E. Van Dalsem. Plaintiff and Cross-Defendant

21    Amber Laurel Baptiste (Baptiste) and Cross-Defendant Every Girl Counts (Every Girl Counts) had

22    proper notice of trial but failed to appear. Goguen waived his right to a jury trial on the record. Baptiste

23    and Every Girl Counts waived their rights to a jury trial by failing to appear pursuant to Code of Civil

24    Procedure section 631, subdivision (f)

25          Goguen requested a statement of decision and the Court issued a proposed statement of decision

26    (Proposed SOD) on December 20, 2019. The parties had 20 days to object to the Proposed SOD.

27    Goguen timely submitted comments to the proposed SOD. Neither Baptiste nor Every Girl Counts

28

---

FINAL JUDGMENT - 1

submitted any objections or comments to the Proposed SOD. The Court issued its final statement of decision on January 24, 2020.

Having considered and weighed the testimony and evidence presented at trial, all papers submitted in connection with the trial, the arguments of counsel, the applicable law, and all other pleadings and papers on file herein, the Court hereby enters judgment in favor of Goguen and against Baptiste in accordance with the final statement of decision as follows:

1.    Baptiste must pay Goguen the following sum:

| | |
|---|---|
| Damages: | $10,005,000 |
| Prejudgment interest: | $3,950,847.35 |
| Total: | $13,955,847.35 |

2.    Baptiste and Every Girl Counts must pay Goguen the following additional sum:

| | |
|---|---|
| Damages: | $250,000 |
| Prejudgment interest: | $117,323.15 |
| Total: | $367,323.15 |

Baptiste and Every Girl Counts are jointly and severally liable for this sum

3.    The "Release and Personal Injury Settlement Agreement" executed by Goguen and Baptiste on May 23, 2014 is hereby declared null and void *ab initio*, and rescinded, and has no force or effect.

4.    Baptiste and her agents, employees, and all other persons acting in concert with her or at her direction are enjoined and prohibited from using, sharing, or publicizing any recording or transcript of Baptiste's telephone conversations with Goguen.

5.    The attached Civil Harassment Restraining Order After Hearing (CH-130) is issued against Baptiste.

5.    Baptiste shall recover nothing on her Verified Complaint for Breach of Contract.

Dated:  January 24, 2020

Danny Y. Chou
Judge of the Superior Court

FINAL JUDGMENT - 2

**CH-130**   **Civil Harassment Restraining Order After Hearing**

*Clerk stamps date here when form is filed.*

*Person in ① must complete items ①, ②, and ③ only.*

① **Protected Person**
   a. Your Full Name: Michael Goguen

   Your Lawyer *(if you have one for this case)*
   Name: Diane Doolittle_____ State Bar No.: 142046

   Firm Name: Quinn Emanuel Urquhart & Sullivan, LLP

   b. Your Address *(If you have a lawyer, give your lawyer's information. If you do not have a lawyer and want to keep your home address private, you may give a different mailing address instead. You do not have to give telephone, fax, or e-mail.)*
   Address: 555 Twin Dolphin Drive, 5th Floor

   City: Redwood Shores_____ State: CA___ Zip: 94065

   Telephone: (650) 801-5000____ Fax: (650) 801-5100

   E-Mail Address: dianedoolittle@quinnemanuel.com

*Fill in court name and street address:*

**Superior Court of California, County of San Mateo**
1050 Mission Road
South San Francisco, CA 94080

*Court fills in case number when form is filed.*

**Case Number:**
CIV 537691

② **Restrained Person**
   Full Name: Amber Laurel Baptiste
   Description:

| | |
|---|---|
| Sex: ☐ M  ☒ F   Height: 5 ft 7 in___   Weight: 120 lbs___   Date of Birth: 10/18/1980 | |
| Hair Color: Brown_____   Eye Color: Brown_____   Age: 39___   Race: Bl | |
| Home Address *(if known):* | |
| City: Los Angeles_____   State: CA___   Zip: _____ | |
| Relationship to Protected Person: None | |

③ ☒ **Additional Protected Persons**
   In addition to the person named in ①, the following family or household members of that person are protected by the orders indicated below:

| Full Name | Sex | Age | Lives with you? | How are they related to you? |
|---|---|---|---|---|
| Jamie Stephenson Goguen | F | 38 | ☒ Yes ☐ No | Wife |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |
| _____ | ___ | ___ | ☐ Yes ☐ No | _____ |

   ☐ *Check here if there are additional persons. List them on an attached sheet of paper and write "Attachment 3— Additional Protected Persons" as a title. You may use form MC-025, Attachment.*

④ **Expiration Date**
   *This Order, except for any award of lawyer's fees, expires at*

| |
|---|
| Time:_____   ☐ a.m. ☐ p.m. ☐ midnight on *(date):* _____ |

   If no expiration date is written here, this Order expires three years from the date of issuance.

**This is a Court Order.**

Judicial Council of California, *www.courts.ca.gov*
Rev. March 15, 2019, Mandatory Form
Code of Civil Procedure, §§ 527.6 and 527.9
Approved by DOJ
**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
**(Civil Harassment Prevention)**

| Case Number: |
|---|
| CIV 537691 |

**(5) Hearing**   *(DYC)*

a. There was a hearing on *(date):* Oct. 28 ~~30~~, 2019 at *(time):* 9:00 a.m.  in Dept.: 22  Room: K
   *(Name of judicial officer):* Judge Danny Y. Chou _____ made the orders at the hearing.

b. These people were at the hearing:

   (1) ☒ The person in ①.  (3) ☒ The lawyer for the person in ① *(name):* Diane Doolittle

   (2) ☐ The person in ②.  (4) ☐ The lawyer for the person in ② *(name):* _____

   ☐ Additional persons present are listed at the end of this Order on Attachment 5.

c. ☐ The hearing is continued. The parties must return to court on *(date):* _____ at *(time):* _____.

## To the Person in ② :

**The court has granted the orders checked below. If you do not obey these orders, you can be arrested and charged with a crime. You may be sent to jail for up to one year, pay a fine of up to $1,000, or both.**

**(6) ☒ Personal Conduct Orders**

a. You must **not** do the following things to the person named in ①

   ☒ and to the other protected persons listed in ③:

   (1) ☒ Harass, intimidate, molest, attack, strike, stalk, threaten, assault (sexually or otherwise), hit, abuse, destroy personal property of, or disturb the peace of the person.

   (2) ☒ Contact the person, either directly or indirectly, in **any** way, including, but not limited to, in person, by telephone, in writing, by public or private mail, by interoffice mail, by e-mail, by text message, by fax, or by other electronic means.

   (3) ☒ Take any action to obtain the person's address or location. If this item (3) is not checked, the court has found good cause not to make this order.

   (4) ☐ Other *(specify):*

      ☐ Other personal conduct orders are attached at the end of this Order on Attachment 6a(4).

b. Peaceful written contact through a lawyer or process server or other person for service of legal papers related to a court case is allowed and does not violate this Order.

**(7) ☒ Stay-Away Orders**

a. You **must** stay at least ___50___ yards away from *(check all that apply):*

   (1) ☒ The person in ①.  *(DYC)* (7)  The place of child care of the children of the person in ①.

   (2) ☒ Each person in ③.

   (3) ☒ The home of the person in ①.  (8) ☒ The vehicle of the person in ①.

   (4) ☒ The job or workplace of the person in ①.  (9) ☐ Other *(specify):*

   *(DYC)* (5) ☐ The school of the person in ①.

   *(DYC)* (6) ☐ The school of the children of the person in ①.

b. This stay-away order does not prevent you from going to or from your home or place of employment.

## This is a Court Order.

**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
**(Civil Harassment Prevention)**

| Case Number: |
|---|
| CIV 537691 |

**(8) No Guns or Other Firearms and Ammunition**

    a. **You cannot own, possess, have, buy or try to buy, receive or try to receive, or in any other way get guns, other firearms, or ammunition.**

    b. If you have not already done so, you must:

      • Within 24 hours of being served with this Order, sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms in your immediate possession or control.

      • File a receipt with the court within 48 hours of receiving this Order that proves that your guns or firearms have been turned in, sold, or stored. *(You may use form CH-800,* Proof of Firearms Turned In, Sold, or Stored, *for the receipt.)*

    c. ☐ The court has received information that you own or possess a firearm.

    d. ☐ The court has made the necessary findings and applies the firearm relinquishment exemption under Code of Civil Procedure section 527.9(f). Under California law, the person in ② is not required to relinquish this firearm *(specify make, model, and serial number of firearm(s)):* _____

      The firearm must be in his or her physical possession only during scheduled work hours and during travel to and from his or her place of employment. Even if exempt under California law, the person in ② may be subject to federal prosecution for possessing or controlling a firearm.

**(9) ☐ Lawyer's Fees and Costs**

    The person in ___ must pay to the person in ___ the following amounts for

    ☐ lawyer's fees    ☐ costs:

| Item | Amount | Item | Amount |
|---|---|---|---|
| _____ | $ _____ | _____ | $ _____ |
| _____ | $ _____ | _____ | $ _____ |

    ☐ Additional items and amounts are attached at the end of this Order on Attachment 9.

**(10) ☐ Possession and Protection of Animals**

    a. ☐ The person in ① is given the sole possession, care, and control of the animals listed below, which are owned, possessed, leased, kept, or held by him or her, or reside in his or her household. *(Identify animals by, e.g., type, breed, name, color, sex.)*

    _____

    _____

    b. ☐ The person in ② must stay at least _____ yards away from, and not take, sell, transfer, encumber, conceal, molest, attack, strike, threaten, harm, or otherwise dispose of, the animals listed above.

**(11) ☒ Other Orders** *(specify):*

See Attachment 11. _____

_____

_____

_____

    ☒ Additional orders are attached at the end of this Order on Attachment 11.

**This is a Court Order.**

**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
**(Civil Harassment Prevention)**

→

| Case Number: |
|---|
| CIV 537691 |

## To the Person in ①:

**(12) Mandatory Entry of Order Into CARPOS Through CLETS**

This Order must be entered into the California Restraining and Protective Order System (CARPOS) through the California Law Enforcement Telecommunications System (CLETS). *(Check one):*

a. ☐ The clerk will enter this Order and its proof-of-service form into CARPOS.

b. ☐ The clerk will transmit this Order and its proof-of-service form to a law enforcement agency to be entered into CARPOS.

c. ☐ By the close of business on the date that this Order is made, the person in ① or his or her lawyer should deliver a copy of the Order and its proof-of-service form to the law enforcement agency listed below to enter into CARPOS:

Name of Law Enforcement Agency                    Address *(City, State, Zip)*

☐ Additional law enforcement agencies are listed at the end of this Order on Attachment 12.

**(13) Service of Order on Restrained Person**

a. ☐ The person in ② personally attended the hearing. No other proof of service is needed.

b. ☒ The person in ② did not attend the hearing.

(1) Proof of service of form ~~CH-110~~CH-130, *Temporary Restraining Order,* was presented to the court. The judge's orders in this form are the same as in form ~~CH-110~~CH-130 except for the expiration date. The person in ② must be served with this Order. Service may be by mail.

(2) ☒ The judge's orders in this form are different from the temporary restraining orders in form CH-110. Someone—but not anyone in ① or ③—must personally serve a copy of this Order on the person in ②. *or in any manner previously agreed upon by the person in ② (DYC)*

**(14) ☐ No Fee to Serve (Notify) Restrained Person**

The sheriff or marshal will serve this Order without charge because:

a. ☐ The Order is based on unlawful violence, a credible threat of violence, or stalking.

b. ☐ The person in ① is entitled to a fee waiver.

**(15)** Number of pages attached to this Order, if any:   1

Date:   1/24/2020

Judicial Officer          **DANNY Y. CHOU**

## This is a Court Order.

| Case Number: |
| --- |
| CIV 537691 |

## Warning and Notice to the Restrained Person in ❷:

### You Cannot Have Guns or Firearms

Unless item 8d is checked, you cannot own, have, possess, buy or try to buy, receive or try to receive, or otherwise get guns, other firearms, or ammunition while this Order is in effect. If you do, you can go to jail and pay a $1,000 fine. You must sell to or store with a licensed gun dealer, or turn in to a law enforcement agency, any guns or other firearms that you have or control as stated in item ⑧ above. The court will require you to prove that you did so.

## Instructions for Law Enforcement

### Enforcing the Restraining Order

This Order is enforceable by any law enforcement agency that has received the Order, is shown a copy of the Order, or has verified its existence on the California Restraining and Protective Order System (CARPOS). If the law enforcement agency has not received proof of service on the restrained person, and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the Order and then must enforce it. Violations of this Order are subject to criminal penalties.

### Start Date and End Date of Orders

This Order *starts* on the date next to the judge's signature on page 4 and *ends* on the expiration date in item ④ on page 1.

### Arrest Required If Order Is Violated

If an officer has probable cause to believe that the restrained person had notice of the order and has disobeyed it, the officer must arrest the restrained person. (Pen. Code, §§ 836(c)(1), 13701(b).) A violation of the order may be a violation of Penal Code section 166 or 273.6. Agencies are encouraged to enter violation messages into CARPOS.

### Notice/Proof of Service

The law enforcement agency must first determine if the restrained person had notice of the order. Consider the restrained person "served" (given notice) if (Pen. Code, § 836(c)(2)):

- The officer sees a copy of the *Proof of Service* or confirms that the *Proof of Service* is on file; *or*
- The restrained person was at the restraining order hearing or was informed of the order by an officer.

An officer can obtain information about the contents of the order and proof of service in CARPOS. If proof of service on the restrained person cannot be verified and the restrained person was not present at the court hearing, the agency must advise the restrained person of the terms of the order and then enforce it.

### If the Protected Person Contacts the Restrained Person

Even if the protected person invites or consents to contact with the restrained person, this Order remains in effect and must be enforced. The protected person cannot be arrested for inviting or consenting to contact with the restrained person. The orders can be changed only by another court order. (Pen. Code, § 13710(b).)

## This is a Court Order.

**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
(Civil Harassment Prevention)



| Case Number: |
|---|
| CIV 537691 |

## Conflicting Orders—Priorities of Enforcement

**If more than one restraining order has been issued, the orders must be enforced according to the following priorities:** *(See Pen. Code, § 136.2; Fam. Code, §§ 6383(h)(2), 6405(b).)*

1. *EPO:* If one of the orders is an *Emergency Protective Order* (form EPO-001) and is more restrictive than other restraining or protective orders, it has precedence in enforcement over all other orders.
2. *No-Contact Order:* If there is no EPO, a no-contact order that is included in a restraining or protective order has precedence over any other restraining or protective order.
3. *Criminal Order:* If none of the orders includes a no contact order, a domestic violence protective order issued in a criminal case takes precedence in enforcement over any conflicting civil court order. Any nonconflicting terms of the civil restraining order remain in effect and enforceable.
4. *Family, Juvenile, or Civil Order:* If more than one family, juvenile, or other civil restraining or protective order has been issued, the one that was issued last must be enforced.

*Clerk's Certificate*
*[seal]*

*(Clerk will fill out this part.)*
**—Clerk's Certificate—**

I certify that this *Civil Harassment Restraining Order After Hearing* is a true and correct copy of the original on file in the court.

Date: _____     Clerk, by _____ , Deputy

**This is a Court Order.**

**Civil Harassment Restraining Order After Hearing (CLETS-CHO)**
(Civil Harassment Prevention)

# Attachment 11

Baptiste is restrained from repeating the following false and defamatory statements, under her own name or under any pseudonym, that she has previously made in her social media posts:

(1)     Goguen purchased Baptiste when she was a young girl from an organized crime syndicate;

(2)     Goguen raped, sodomized, or abused Baptiste or any other women;

(3)     Goguen infected Baptiste or any other women with a sexually transmitted disease, including HPV;

(4)     Goguen kept Baptiste as a sex slave;

(5)     Goguen tore, ruptured, or perforated Baptiste's anal canal during sex, or that he left her bleeding and unable to evacuate her bowels;

(6)     Goguen stalked or harassed Baptiste or any other persons.

(7)     Goguen engaged in human trafficking, sex trafficking, sex slavery, or child sex tourism;

(8)     Goguen is a pedophile, psychopath, pervert, or sexual deviant;

(9)     Goguen forced numerous women to have abortions;

(10)    Goguen committed or solicited murder;

(11)    Goguen bribed the Court, attorneys, or law enforcement;

(12)    Goguen tampered with evidence to hide his crimes;

(13)    Goguen married multiple prostitutes;

(14)    Goguen committed tax evasion or tax fraud;

(15)    Goguen silenced victims through nondisclosure agreements or any other means;

(16)    Jamie Goguen is a prostitute;

(17)    Jamie Goguen cyberbullies Baptiste or any other rape or trafficking victim; and

(18)    Jamie Goguen instructs her friends to make false social media posts about Baptiste.

Notwithstanding the above, Baptiste is not restrained from presenting her grievance to government officials.



**SUPERIOR COURT OF SAN MATEO COUNTY**
400 County Center, Redwood City, CA 94063
(650) 261-5100
www.sanmateocourt.org

**ENDORSED FILED**
**SAN MATEO COUNTY**

JAN 2 4 2020

Clerk of the Superior Court
By_____J. TORRES_____
DEPUTY CLERK

## AFFIDAVIT OF EMAIL SERVICE

Date:                    **01/24/2020**

In the Matter of:        **MICHAEL GOGUEN and DOES 1 through 100 inclusive, v. AMBER LAUREL BAPTISTE, EVERY GIRL COUNGS, a California Corporation, and Roes 1 through 10 inclusive**

Case No.:                **CIV 537691**

I declare under penalty of perjury that on the following date I sent by electronic mail, a true copy of the attached document(s) **FINAL JUDGMENT**, addressed to the listed email address(es):

Executed on: 01/24/2020         Neal I. Taniguchi, Court Executive Officer/Clerk

By: _____

Jane Torres, Deputy Court Clerk

Copies mailed to:

**DONNA DOOLITTLE**             Donnadoolittle@quinnemanuel.com
**BRUCE VAN DALSEM**            Brucevandalsem@quinnemanuel.com
**VICKY PARKER**                vickiparker@quinnemanuel.com

**AMBER LAUREL BAPTISTE**       amberslawsuit2016@gmail.com
**EVERY GIRL COUNTS**           amber8585@gmail.com

# **<u>Exhibit D</u>**

1     SUPERIOR COURT OF THE STATE OF CALIFORNIA

2     IN AND FOR THE COUNTY OF SAN MATEO

3

4 AMBER LAUREL BAPTISTE,    ) Case No.: CIV 537691

       )

5     Plaintiff,    ) **ORDER DENYING CROSS-DEFENDANT**

       ) **AMBER LAUREL BAPTISTE'S MOTION**

6   v.     ) **TO VACATE; GRANTING IN PART AND**

       ) **DENYING IN PART CROSS-**

7 MICHAEL GOGUEN and DOES 1 through 100 ) **COMPLAINANT MICHAEL GOGUEN'S**

 inclusive,    ) **MOTION TO SEAL**

8       )

     Defendant.   )

9       )

  ————————————————)

10 MICHAEL GOGUEN,    )

       )

11    Cross-Complainant,  )

       ) 

12   v.     )

       ) 

13       )

 AMBER LAUREL BAPTISTE, EVERY GIRL )

14 COUNTS, a California Corporation, and ROES 1 )

 through 10 inclusive,   )

15       )

     Defendants.  )

16       )

  ————————————————)

17

18   Plaintiff and Cross-Defendant Amber Laurel Baptiste's Motion to Vacate Default and Default

19 Judgment (Motion to Vacate) and Defendant and Cross-Complainant Michael Goguen's unopposed

20 Motion for an Order Sealing Documents Filed by Cross-Defendant Amber Baptiste (Motion to Seal)

21 came for hearing before this Court on January 5, 2023 at 2:00 p.m. Baptiste appeared by Zoom

22 videoconference on her own behalf. Diane Doolittle and Kyle Batter appeared by Zoom videoconference

23 on behalf of Goguen. Having considered all papers filed in support of and in opposition to the Motion to

24 Vacate and Motion to Seal, oral arguments of the parties, any testimony and evidence presented at the

25 hearing, and all other pleadings and papers on file herein, the Court:

26   (1) DENIES the Motion to Vacate; and

27   (2) GRANTS IN PART and DENIES IN PART the Motion to Seal.

28

---

## I.   MOTION TO VACATE

In the Motion to Vacate, Baptiste moves to vacate the Final Judgment entered by the Court on January 24, 2020 (Judgment). She contends the Judgment should be vacated because of extrinsic fraud. This contention lacks merit.

A motion for new trial or to vacate a judgment must be filed and served "[w]ithin 15 days of the date of mailing notice of entry of judgment by the clerk of the court . . . or within 180 days after the entry of judgment, whichever is earliest." (Code Civ. Proc., §§ 659, 663a; see also Code Civ. Proc., § 473 [motion must be made "in no case exceeding six months[] after the judgment, dismissal, order, or proceeding was taken"].) "After six months from entry of default, a trial court may still vacate a default on equitable grounds even if statutory relief is unavailable." (*Rappleyea v. Campbell* (1994) 8 Cal. 4th 975, 981.) "To qualify for equitable relief on the ground of extrinsic fraud or mistake, the moving party must demonstrate diligence in seeking to set aside the default once it was discovered." (*Manson, Iver & York v. Black* (2009) 176 Cal. App. 4th 36, 49.)

Here, Baptiste filed the Motion to Vacate on October 13, 2022—more than two years and eight months after the Notice of Entry of Judgment was served on her. (See Feb. 10, 2020 Notice of Entry of Judgment.) Her request for statutory relief is therefore untimely. Baptiste has also failed to demonstrate diligence in seeking to set aside the Judgment. Until the filing of her Motion to Vacate, she made no attempt to inform the Court about any threats or coercion or suggest that any act by Goguen coerced her into not appearing at trial. Moreover, she provided no explanation for her 32-month delay in filing the Motion to Vacate. Finally, because the alleged threats and coercion must have occurred before the trial began in October 2019, the threats and coercion could not have been discovered only recently. (See Pl. MPA, at p. 27 ["I just found out about the Complete Extrinsic fraud upon myself and the Court In recent weeks"].) Her request for equitable relief is therefore also untimely and is denied solely on this ground.

In any event, Baptiste has not established grounds for equitable relief. According to Baptiste, Goguen used "coercion, threats[,] solicitation of my murder[,] stalking, tampering with witnesses and government officials, [e]xtrinsic and intrinsic [f]raud" to "(block) me from participating in trial." (Pl. MPA, at pp. 21 – 22.) In support, she cites to her declaration. As relevant to her claim of extrinsic fraud, her declaration states that she "was unable to present my case at trial due to death threats that [she]

would be killed," "[t]hreats of my life being taken if [she] appeared at trial," and "[s]evere illness at the time of trial." (Baptiste Decl., ¶ 3.) These statements, however, are too vague to support her claim of extrinsic fraud. Accordingly, she has not provided sufficient evidence to support equitable relief.

Baptiste also takes issue with the terminating sanction that dismissed her complaint. (Pl. MPA, at pp. 26-27.) But that terminating sanction was issued through an order after a hearing before the discovery referee and was not decided at the trial. In any event, Baptiste provides no evidence or argument to support her contention that the order was procured through extrinsic fraud or mistake.

Finally, Baptiste's request at the hearing for an opportunity to present additional evidence to support her Motion to Vacate is denied. Baptiste has already submitted over 1000 pages of documents in support of her Motion, and it is not clear what additional evidence she wishes to present. Indeed, at the hearing, Baptiste did not identify, except in general terms, any additional evidence that she would like to submit for the Court's consideration. More notably, she did not identify any additional evidence that would explain her 32-month delay in bringing this Motion. Although Baptiste undoubtedly has a right to present her case in court, she must also follow the deadlines established by the law for doing so. She did not comply with those deadlines here, and her inability to provide an adequate explanation for her failure to do so precludes the Court from granting her the relief that she requests.

Accordingly, the Motion to Vacate is denied.

## II. MOTION TO SEAL

On October 21, 2022, the Court issued an order sealing Baptiste's Motion to Vacate "until such time that the Court rules upon Goguen's" Motion to Seal. In that Motion, Goguen moves to seal the Notice of Motion and Motion to Vacate Default and Default Judgment, including the Memorandum of Points and Authorities in Support of Motion, and Declarations of Amber Baptiste, Nancy Kaiser Boyd, and John Itamura, filed by Baptiste (collectively, Moving Papers). In support, Goguen contends the Moving Papers contain disparaging and defamatory statements that the Court previously enjoined Baptiste from making. The Court agrees that many of the statements contained in Baptiste's Moving Papers were enjoined by the Court's January 29, 2020 Restraining Order and finds that Baptiste should not be permitted to evade that Order by republishing those enjoined statements through her court filings. Accordingly, to the extent statements in Baptiste's Moving Papers are enjoined by the Court's

Restraining Order, the Court finds that: (1) there exists an overriding interest that overcomes the right of public access to the record; (2) the overriding interest supports sealing the record; (3) a substantial probability exists that the overriding interest will be prejudiced if the record is not sealed; and (4) no less restrictive means exist to achieve the overriding interest. (Cal. Rules of Court, rule 2.550.)

The Court, however, finds that the proposed sealing is not sufficiently narrowly tailored. (Cal. Rules of Court, rule 2.550.) Although Baptiste's Moving Papers are replete with statements that were enjoined by the Court's Restraining Order, not every statement in those Papers is covered by that Order. To the extent statements made in the Moving Papers are not covered by the Restraining Order, they may not be sealed.

Accordingly, Goguen is ordered to file on or by February 6, 2023: (1) a redacted version of Baptiste's Moving Papers that will be made available to the public; and (2) a document or chart explaining the basis for any portions of Baptiste's Moving Papers to be sealed. The Moving Papers will otherwise remain sealed.

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED THAT:

1. The Motion to Vacate is DENIED.

2. The Motion to Seal is GRANTED IN PART and DENIED IN PART. Goguen is ORDERED to file on or by **February 6, 2023**: (1) a redacted version of Baptiste's Moving Papers that will be made available to the public; and (2) a document or chart explaining the basis for any portions of Baptiste's Moving Papers to be sealed. Baptiste's Moving Papers will otherwise remain SEALED.

Dated: Jan. 6, 2023

Danny Y. Chou
Judge of the Superior Court

ORDER RE MOTION TO VACATE AND MOTION TO SEAL - 4

# **<u>Exhibit E</u>**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Diane M. Doolittle (Bar No. 142046)
  dianedoolittle@quinnemanuel.com
  Margret Caruso (Bar No. 243473)
  margretcaruso@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065-2139
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

  John B. Quinn (Bar No. 90378)
  johnquinn@quinnemanuel.com
  Bruce E. Van Dalsem (Bar No. 124128)
  brucevandalsem@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017-2543
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

*Attorneys for Cross-Complainant Michael Goguen*

Electronically
**FILED**
by Superior Court of California, County of San Mateo
ON     2/14/2023
By     /s/ Priscilla Tovar
              Deputy Clerk

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN MATEO

| | |
|---|---|
| MICHAEL GOGUEN,<br><br>        Cross-Complainant,<br><br>   vs.<br><br>AMBER LAUREL BAPTISTE; EVERY GIRL COUNTS, a California Corporation; and ROES 1 through 10, inclusive;<br><br>        Cross-Defendants. | CASE NO. CIV 537691<br><br>**PROOF OF SERVICE**<br><br>[Signed Via Facsimile] |

## PROOF OF SERVICE

I am employed in the County of San Francisco, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is Quinn Emanuel Urquhart & Sullivan, LLP, 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, CA  94065.

On January 20, 2023, I served true copies of the following document(s) described as

**1.      MICHAEL GOGUEN'S AMENDED NOTICE OF MOTION TO SEAL PORTIONS OF REQUEST FOR RESTRAINING ORDER EXTENSION;**

**2.      NOTICE OF HEARING TO RENEW RESTRAINING ORDER (CH-710).**

on the interested parties in this action as follows:

| | |
|---|---|
| ***Cross-Defendants Amber Baptiste  and Every Girl Counts*** | Amber Baptiste<br>8306 Wilshire Blvd., Ste. 2020<br>Beverly Hills, CA 90211<br>amberslawsuit2016@gmail.com<br>amberb8585@gmail.com<br>amberlitigate@gmail.com<br>justiceandpeaceforamber@gmail.com<br><br>Cross-Defendant Amber Baptiste<br>*Pro per*<br>Cross-Defendant Every Girl Counts<br>*CEO Amber Baptiste* |

-1-

*Je Ne Se Que Enterprises LLC*

Je Ne Se Que Enterprises LLC
c/o LegalZoom.com, Inc.
101 North Brand Blvd. 11th Floor
Glendale, CA 91203

Alter Ego Je Ne Se Que Enterprises LLC

**X**___ **BY EMAIL:**  I caused such documents to be personally transmitted to the person at the email addresses set forth above.

Executed on January 20, 2023 at San Francisco, California.

*/s/ Kyle Batter*

_____
Kyle Batter

PROOF OF SERVICE

# Exhibit F

## Kyle Batter

| | |
|---|---|
| **From:** | Kyle Batter |
| **Sent:** | Wednesday, April 5, 2023 12:51 PM |
| **To:** | amberlitigate@gmail.com; Amber Laurel |
| **Subject:** | Demand to Cease and Desist / Notice of Ex Parte Application |
| **Attachments:** | Restraining Order.PDF |

Ms. Baptiste,

I write regarding the Complaint you filed on March 28, 2023 in the Central District of California against Michael Goguen and hundreds of other defendants (Amber Doe v. Goguen, et al., Case number CV23-2280-MEMF(SK)).  As you know, on January 24, 2020, the San Mateo Superior Court entered a Restraining Order against you that, among other things, restrained you from repeating a number of specifically enumerated false and defamatory statements about Mr. Goguen.  On March 6, 2023, the San Mateo Superior Court extended the Restraining Order through to March 6, 2026.  I've attached that Order to this email for your convenience.  Your Complaint is replete with the false claims that the San Mateo Superior Court has explicitly prohibited you from repeating.  Your actions of filing the Complaint and circulating it to third parties is likewise in direct violation of the Restraining Order.  We hereby demand that you dismiss your Complaint, cease and desist circulating it, and that you comply with the Restraining Order entered against you.

Separately, I write to give you formal notice, consistent with Central District Local Rule 7-19, that later today Mr. Goguen will be filing an ex parte application seeking to have your Complaint sealed on the basis that it violates the Restraining Order.  Let us know if you oppose the relief Mr. Goguen will be seeking.

Mr. Goguen expressly reserves all of his legal rights and remedies.

Kyle

**Kyle Batter**
**Quinn Emanuel Urquhart & Sullivan, LLP**

555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
650-801-5134 Direct
650.801.5000 Main Office Number
650.801.5100 FAX
kylebatter@quinnemanuel.com
www.quinnemanuel.com

## Most Feared Law Firm in The World

B T I  based on survey of top legal decision makers at over 300 organizations by leading
independent research provider BTI Consulting Group for its Litigation Outlook 2020 & 2021

NOTICE: The information contained in this e-mail message is intended only for the personal and confidential use of the recipient(s) named above. This message may be an attorney-client communication and/or work product and as such is privileged and confidential. If the reader of this message is not the intended recipient or agent responsible for delivering it to the intended recipient, you are hereby notified that you have received this document in error and that any review, dissemination, distribution, or copying of this message is strictly prohibited. If you have received this communication in error, please notify us immediately by e-mail, and delete the original message.

# Exhibit G

-------- Original message --------
From: Amber B <amberlitigate@gmail.com>
Date: 4/5/23 2:11 AM (GMT-08:00)
To: John Quinn <johnquinn@quinnemanuel.com>, Diane Doolittle <dianedoolittle@quinnemanuel.com>, Bruce Van
Dalsem <brucevandalsem@quinnemanuel.com>, Kyle Batter <kylebatter@quinnemanuel.com>, marosati@wsgr.com,
cbaybay@goodwinlaw.com, lsonsini@wsgr.com, greg@bcllplaw.com, rlatta@wsgr.com, gchacon@goodwinlaw.com,
moritz@sequoiacap.com, Sarah Cork <sarahcork@quinnemanuel.com>, bchase@bisnarchase.com,
info@twobearcapital.com, mike_sitrick@sitrick.com, wmc@sequoiacap.com, mrosati@wsgr.com,
assistant@shermanlawgroup.com, jdankert@bc-llp.com, jcole@nemecek-cole.com, goetz@sequoiacap.com,
mcole@nemecek-cole.com, lcunningham@wsgr.com, William Price <williamprice@quinnemanuel.com>,
leone@sequoiacap.com, early-rb@sequoiacap.com, mfeenberg@nemecek-cole.com, mschaeffer@nemecek-cole.com,
fnemecek@nemecek-cole.com, abrown@daydayandbrown.com, justiceandpeaceforamber@gmail.com,
jscott@nemecek-cole.com, Kathleen Sullivan <kathleensullivan@quinnemanuel.com>, amccusker@goodwinlaw.com,
mbarr@goodwinlaw.com, Michael Lifrak <michaellifrak@quinnemanuel.com>, mmccarthy@nemecek-cole.com
Subject: Depositions and Defendants Interested parties

[EXTERNAL EMAIL from amberlitigate@gmail.com]

This is the rest of the known Defendants by name the rest of the names will be listed upon My internationally protected status being granted

 These names were on the complaint when it converted to a word document something happened.

 I will ask a volunteer to fix it. I am going to ask law students to volunteer because clearly there are zero lawyers in any firm that can be trusted with this matter.

   I am going to interview a volunteer deposition specialist to depose Diane Doolittle. I am not sitting in a room with her. I am not a masochist. All of the questions and exhibits are prepared.

I am taking all of the other depositions when I can. Your Deposition notices will be served next week. You have no option as to dates as there are hundreds of depositions to be taken.

I have made dozens of requests with redundancy for dates for the depositions and no response yet the lawyers are always filing motions to have more hours of deposition time with me. And I was told I only had to go for 8 hours on the record

I do not know what questions you could actually need to ask me. It's very self explanatory.

 I am not going to any more  depositions where I have to sit in the room with the predator and Diane doolittle and their supreme Folie A Deux. The government can ask me questions. I am not going to any more depositions.

You are paying for your own stenographers and videographers as you decided I don't need any money for medical treatment or shelter.

You are not by law allowed to refuse to serve me nor to refuse to meet and confer as everyone decided I don't need legal representation.

I am preparing complaints against everyone in Canada, England, France, Japan, China and the other countries I was trafficked to.

I need to know how many hours everyone will be cross examining Diane Doolittle for in her deposition so I can create a long enough deposition which will continue for at least 5 days
And I will research whether I can sue the Ivy League University who educated her because clearly they need a better ethics program.

I will answer questions on the witness stand. I am not going to be trapped in any building with murderers, rapists or any cruel and inhumane lawyers that merely want to continue to exploit me. I will answer reasonable written discovery pertaining to the issues at hand not millions of questions about did the cork pop when Goguen Poured the champagne that he drugged to rape me. Questions like is rape distressing is litigation distressing are self explanatory. It is evident that one person with no law degree and a very compromised state of health and danger can not answer frivolous questions.

I am not participating in deposing the traffickers The Gang

That is Quinn Emanuel's fault in totality The city official explicitly told them they are aware of their involvement and the second city official in another city explicitly told Quinn Emanuel that since the time Amber was trafficked they have instituted a one month mandatory program that the girls have to take before working so they understand Human Trafficking. The problem was identified shortly after Amb'er paid her debt and ran away from indentured servitude.

All of the Lawyers and Judges who have profited by enriching themselves off of the avails of Ambers Human trafficking have already been made aware that they are the true prostitutes in this case by prostituting their law degrees for blood money.

Vox media
New Your Magazine
The New York Post
The Wall street Journal
Global Legal Chronicle
Linkedin
National post

Daily Mail
Rupert Murdock
The Daily Beast
Donald Trump
National Post
Michael Bloomberg
Vox media
New Your Magazine
The New York Post
The Wall Street Journal
Global Legal Chronicle
Estate of David Flechheimer
Chris Reynolds
Estate of Jeffery Epstein
Linkedin
National post
The Daily Mail
Rupert Murdock
The Daily Beast
The Mirror
Donald Trump
National Post
Michael Bloomberg
Bloomberg Media
Harvey Weinstein
Blomberg companies
Spotify
MSN
MLB association PGA Golfers
Cattle barons
Oil Barons
Stock Brokers
Hedge Fund Men
Record Producers
Police that took bribes
Police that looked at Amber naked as a teenager
The US military, The US Navy and whomever else the government buses dropped off at the strip club in their Military and Navy uniforms.
All individuals whose names I can recall will be named as defendants I reserve the right to add all of them and the additional causes of action

You are to preserve all evidence.
Sequoia Capital has all evidence Of Goguen, Doolittle, Quinn Emanuel and Goodwin Procter's Malice on their server.